UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| MYWEBGROCER, INC. | ) |
|       Plaintiff and<br>      Counterclaim Defendant | )<br>)<br>) |
| v. | )    Civil Action No. 5:16-cv-00310-gwc |
| ADLIFE MARKETING &,<br>COMMUNICATIONS CO., INC. | )<br>)<br>) |
|       Defendant and<br>      Counterclaim Plaintiff | )<br>) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STRIKE
AND REQUEST FOR ATTORNEYS' FEES AND COSTS**

Pursuant to 12 V.S.A. § 1041(b) and Local Rule 7(a)(3), Plaintiff MyWebGrocer, Inc. ("MyWebGrocer") hereby responds to Defendant Adlife Marketing & Communications Co.'s ("Adlife") Motion to Strike Pursuant to 12 V.S.A. § 1041 and Request for an Award of Attorneys' Fees and Costs (Doc. No. 34). As explained below, Adlife's motion is fatally defective from both a procedural and merits standpoint. Procedurally the motion is untimely, having been filed long after the statutory deadline passed with no creditable justification. On the merits, the motion inexplicably ignores clear Vermont precedent that governs the threshold Adlife must pass to meet its burden under Vermont's "anti-SLAPP"[1] statute, and fails to meet that burden in any event. Adlife's motion should be DENIED.

---

[1] "SLAPP" stands for "Strategic Lawsuit Against Public Participation." Felis v. Downs Rachlin Martin PLLC, 2015 VT 129, 200 Vt. 465, 468 n. 1, 133 A.3d 836 (2015).

**I.    Relevant Case History**

MyWebGrocer filed this action on **November 18, 2016**, seeking (1) a declaratory judgment that it has not and does not infringe any of Adlife's alleged copyrights and (2) an injunction enjoining Adlife from threatening MyWebGrocer or its customers with infringement litigation. Doc. No. 1. On **December 7, 2016**, MyWebGrocer's counsel served a Notice of Lawsuit and Request to Waive Service on Adlife's counsel, Jack W. Pirozzolo of Sidley Austin LLP's Boston, Massachusetts office. Attorney Pirozzolo executed the Waiver of Service on **December 16, 2016**. Doc. No. 4. Adlife filed an Answer, Affirmative Defenses, and Counterclaim with the Court on **February 6, 2017** through local Vermont counsel Gregory P. Howard of Donovan O'Connor & Dodig, LLP, with Attorney Pirozzolo and Attorney Kenyon D. Colli (also from Sidley Austin LLP) also named in the signature block. Doc. No. 5.

On **February 23, 2017**, MyWebGrocer filed an Amended Complaint (which was served on Adlife's counsel that same day via ECF) that added a count against Adlife for violation of the Vermont Consumer Protection Act ("VCPA") based upon Adlife's dissemination of improper, deceptive, and misleading infringement notices to MyWebGrocer and its retail customers. Doc. No. 10. Adlife filed an Answer, Affirmative Defenses, and Counterclaim on **March 9, 2017** through Attorney Howard, with Attorneys Pirozzolo and Colli named in the signature block. Doc. No. 12. Notably, Adlife did not file a motion to dismiss MyWebGrocer's VCPA claim, nor did it assert as affirmative defenses the Vermont anti-SLAPP statute or the litigation privilege.

On **March 10, 2017**, Attorneys Pirozzolo and Colli moved for admission *pro hac vice*, which motions were granted by the Court on **March 17, 2017**. Doc. Nos. 13-15. The parties then began to work on the discovery schedule and the convening of an early ENE session. On **May 23, 2017**, however, Adlife moved to extend the case schedule for 60 days on the grounds

that it was obtaining new counsel.  Doc. No. 21.  That same day, Attorneys Howard, Pirozzolo, and Colli all moved to withdraw, which motion was denied by the Court on the grounds that new counsel had not yet appeared.  Doc. Nos. 22-23.  On **June 1, 2016**, Attorney Howard moved for admission *pro hac vice* of Attorney Mathew K. Higbee of the Law Office of Higbee & Associates, which motion was granted on **June 5, 2017**.[2]  Doc. Nos. 24 & 26.

Following Attorney Higbee's appearance, the parties continued with written discovery and, on **July 10, 2017**, held an ENE session, which was unsuccessful.  Doc. No. 33.  Discovery between the parties continued afterwards.  Finally, on **August 22, 2017**, Adlife filed the present motion to strike under 12 V.S.A. § 1041, Vermont's anti-SLAPP statute.  Doc. No. 34.  Besides being untimely (as explained below), Adlife's motion violates this Court's Local Rule 83.1(b)(4), which requires that "[a]n attorney admitted *pro hac vice* must remain associated in the action with a member of the Bar of this court at all times" and that "[t]he local attorney must also sign all filings."  Adlife's motion, however, is signed by Attorney Higbee only.  Adlife's local counsel, Attorney Howard, did not sign the motion.  In fact, he is not even named in the signature block or elsewhere.

## II.     Argument

As noted above, Adlife's motion to strike should be denied – and, in fact, is frivolous – on both procedural and substantive grounds.  These issues are discussed in turn below.

### A.     Adlife's Motion Should Be Denied On The Grounds That It Is Untimely Under 12 V.S.A. § 1041(b).

Vermont's anti-SLAPP statute expressly provides that "[a] special motion to strike under this section ***shall be*** filed with the court and served on all parties ***not more than 60 days after the***

---

[2] On **June 21, 2017**, Attorney Howard also moved for admission *pro hac vice* of Attorney Naomi M. Sarega of the Law Office of Higbee & Associates, which motion was granted on **June 22, 2017**.  Doc. Nos. 28-29.

***filing of the complaint*** . . . . The court may extend the time limits of this subsection for good cause shown." 12 V.S.A. § 1041(b) (emphasis added). The operative complaint in this case is MyWebGrocer's Amended Complaint, which was filed on February 23, 2017 and served on Adlife via ECF that same day. Adlife did not file its motion to strike, however, until August 22, 2017 – **<u>180 days after</u>** the Amended Complaint was filed and served, or **<u>three times</u>** the statutory deadline. The motion therefore is not just untimely, it is extremely untimely.

In an effort to escape this fatal procedural defect, Adlife turns to the statute's language providing that the 60-day filing deadline can be extended by the Court "for good cause shown." Notably, Adlife is seeking to extend this deadline ***after it has already long passed***, which typically requires a higher burden ("excusable neglect") than simply "good cause." <u>Cf.</u> Fed. R. Civ. P. 6(b)(1)(B). But even applying a "good cause" standard, Adlife's proffered reasons for why good cause exists to allow its very belated motion ring hollow.

First, Adlife points out that it had different counsel when it first appeared in February 2017. This observation is meaningless. Aside from the fact that Adlife had the same local Vermont counsel in February 2017 as it has today (Attorney Howard – who would be presumed to be familiar with Vermont law), Adlife also had two highly competent attorneys (Attorneys Pirozzolo and Colli) from Sidley Austin, LLP, one of the top ten largest law firms in the country, as outside counsel. At the time MyWebGrocer filed and served its Amended Complaint (February 23, 2017), Attorneys Howard, Pirozzolo, and Colli were more than capable of assessing the VCPA claim and determining whether to move to strike under 12 V.S.A. § 1041, but they chose not to. Instead, these same counsel answered the Amended Complaint on Adlife's behalf on March 9, 2017, without even seeking to dismiss the VCPA claim under Rule 12(b)(6).

Second, Adlife's replacement of Attorneys Pirozzolo and Colli with Attorney Higbee as outside counsel on June 1, 2016 (with *pro hac vice* admission granted on June 5) did not change the equation. The 60-day deadline under 12 V.S.A. § 1041(b) was already **38 days past its expiration**. And even after Attorney Higbee was admitted, Adlife still did not act within 60 days, and instead waited **another 78 days** to file its motion to strike.[3]

Third, Adlife explains that the ENE session was held on July 10, 2017 and that "Adlife and its counsel felt that is would have been counterproductive to any ongoing settlement efforts and reduced the likelihood of a settlement at the scheduled ENE session if Adlife filed an anti-SLAPP motion to strike prior to the ENE session." Def. Mot. to Strike (Doc. No. 34-1) at 4. But this personal decision by Adlife to hold off on the motion prior to the ENE session was a risk they were free to take, and did take, at their own peril.[4] Adlife's subjective decision to delay was completely within its control, a factor that weighs against a "good cause" argument for an extension. Cf. George v. Prof. Disposables Int'l, Inc., 221 F. Supp.3d 428, 432 (S.D.N.Y. 2016) (good cause is found only if need for extension arises from circumstances beyond party's control); Tummino v. Hamburg, 260 F.R.D. 27, 38 (E.D.N.Y. 2009) (quoting Myers v. New York City Human Rights Comm'n, No. 04 Civ. 00543(JCF), 2006 WL 2053317, at *1 (S.D.N.Y. Jul. 21, 2006)) ("the good cause standard may be invoked where the cause for missing the deadline was entirely beyond the control of the moving party").

---

[3] Adlife notes that it filed a motion to extend the discovery schedule by 60 days, which the Court granted on June 15, 2017. As explained below, this has no bearing on the timeliness of Adlife's motion to strike.

[4] Typically, parties will try to get dispositive motions on file *in advance of* a mediation in order to create settlement leverage. Moreover, if Adlife had actually been concerned about actions that were counterproductive to ongoing settlement efforts, it would not have elected to serve discovery requests prior to the ENE session, which was counter to the parties' prior agreement to hold off on discovery until after the ENE session.

Fourth, Adlife explains that both it and its counsel again "felt" that waiting to file the motion until after more discovery had occurred "would have equipped Adlife with better and more sufficient evidence to prepare a proper anti-SLAPP motion to strike." Doc. No. 34-1 at 4-5. This argument is flawed on multiple levels:

- The statute does not provide any basis for delaying the filing of a motion to strike until after additional discovery. Instead, the statute only contemplates additional discovery *after* the filing of the motion "for the purpose of assisting [the Court's] decision on the special motion to strike." 12 V.S.A. § 1041(c)(1)(2). If Adlife's position were to be credited, then any defendant seeking to file a motion to strike could hold off as long as it wanted until it "felt" that it had enough discovery in hand. That would swallow up the 60-day deadline provision in the statute and render it meaningless.

- Allowing the moving party to wait for more discovery before proceeding with a motion to strike ignores that party's burden, which is to show that the "action aris[es] from the defendant's exercise, in connection with a public issue, of the right to freedom of speech or to petition the government for redress of grievances under the U.S. or Vermont Constitution." 12 V.S.A. § 1041(a). That burden, however, necessarily can be met with evidence entirely in the moving party's possession – it is not dependent on discovery from the opposing party. The critical issues are (a) the nature and basis for the moving party's exercise of its rights and (b) the fact that the opposing party has brought suit against that exercise, both of which the moving party already knows as of the filing of the complaint. Notably, nothing in Adlife's discussion of how it meets its burden (see Section C of the motion) relies upon information received in discovery from MyWebGrocer; the focus is solely on the allegations in the First Amended Complaint.

Finally, Adlife points out that waiting for more discovery before filing would "provid[e] the Court with more relevant evidence to assist the Court in making an informed decision on the motion." Doc. No. 34-1 at 5. But as noted above, the statute already contains a mechanism for this very purpose: *after the motion to strike has been filed*, the Court can order limited discovery to assist it in deciding the motion. 12 V.S.A. § 1041(c)(1)(2).

As the above discussion demonstrates, Adlife's motion to strike is frivolous on procedural grounds. Adlife did not just "miss" the 60-day deadline; it annihilated the deadline by filing its motion 180 days after MyWebGrocer's filing and service of the Amended

- 6 -

Complaint. Moreover, Adlife has not offered, nor can it offer, a legally or factually supportable justification for why this Court should extend the deadline – after it has already expired, no less – by 120 days.

### B. Adlife's Motion Should Be Denied On The Grounds That It Ignores Controlling Vermont Precedent, Under Which Adlife's Actions And The Basis For Adlife's Motion Fall Outside The Scope Of 12 V.S.A. § 1041.

In addition to failing on procedural grounds, Adlife's anti-SLAPP motion fails on the merits. As explained below, the motion is supported solely with case law premised on California's interpretation of that state's own anti-SLAPP statute, which interpretation has been soundly rejected by the Vermont Supreme Court – well prior to the filing of Adlife's motion. Not only does Adlife's motion fail to meet Vermont's specific legal basis for an anti-SLAPP motion, it neglects to even mention that basis.

#### 1. The Vermont Supreme Court Has Narrowly Interpreted The Vermont Anti-SLAPP Statute.

Early in its motion, Adlife states the legal framework it contends the Court must apply as follows:

> Like any federal case that calls for the application of Vermont law, it is the role of the federal district court to apply the Vermont anti-SLAPP statute as the Vermont Supreme Court would apply it. *See Morse v. University of Vermont*, 776 F. Supp. 844, 850 (D. Vt. 1991). **As the Vermont Supreme Court has not interpreted the state anti-SLAPP statute**, "this court may look to any sources on which the state's highest court might rely in order to determine what that court may decide." *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 71 (2d Cir. 2000). "In this case, those sources include the text of the statute itself and persuasive authority from California, which has an anti-SLAPP statute that protects a similarly broad range of activity by defendants." *Ernst v. Kauffman*, 50 F. Supp.3d 553, 559 (D. Vt. 2014).

Doc. No. 34-1 at 3 (bold/underline emphasis added). In fact, Adlife repeats this framework two more times in its motion. Id. at 6 ("As previously noted, **the Vermont Supreme Court has not**

**interpreted [12 V.S.A.] § 1041**, and federal district courts applying the anti-SLAPP statute have looked [to] the substantively analogous California anti-SLAPP statute 'that protects a similarly broad range of activity by defendants.' *Ernst v. Kauffman*, 50 F. Supp.3d 553, 559 (D. Vt. 2014).") (bold/underline emphasis added); id. at 12 (repeating entire paragraph quoted above nearly word for word).

Adlife's recitation of the legal framework would have been correct two or more years ago, following decisions from this Court such as Ernst v. Kauffman. However, on October 16, 2015, the Vermont Supreme Court issued a lengthy opinion in Felis v. Downs Rachlin Martin PLLC, 2015 VT 129, 200 Vt. 465, 133 A.3d 836 (2015) that ***changed everything***. Directly contrary to Adlife's unequivocal statement – in three places in its motion – that "the Vermont Supreme Court has not interpreted 12 V.S.A. § 1041," the Vermont Supreme Court interpreted the statute to great length in Felis. Inexplicably, Adlife's motion is completely silent on this major legal development in Vermont concerning the state's anti-SLAPP statute. Even more unbelievable is the fact that Adlife actually cites the Felis case in its motion (on page 3) to support its statement of MyWebGrocer's burden of proof under the statute, but then never mentions the case, its holding, or its substantial implications for Adlife's motion. Not once. The bottom line is that Adlife knew about Felis but either (a) never bothered to read the case in full, or (b) read the case but then deliberately decided to ignore it because it makes clear that Adlife's anti-SLAPP motion is meritless.

The Felis case arose out of divorce proceeding between the plaintiff (Mr. Felis) and his ex-wife, in which defendant Downs Rachlin Martin ("DRM") represented the ex-wife and defendant Gallagher Flynn & Company ("GFC") was hired by DRM to perform business valuations. 200 Vt. at 468. The plaintiff sued DRM and GFC for fraud and breach of fiduciary

duty, claiming that in the divorce proceeding DRM engaged in protracted and vexatious litigation and presented false evidence, and that GFC gave false expert testimony to influence the court to improperly value the plaintiff's business assets in favor of his ex-wife. Id. at 468-70. Of relevance to the present case, GFC moved to strike under 12 V.S.A. § 1041 and also moved to dismiss on witness immunity grounds. Id. at 470. The trial court granted GFC's motion to dismiss and therefore concluded that its § 1041 motion to strike was moot. Id. at 471. Plaintiff appealed on several grounds, and GFC cross-appealed on the issues that (1) its motion to strike was not moot because it was still entitled to attorneys' fees and (2) its testimony was protected under § 1041.

On appeal, the Vermont Supreme Court first held that GFC's motion to strike was not moot, on the grounds that GFS was still entitled to a ruling on its anti-SLAPP motion and, if successful on that motion, to an award of attorneys' fees. Id. at 478. The Court then explained that "[t]he issue before us turns on whether plaintiff's action is a SLAPP suit, as defined under § 1041. This requires that we determine the meaning of the language contained in § 1041(a) . . . . This language is further defined in § 1041(i), and the interplay between subsections (a) and (i) is at the heart of the question before us."[5] Id. at 482. To tackle this issue, the Court first looked at

---

[5] Section 1041(i) of Vermont's anti-SLAPP statute provides that the conduct set forth by § 1041(a), and therefore covered under the statute, includes:

> (1) any written or oral statement made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;
> (2) any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other proceeding authorized by law;
> (3) any written or oral statement concerning an issue of public interest made in a public forum or a place open to the public; or
> (4) any other statement or conduct concerning a public issue or an issue of public interest which furthers the exercise of the constitutional right of freedom of speech or the constitutional right to petition the government for redress of grievances.

Felis, 200 Vt. at 482 (quoting § 1041(i)). Adlife appears to be relying upon items (2) and (4) above in its motion to strike.

the legislative background to Vermont's anti-SLAPP statute and identified two particular areas of focus for the statute that became evident in legislative hearings and reports:

> (1) First, the Court observed "the importance of protecting free speech in matters of 'public interest and government decisionmaking,' particularly in areas of land use and zoning, permitting and regulatory matters affecting communities, and public health and quality of life. As explained, 'when [citizens] participate [in such matters], they are subject to suit by parties opposed to their interests in public participation.' In this way, parties with financial means are able to use litigation to intimidate others into silence." Id. at 479-80 (quoting Hearing on S. 103 before Senate Judiciary Committee, 2005–2006 Bien. Sess. (Vt. Mar. 2, 2006)) (internal citations omitted).
>
> (2) Second, the Court recognized that SLAPP lawsuits "are lawsuits filed in response to or in retaliation for citizen communication with government entities or employees. People have been sued for testifying before their city councils, zoning commissions, and school boards and for reporting violations of environmental laws to regulatory agencies. SLAPP suits are intimidating, punishing and expensive for ordinary citizens to fight . . . . The objective of this bill is to help protect Vermonters' First Amendment rights and to prevent the misuse of the courts as a vehicle to punish people for expressing their opinions on issues of public interest." Id. at 480 (quoting Report to the House on S. 103 SLAPP–Suit Bill, at 1 (Apr. 11, 2006)).

The Court also reported an incident that it characterized as "the paradigm for the legislation":

> [Twelve] Barnard residents, the zoning board, and others were targets of a suit brought by a new land owner whose property development projects were impacting a public right of way. The residents signed a petition with Barnard's zoning board of adjustment appealing the landowner's permit. A retaliatory suit was served on those Barnard citizens on Christmas Eve. The right to petition is expressly recognized under Vermont law. Nevertheless, these residents decided to "cut their loses" and settle the case on terms dictated by the plaintiffs. They simple [sic] couldn't afford to pay the enormous costs of defending/litigating their constitutional rights.

Id. at 480 n. 9 (quoting Report to the House on S. 103, at 1).

Against this backdrop, the Court in Felis then carefully analyzed and interpreted 12 V.S.A. § 1041, ultimately concluding that Vermont's anti-SLAPP statute requires ***all*** actions sought to be protected – whether falling under §§ 1041(i)(1), (2), (3), or (4) – to be "in connection with a public issue." Id. at 483. In so concluding, the Court rejected the

- 10 -

interpretation adopted in California (and initially by this Court in Ernst[6]) that all actions taken in connection with judicial proceedings "inherently" concern a public issue. Specifically, the Court rejected the California Supreme Court's reasoning and holding in Briggs v. Eden Council for Hope & Opportunity, 19 Cal.4th 1106, 81 Cal. Rptr.2d 471, 969 P.2d 564 (1999) – a case specifically relied upon by Adlife in its motion to strike for the proposition that Vermont's anti-SLAPP statute "necessarily applies to pre-litigation activities" (including Adlife's infringement notice letters). Doc. No. 34-1 at 12-13. The Court first pointed out that "the California construction is inconsistent with the language of [§ 1041(a)], which governs the scope of the statute generally and requires the defendant's exercise of constitutional rights be in connection with a public issue." Felis, 200 Vt. at 484. The Court further explained that Briggs "concluded that the legislative intent was to protect 'all direct petitioning of governmental bodies (including . . . courts and administrative agencies) and petition-related statements and writings,' regardless of the subject matter." Id. at 486 (quoting Briggs, 969 P.2d at 574). Finally, the Court acknowledged viewpoints raised by the dissent in Briggs, namely that the majority's interpretation "will allow the use of the extraordinary remedy 'in a great number of cases to which it was never intended to apply.'" Id. (quoting Briggs, 969 P.2d at 576 (Baxter, J., dissenting)). The Vermont Supreme Court culminated its discussion of Briggs as follows:

> On the legislative history and public policy points integral to the *Briggs* decision, **the Vermont context and experience is very different. We conclude that this difference is sufficient to overcome the presumption that the Vermont Legislature adopted the California statutory provision as interpreted by**

---

[6] In its initial decision in Ernst, this Court granted certain anti-SLAPP motions filed by the defendants, following California case law in the absence of controlling Vermont precedent. After the decision in Felis, however, this Court granted the plaintiffs' motion for reconsideration in the Ernst case and denied the previously-granted motions to strike. In reversing its earlier rulings, this Court recognized Vermont's clear departure from the California anti-SLAPP interpretation, explaining that "[a] legal dispute does not become a matter of public interest just because it involves a case in court or a proceeding before a municipal body." Ernst v. Kauffman, Case No. 5:14-cv-59, 2016 WL 1610608, at *5 (D. Vt. Apr. 20, 2016).

- 11 -

> ***Briggs***. *See Giguere*, 107 Vt. at 157–58, 177 A. at 316 (presumption that Legislature adopted construction is rebuttable). As we set out above, *supra,* ¶ 29, the Legislature made two findings that explain its intent in enacting the anti-SLAPP statute. The first finding addresses the increase in lawsuits brought to chill free speech and petitioning rights. The second states that "[i]t is in the public interest to encourage continued participation *in matters of public significance,* and this participation should not be chilled through abuse of the judicial process." 2005, No. 134, § 1 (emphasis added).
>
> The findings reflect the broader national concerns that fueled the development of anti-SLAPP legislation. Anti–SLAPP legislation emerged in the 1990s after legal scholars brought to light the "growing legal risk for ordinary citizens who speak up on community political issues," G. Pring, *SLAPPs: Strategic Lawsuits Against Public Participation*, 7 Pace Envtl. L. Rev. 3, 8 (1989) . . . . The concern of Pring and other commentators was the power differential inherent between citizens engaged in political participation and the entities that use their financial resources to intimidate and silence these citizen activists. *Id.* at 7 . . . .
>
> . . . .
>
> We also believe that the public policy analysis in *Briggs* turned out to be wishful thinking that did not predict the result of that decision. **Although the establishment of a bright line rule may have simplified the issues in some litigation, it nevertheless dramatically increased the use of the anti-SLAPP remedy in suits far afield from the SLAPP suit paradigm, as feared by the dissent**. *See Briggs*, 81 Cal. Rptr.2d 471, 969 P.2d at 579 (Baxter, J., dissenting) (observing that majority holding "expands the definition of a SLAPP suit to include a potentially huge number of cases"). Indeed, California's statute has been invoked in thousands of cases on a broad range of legal issues and **filing a motion under the statute has become almost a matter of course**. Since its inception in 1992, California's statute has been cited in nearly 5000 appellate court decisions, almost all of them post-dating the 1997 amendment, and *Briggs* has been cited nearly 1000 times. . . .

Id. at 486-88 (bold/underline emphasis added).

In the end, the Vermont Supreme Court's response to California's substantially broad interpretation and application of the anti-SLAPP statute was to go strongly in the opposite direction:

> Ordinarily, we would give remedial legislation, like the anti-SLAPP statute, a liberal construction. *See Raynes v. Rogers*, 2008 VT 52, ¶ 15, 183 Vt. 513, 955 A.2d 1135. Here, however, the statute is attempting to define the proper intersection between two constitutional rights—a defendant's right to free speech and petition and a plaintiff's right to petition and free access to the courts. *See Duracraft Corp. v. Holmes Prods. Corp.*, 427 Mass. 156, 691 N.E.2d 935, 943 (1998) ("By protecting one party's exercise of its right of petition, unless it can be shown to be sham petitioning, the statute impinges on the adverse party's exercise of its right to petition, even when it is not engaged in sham petitioning."). As the Massachusetts court noted in *Duracraft*, "[t]his conundrum is what has troubled judges and bedeviled the statute's application." *Id.* **We are convinced that in this circumstance an overly broad interpretation of the statute would be inappropriate**. Indeed, we join the Rhode Island Supreme Court in concluding that **the anti-SLAPP statute should be construed as limited in scope and that great caution should be exercised in its interpretation**. *See Sisto v. Am. Condo. Ass'n*, 68 A.3d 603, 615 (R.I. 2013).
>
> . . . .
>
> The *Briggs* ruling is not the only source of the vast expansion of anti-SLAPP motions in California, although it is a substantial cause of that expansion . . . . It is fair to say, however, **that there is no evidence that the Vermont Legislature intended, or even foresaw, the expansive use of the anti-SLAPP remedy in circumstances far afield from the paradigm on which the statute was based**. One way to reduce overuse of the remedy is to enforce the requirement of § 1041(a) that a defendant's exercise of constitutional rights be in connection with a matter of public issue, as the legislative history demonstrates the Legislature intended.
>
> We conclude that the "in connection with a public issue" requirement of 12 V.S.A. § 1041(a) must be met in any motion to strike under the anti-SLAPP statute, regardless of the type of activity. **We reach this result as a matter of statutory interpretation in order to implement the intent of the Legislature in adopting the anti-SLAPP remedy and keeping**

> **that remedy within the bounds of the paradigm on which it was based**.

Id. at 485, 489-90 (bold/underline emphasis added).

In its sole decision applying the Vermont anti-SLAPP statute since Felis, the Vermont Supreme Court affirmed an order striking the plaintiff's complaint, which was aimed at the defendants' writing and publishing of a newspaper article concerning allegations of public corruption – specifically, a county sheriff seeking "protection money" from local businesses – and the investigation and criminal charges that resulted from those allegations. See Chandler v. Rutland Herald Publ'g, No. 2015-265, 2015 WL 7628687 (Vt. Nov. 2015) (unpub. mem.). The Court found that "[a]llegations of public corruption clearly present a matter of public interest, as do the results of an investigation into such allegations, including criminal charges being lodged against the person who made the allegations. The fact that [plaintiff] had another pending criminal charge that involved public officers also presented a matter of public interest." 2015 WL 7628687, at *2. The Court further observed that "[s]peech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Id. (quoting Lane v. Franks, ___U.S. ___, 134 S. Ct. 2369, 2380, 189 L. Ed.2d 312 (2014)).

### 2. The Vermont Anti-SLAPP Statute, As Interpreted By The Vermont Supreme Court, Does Not Apply To The Issues Raised In Adlife's Motion.

As explained above, in order for a statement or action to be protected under Vermont's anti-SLAPP statute, it must (1) be "in connection with a matter of public issue" and (2) fall "within the bounds of the paradigm on which [the anti-SLAPP remedy] was based." Felis, 200 Vt. at 489-90. But rather than properly analyzing the issue under Felis (or even acknowledging

Felis), Adlife argues that it has met its burden under 12 V.S.A. §§ 1041(a) and (i) by application of the overly broad – *and inapplicable* – California interpretations established by Briggs and the cases that followed it, without any consideration for whether its position comports with Vermont's narrow and focused application of the statute. The crux of Adlife's position is that "[u]nder the analogous California statute, a pre-litigation communication that is made in connection with litigation that is contemplated in good faith arises out of protected activity for the purposes of the anti-SLAPP statute." Doc. No. 34-1 at 2, 6 (citing Neville v. Chudacoff, 160 Cal. App.4th 1255, 1262-63, 73 Cal. Rptr.3d 383 (2008)). Adlife also quotes from Malin v. Singer, 217 Cal. App.4th 1283, 159 Cal. Rptr.3d 292 (2013) for the same proposition, i.e., that a pre-litigation demand letter "logically connected to litigation that was contemplated in good faith and under serious consideration" is protected under anti-SLAPP. Id. at 6-7. Notably, however, both Neville and Malin follow the holding and statutory interpretation from Briggs, and therefore these cases are of little to no value.

Adlife correctly observes that MyWebGrocer's VCPA claim arises from Adlife's sending of unfair and deceptive copyright infringement notices. From this, however, Adlife resorts to a handful of conclusory points to establish its initial statutory burden. Relying solely upon California law, Adlife proclaims that "it is abundantly evident that Plaintiff's claims are based on Adlife's exercise of protected actions or activities under Vermont's anti-SLAPP statute." Id. at 7. And that "[t]he copyright infringement notices on which Plaintiff's claim is based were clearly related to Adlife's exercise of Adlife's right to 'petition the government for redress of grievances.'" Id. at 8. And that "[a]sserting one's right to payment for copyright infringement against actual or reasonably perceived acts of infringement, and the option to seek federal court

action, are all protected activities directly relating to one's exercise of his or her right to petition and seek redress for grievances from the government." Id. at 8-9.

However, Adlife does not explain how its sending of unfair and deceptive copyright infringement notices was "in connection with a matter of public issue" – ***as that element is narrowly interpreted by the Vermont Supreme Court*** – and how its infringement notices meet the specific paradigm underlying Vermont's anti-SLAPP statute. This is because Adlife cannot do so. Adlife's infringement notices (along with any litigation it may have been contemplating) amount to nothing more than a private party communicating with other private parties about a copyright dispute over food images between those particular parties. In fact, as Adlife itself expressly recognizes, "the copyright infringement notices that Adlife sent to Plaintiff's retail customers were nothing more than standard pre-litigation demands that potential litigants send to each other every day for perceived legal harms and liabilities" – i.e., they were all just "routine." Id. at 8. This is not a matter of public issue or public concern. This does not amount to "participation in matters of public significance" or "citizen communication with government entities or employees" or "punish[ing] people for expressing their opinions on issues of public interest." Felis, 200 Vt. at 479-80 (quoting Vermont legislative history). It simply is a private grievance of concern to Adlife.[7] The fact that Adlife's activities might have been in connection with potential future litigation does not – ***under Vermont law, as opposed to California law*** – transform this grievance into a public issue.

The holding in Felis on the merits of GFC's anti-SLAPP motion is instructive. The issue in Felis concerned actual testimony in the divorce lawsuit itself – undoubtedly statements "made

---

[7] Importantly, MyWebGrocer's VCPA claim is not based on a position that an owner of intellectual property cannot, under any circumstances, send infringement notices or threaten litigation. Rather, the claim is directed specifically at *Adlife's* oppressive, misleading, and bullying tactics.

- 16 -

before a . . . judicial proceeding" and "in connection with an issue under consideration or review by a . . . judicial body" – rather than mere pre-litigation infringement notice letters as in the present case. Even so, the fact that the divorce proceeding concerned a private dispute between private parties, and not a dispute akin to the paradigm underlying the Vermont anti-SLAPP statute, meant that the "public issue" element was missing.[8] The private dispute raised by Adlife's anti-SLAPP motion is no different. It certainly does not "relat[e] to any matter of political, social, or other concern to the community," nor is it "a subject of general interest and of value and concern to the public." Chandler, 2015 WL 7628687, at *2.

In view of the fact that Adlife's motion to strike (a) seeks protection under the Vermont anti-SLAPP statute for a matter that clearly falls outside the bounds of the statute as interpreted by the Vermont Supreme Court, and (b) completely ignores the controlling Vermont precedent outlining such interpretation, Adlife's motion is frivolous on substantive grounds.

> **3. If The Court Determines That Adlife's Motion To Strike Is Not Untimely And That Adlife Has Met Its Initial Burden To Show That The Vermont Anti-SLAPP Statute Applies, MyWebGrocer Requests Additional Time For Discovery Regarding Adlife's Infringement Notices.**

Vermont's anti-SLAPP statute requires that once the defendant has met its initial burden, the plaintiff must show (a) that the defendant's exercise of the right to freedom of speech and to petition was devoid of any reasonable factual support and any arguable basis in law, and (b) that the plaintiff suffered actual injury. 12 V.S.A. § 1041(e). For the reasons discussed at length above, MyWebGrocer submits that Adlife has not and cannot meet its burden and that, in any event, Adlife's motion fails because it is untimely.

---

[8] In further distancing Vermont's narrow anti-SLAPP interpretation from California's overly broad one, the Court in Felis noted that California courts have even applied the California statute in divorce cases. See 200 Vt. at 488.

If the Court disagrees, however, then MyWebGrocer respectfully requests the opportunity to engage in further discovery concerning Adlife's activities that are the subject of MyWebGrocer's VCPA claim, following which MyWebGrocer will file a supplemental memorandum with the Court addressing the § 1041(e) elements. Good cause exists for this request because, although MyWebGrocer has already propounded written discovery to Adlife concerning such activities, MyWebGrocer has now reviewed Adlife's responses and determined that they are not complete. Because the requested discovery concerns information that is only in Adlife's possession, such discovery is necessary to allow MyWebGrocer a fair opportunity to meet its burden. The requested discovery also will serve the purpose of "assisting [the Court's] decision on the special motion to strike," and therefore is warranted under 12 V.S.A. § 1041(c)(2).

### III.     Conclusion

WHEREFORE, for the foregoing reasons, MyWebGrocer respectfully requests that this Court DENY Adlife's Motion to Strike Pursuant to 12 V.S.A. § 1041 and Request for an Award of Attorneys' Fees and Costs. MyWebGrocer also respectfully requests that this Court determine that Adlife's motion is frivolous and, accordingly, that this Court award costs and reasonable attorneys' fees to MyWebGrocer pursuant to 12 V.S.A. § 1041(f)(1).

Dated at Burlington, Vermont this 31st day of August, 2017.

MYWEBGROCER, INC.

  /s/ Matthew S. Borick
Cathleen E. Stadecker
Matthew S. Borick
Downs Rachlin Martin PLLC
199 Main Street
P.O. Box 190
Burlington, VT 05402-0190
Telephone: 802-863-2375
Fax: 802-862-7512
cstadecker@drm.com
mborick@drm.com

Attorneys For MyWebGrocer, Inc.

# CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2017, I filed the foregoing document with the Clerk of Court via the CM/ECF system, which will provide notice of such filing to the following NEF counsel:

    Gregory P. Howard, Esq., ghoward@docatty.com, jnn@docatty.com

I further certify that a copy of the filed document was served by electronic mail on the following non-NEF counsel:

    Mathew K. Higbee, Esq.
    Naomi M. Sarega, Esq.


        /s/ Matthew S. Borick
    Matthew S. Borick

17735077.3