# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF VERMONT

MYWEBGROCER, INC.                              )
                                               )
        Plaintiff and                        )
        Counterclaim Defendant               )
                                               )
    v.                                       )          Civil Action No. 5:16-cv-00310-gwc
                                               )
ADLIFE MARKETING &,                            )
COMMUNICATIONS CO., INC.                       )
                                               )
        Defendant and                        )
        Counterclaim Plaintiff               )
_____        )

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON LIABILITY FOR COPYRIGHT INFRINGEMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, Plaintiff MyWebGrocer, Inc.

("MyWebGrocer") hereby moves for partial summary judgment on the issue of liability as it

pertains to the copyright infringement claims in this litigation – specifically, Count I

("Declaratory Judgment of No Copyright Infringement") of MyWebGrocer's Amended

Complaint (ECF 10) and the First Cause of Action ("Copyright Infringement") of Adlife

Marketing & Communications Co.'s ("Adlife") Amended Counterclaim (ECF 47).  For the

reasons set forth herein, MyWebGrocer's motion should be granted.

## MEMORANDUM OF LAW

## I.    INTRODUCTION

MyWebGrocer provides software services to its retail grocery store customers that

consist of (a) building and maintaining e-commerce websites, (b) providing digital circular

services, and/or (c) building WordPress websites for customers.  SUMF ¶ 1.[1]  MyWebGrocer has

---

[1] "SUMF" refers to MyWebGrocer's Statement of Undisputed Material Facts, filed concurrently herewith.

its own product library/database that contains information (e.g., descriptions, ingredients, nutrition facts) on more than one million products, some of which have images associated with them.  Id. ¶ 2.  MyWebGrocer has obtained the images that are included in its product library from consumer packaged goods companies/manufacturers pursuant to written authorizations, from third-party image providers (e.g., iStock, Multi-Ad/Kwikee, ItemMaster) pursuant to license agreements, and from industry groups (e.g., National Cattlemen's Beef Association) that provide images they own.  Id. ¶ 3.

MyWebGrocer's retail grocery store customers use MyWebGrocer's product library primarily in connection with e-commerce websites and recipe pages on websites.  Id. ¶ 4.  MyWebGrocer does not provide images for circular content on customer websites; such images are provided solely by the customer.  Id. ¶ 9.[2]  For WordPress websites built by MyWebGrocer for its retail grocery store customers, the website is controlled solely by the customer.  Id. ¶ 11.  Based upon (a) its own sourcing of images for its product library, (b) the representations and warranties of its customers concerning images they provide, and (c) the fact that it does not illegally download unlicensed or unauthorized images, MyWebGrocer at all times believes that all images it displays or provides for display on customer websites do not infringe the intellectual property rights of third parties.  Id. ¶ 16.

Notwithstanding these sound business practices, beginning in or about July 2016, Adlife began accusing MyWebGrocer of infringing copyrights allegedly owned by Adlife in various

---

[2] With respect to images MyWebGrocer receives from its retail grocery store customers for display on those customers' websites, the customer represents and warrants to MyWebGrocer, through its master services agreement, that it has obtained all necessary rights for the display of the image and that such display will not infringe upon the intellectual property rights of any third parties.  SUMF ¶ 13.  MyWebGrocer does not add images provided by its retail grocery store customers to its product library, nor does it display such images for any other customers.  Id. ¶ 14.  Also, MyWebGrocer does not illegally download unlicensed or unauthorized images from the Internet or any other source.  Id. ¶ 15.

prepared or raw food images (identified below).[3]  After receiving notice of the alleged

infringement and despite having rights to use several of the images or otherwise reasonably

believing the use at issue was duly authorized, MyWebGrocer promptly and in good faith

removed the images from its product library and/or from the customer website(s) where they

were displayed.  Id. ¶¶ 26, 34, 47, 58, 71, 84, 96.

MyWebGrocer filed this action on November 18, 2016, and later amended its Complaint

on February 23, 2017, seeking a declaratory judgment of non-infringement of Adlife's alleged

copyrights.[4]  ECF 1 & 10.  In response, Adlife filed an Answer, Affirmative Defenses, and

Counterclaim on February 6, 2017, and subsequently amended the same on March 9, 2017 and

January 31, 2018, claiming that that MyWebGrocer has infringed Adlife's alleged copyrights.

ECF 5, 12 & 47.  The five food images at issue in MyWebGrocer's declaratory judgment claim

are those identified by Adlife as "BeefBrisket001," "SandwichTunaSalad001,"

"WrapTurkeyHam001," "SausagePasta001," and "PorkRibBabyBack006."  The latter three

images are also at issue in Adlife's infringement counterclaim, along with two other images

("MangosHR0612," and "CherryBing006_ADL").  For the remainder of this motion, these seven

(7) images are referred to collectively as the "Accused Images."[5]

---

[3] As explained below, the Accused Images at issue in this case are wholly unoriginal photographic images of
prepared and raw foods, which were allegedly created between 11 and 22 years prior to any registration with the
Copyright Office.  Having previously licensed its food images widely via iStock and Multi-Ad, Adlife apparently
decided sometime in 2016 to rescind those licenses (effective in 2017) and focus instead on extracting settlements
from third parties (including licensees) based on allegations of willful copyright infringement and threats of
litigation.  As part of this program, starting in or about August 2016, Adlife began retroactively registering groups of
food photographs—totaling well into the thousands— in its name with the Copyright Office.

[4] MyWebGrocer also brought a claim for injunctive relief and damages for Adlife's violation of the Vermont
Consumer Protection Act, 9 V.S.A. §§ 2451 et seq., through unfair and deceptive business practices.  That claim is
not addressed in this motion.

[5] In its counterclaim, Adlife has elected *not* to make any claim for infringement and damages with respect to the
"BeefBrisket001" and "SandwichTunaSalad001" images.  Those images are included only in MyWebGrocer's
declaratory judgment claim.

MyWebGrocer now seeks summary judgment on the issue of liability for copyright infringement.  As demonstrated below, MyWebGrocer is entitled to summary judgment on Adlife's copyright infringement claims because (1) the Accused Images at issue are not sufficiently original to warrant copyright protection, (2) Adlife cannot establish ownership of the Accused Images, and (3) the alleged uses of several of the Accused Images in this case were licensed, or otherwise not a violation by MyWebGrocer.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The record evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences drawn in his or her favor.  GEICO Gen. Ins. Co. v. Dowd, No. 2:12-cv-40, 2012 WL 6597685, at *2 (D. Vt. Dec. 18, 2012) (citing Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)).  "However, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."  Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

"By its very terms, [the summary judgment] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  U.S. v. Sullivan, No. 2:12-CV-72, 2013 WL 709222, at *5 (D. Vt. Feb. 27, 2013) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis added in Sullivan)); Rojas v. The Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (per curiam) ("mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient").  An issue of fact is material if it "might affect the outcome of the suit under the

governing law.  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000); Rojas, 660 F.3d at 104 ("In weighing the evidence on a motion for summary judgment, 'the judge must ask . . . not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented.'").

Also, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" and "must come forward with specific facts showing that there is a genuine issue for trial."  Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002).  The non-moving party may not rest on the pleadings but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

"Summary Judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."  Id. at 327 (internal quotations omitted).  Moreover, the central purpose of summary judgment is to avoid a useless trial by isolating and disposing of factually unsupported claims or defenses, and the Rule should be interpreted in a way that allows it to accomplish this purpose.  See id. at 323-24.

## III.   ARGUMENT

To establish liability for a copyright infringement claim, "two elements must be proven: (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original."  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)  In this case, Adlife cannot establish that the Accused Images possess the requisite degree of originality to be

eligible for copyright protection, nor can Adlife meet its burden to prove that it owns valid copyrights in any of the Accused Images.  Moreover, for several of the Accused Images, MyWebGrocer's use was licensed, and in two other cases MyWebGrocer did not display the Accused Image.  On multiple bases, MyWebGrocer is entitled to judgment as a matter of law.

A.    **No Reasonable Jury Could Conclude That the Accused Images Are "Original" Within the Meaning of the Copyright Act.**

MyWebGrocer is entitled to judgment as a matter of law in this case because the Accused Images lack any originality and are thus ineligible for copyright protection.  To establish the validity of its copyrights, Adlife must demonstrate that the Accused Images are "original" within the meaning of copyright law.  17 U.S.C. § 102(a) ("Copyright protection subsists, in accordance with this title, in *original* works of authorship") (emphasis supplied).  Indeed, the Supreme Court has long held that "the *sine qua non* of copyright is originality" and "[t]o qualify for copyright protection, a work must be original to the author."  Feist, 499 U.S. at 345; accord Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 545-46 (1985) (describing "the scheme established by the Copyright Act for fostering original works that provide the seed and substance of this harvest" of knowledge).  Where, as here, a work is registered more than five years after publication and therefore falls outside the statutory presumption of 17 U.S.C. 410(c), see infra § III.B, the plaintiff "carries the burden of proving ownership of a valid copyright, *including its originality*."  Tuff 'N' Rumble Mgmt., Inc. v. Profile Records, Inc., No. 95 Civ. 0246 (SHS), 1997 WL 158364, at *2 (S.D.N.Y. Apr. 2, 1997) (emphasis supplied).

"Original" as the term is used in copyright means  that "the work was independently created by the author . . ., and that it possesses at least some minimal degree of creativity."  Feist, 499 U.S. at 345 (citing 1 Nimmer on Copyright §§ 2.01[A]-[B] (1990)).  Originality, moreover, is a "constitutional requirement."  Id. at 346.  The Constitution grants to Congress the power to

"Promote the Progress of Science and Useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const., Art. I, § 8, cl. 8.  The term "author," in its constitutional sense, has been construed to mean an "originator," "he to whom anything owes its origin."  Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58 (1884).  Consistent with the purpose behind the Copyright Clause, the grant of a copyright is "intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired."  Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984); Feist, 499 U.S. at 349 ("The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'").[6]

Under well-established federal law, "originality requires independent creation plus a modicum of creativity."  Id. at 346.  While "even a slight amount" of creativity will suffice to establish originality and "the vast majority of works  make the grade quite easily," a work is not protectable where it lacks a "creative spark."  Id. at 345.  As the Tenth Circuit has aptly summarized, "the unequivocal lesson from Feist is that works are not copyrightable to the extent they do not involve any expression apart from the raw facts in the world."  Meshworks, Inc. v. Toyota Motor Sales U.S.A., Inc., 528 F.3d 1258, 1265 (10th Cir. 2008).  For these reasons, "'scenes a faire,' that is, scenes that necessarily result from the choice of a setting or situation," are not protectable.  Walker v. Time Life Films, Inc., 784 F.2d 44, 50 (2d Cir. 1986).  Neither

---

[6] Originality "remains the touchstone of copyright protection today" and is the very "premise of copyright law." Feist, 499 U.S. at 347 (internal citations omitted).  When it amended the Copyright Act in 1976, Congress expressly included the phrase "original works of authorship" in the statute and purposely left it undefined, in order to maintain the established understanding of originality.  See H.R. Rep. No. 94-1476, at *51 (1976) ("The phrase 'original works of authorship,' which is purposely left undefined, is intended to incorporate without change the standard of originality established by the courts under the present [1909] copyright statute.").

does copyright protection extend to "'stock' themes commonly linked to a particular genre." <u>Id.</u>;
<u>see also</u> <u>Am. Dir. Mktg., Inc. v. Azad Int'l, Inc.</u>, 783 F. Supp. 84, 95 (E.D.N.Y. 1992).

For example, the Southern District of New York held that generic photographs of
Chinese food dishes were insufficiently original to warrant copyright protection.  <u>See</u> <u>Oriental
Art Printing, Inc. v. Goldstar Printing Corp.</u>, 175 F. Supp. 2d 542 (S.D.N.Y. 2001).  In <u>Oriental
Art Printing</u>, the plaintiffs' copyrighted work consisted of:

> photographs of several common, but unlabeled Chinese food dishes, arranged in
> various patterns on a white background . . . in full circles, semi-circles, and open
> circles, ovals, zigzags, and parallel rows, among other patterns.  Some of the
> arrangements also contain certain geometric artwork, such as floating hearts,
> stars, or diamonds.  The food items themselves appear on plates of various sizes,
> which each contain the same traditional decorative pattern.

<u>Id.</u> at 544.  The court concluded that "the photographs contained in plaintiffs' work lack the
creative or expressive elements that would render them original works subject to protection
under the Copyright Act."  <u>Id.</u> at 546.  The court explained that the photographs at issue were
"direct depictions of the most common Chinese food dishes" sitting on plates which bore an
"extremely common" pattern reflecting lotus flowers and leaves.  <u>Id.</u> at 547.  Plaintiffs failed to
describe how the photographs were taken and provided nothing beyond a conclusory statement
about the "lighting" and "angles" used by the photographer.  <u>Id.</u>; <u>cf.</u> <u>Rogers v. Koons</u>, 960 F.2d
301, 307 (2d Cir. 1992) (holding that elements of originality in a photograph may include
"posing the subjects, lighting, angle, selection of film and camera," among other variants).  The
photographs were so generic that the Court concluded – at the pleadings stage, no less – that the
"photographs at issue were not designed with creativity or art in mind" but instead "serve[d] a
purely utilitarian purpose: to identify for restaurant customers those dishes on a take-out menu,
such that the customers may achieve a better understanding of what a particular dish contains."
<u>Oriental Art Printing</u>, 175 F. Supp. 2d at 547.

Courts have held other, similar stock themed photographs not to be protectable due to their purely utilitarian and descriptive purposes.  Citing Oriental Art Printing, the Eastern District of North Carolina concluded that a party could "not corner the market on advertising aftermarket motorcycle lighting accessories by copyrighting purely descriptive pictures of its wares." Custom Dynamics, LLC v. Radiantz LED Lighting, Inc., 535 F. Supp. 2d 542, 549 (E.D.N.C. 2008) (denying motion for preliminary injunction).  The photographs were not protectable because they "were meant to serve the purely utilitarian purpose of displaying examples of its product to potential customers."  Id.  Likewise, "before-and-after" photographs of a dentist's cosmetic dental work displayed on his website were found to "fall into a class of photographs that federal courts throughout the United States have found to be devoid of creativity or originality."  Pohl v. MH SUB I, LLC, 314 F. Supp. 3d 1225, 1230 (N.D. Fla. 2018) (collecting cases); see also Inspired By Design, LLC v. Sammy's Sew Shop, LLC, 16-cv-2290-DDC-KGG, 2016 WL 6093778, at *9 (D. Kan. Oct. 19, 2016) (determining "descriptive pictures presenting the types of pet beds available for sale" not likely to be copyrightable); Harner v. Wong Corp., 1:12-cv-00820-KG-ACT, 2013 WL 11549284, at *6 (D.N.M. Oct. 31, 2013) (holding that photographs of computers and computer components served utilitarian and descriptive purposes and were therefore "not sufficiently original to be protected by copyright law").

In this case, the Accused Images are so generic and devoid of creativity that no reasonable jury could conclude that they are original within the meaning of the Copyright Act. Even a cursory examination of the Accused Images indicates that they lack the "creative spark" necessary to render them protectable.  The Accused Images are depicted below:



"PorkRibBabyBack006"          "SausagePasta001"          "WrapTurkeyHam001

"MangosHR0612"          "CherryBing006_ADL"          "BeefBrisket001"

"SandwichTunaSalad001"

Each of the Accused Images serves the purely functional and utilitarian purpose of depicting various foods so that an observer will know which particular item or dish is being advertised.  Notably, Adlife has adduced no evidence regarding how these photographic images were taken, including any aesthetic or artistic choices that informed the process.  SUMF ¶ 108.  This is not surprising, as it is difficult to see why a photographer would need to make any creative choices regarding camera angle and lighting while photographing such generic material, since "[t]he overhead angle flows naturally from the subject matter of the photograph."  Psihoyos v. Nat'l Geographic Soc'y, 409 F. Supp. 2d 268, 276 (S.D.N.Y. 2005) (concluding that photographs at issue were non-original).  Moreover, according to Joel Albrizio, who claims to have photographed six of the seven Accused Images (and, in fact, nearly all of the photographs

retroactively registered by Adlife), "lighting isn't very difficult.  The cameras all pretty much

self-adjust on their own."  SUMF ¶ 110.  Indeed, as far as Mr. Albrizio was concerned, any

creativity lay in cooking the food, not in photographing it:  "[t]he creativity takes place with the

food" – specifically, preparing food that "the customer, the consumer could identify with and

believe they could cook at the house."  Id. ¶ 109.

As Mr. Albrizio's testimony confirms, there is nothing at all original or creative about the

Accused Images.  As to the depiction of raw mangos and a pile of cherries, there is not even any

cooking or other preparation involved.  Nor is there any evidence that the images of a plate of

pasta or other prepared foods were "designed with creativity or art in mind."  It is well

established that a copyright in a photograph derives from "the photographer's original

conception of his subject, not the subject itself."  Kisch v. Ammirati & Puris Inc., 657 F. Supp.

380, 382 (S.D.N.Y. 1987) (internal quotation marks omitted).  "To the extent a photograph

captures the characteristics of an object as it occurs in nature, these characteristics are not

protectable."  Psihoyos, 409 F. Supp. 2d at 275.  Adlife is foreclosed from copyrighting the *idea*

of mangos, cherries, beef brisket, sausage pasta, or any of the other foods depicted in the

Accused Images.  See Harper & Row, 471 U.S. at 547 ("[N]o author may copyright facts or

ideas.  The copyright is limited to those aspects of the work—termed 'expression'—that display

the stamp of the author's originality."); Reyher v. Children's Television Workshop, 533 F.2d 87,

90 (2d Cir. 1976) ("It is an axiom of copyright law that the protection granted to a copyrightable

work extends only to the particular expression of an idea and never to the idea itself.").

Nor can Adlife claim copyright protection as a result of staging of the Accused Images.

The decision to photograph prepared food on a plate accompanied by potato chips or parsley is

not a creative choice.  Such "staging" merely captures the prepared foods exactly as one would

expect to find them served in a delicatessen or restaurant.  See, e.g., Oriental Art Printing, 175 F.

Supp. 2d 548 n.3 ("each of the potentially protectable elements, i.e. the photographs' lighting,

angle, and the choice of plate flow necessarily from the subject matter of the photographs, i.e. the

realistic depiction of the most common Chinese food dishes").  Photographing raw foods (e.g.,

mangos or cherries) on a plain white background has even less spark.  See, e.g., Psihoyos, 409 F.

Supp. 2d at 276 (concluding that copyright protection could not be afforded "to the idea of

showing the Fossil in its natural setting" laying on sand).

    For these reasons, the Accused Images lack any protectable elements.  Adlife cannot

sustain its burden of demonstrating that it contributed any creative or artistic "spark" in the

course of (allegedly) taking the Accused Images.  Non-original works like the Accused Images

are ineligible for copyright protection.  The foods depicted in the Accused Images appear exactly

as one would expect to find them in nature or served in a restaurant.  Their appearance and

characteristics are non-copyrightable facts: they existed before Adlife (allegedly) photographed

them and would have continued to exist if Adlife had never photographed them.  Cf. Feist, 499

U.S. at 361.  Thus, MyWebGrocer is entitled to judgment as a matter of law.

    **B.    Adlife Cannot Establish Ownership of Valid Copyrights.**

    MyWebGrocer is entitled to judgment as a matter of law for the additional reason that

Adlife cannot sustain its burden of establishing ownership of valid copyrights with respect to the

Accused Images.  "Before asking a court to consider the question of infringement, a party must

demonstrate the existence and the validity of its copyright, for in the absence of copyright (or

patent, trademark, or state law) protection, even original creations are in the public domain and

may be freely copied."  Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 908 (2d Cir. 1980).

In many cases, the existence of a valid copyright can be established by the introduction into

evidence of a Copyright Office certificate of registration.  Id.  "It is clear, however, that a certificate of registration creates no irrebuttable presumption of copyright validity.  Where other evidence in the record casts doubt on the question, validity will not be assumed."  Id.

Moreover, the evidentiary weight to be accorded a certificate of registration depends on the passage of time between the registration's effective date and the date of the covered work's publication.  In pertinent part, the Copyright Act of 1976 provides that:

> In any judicial proceedings the certificate of a registration *made before or within five years* after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.  The evidentiary weight to be accorded the certificate of a registration made thereafter *shall be within the discretion of the court*.

17 U.S.C. § 410(c) (emphasis supplied).  As Professor Nimmer comments, Section 410(c) "disentitles certificates issued over five years after publication from any automatic presumption."  3 Nimmer on Copyright § 12.11[A][1].  As the Copyright Act's legislative history indicates, this "five-year period is based on a recognition that the longer the lapse of time between publication and registration the *less likely to be reliable* are the facts stated in the certificate."  H.R. Rep. No. 94-1476, at *156 (1976) (emphasis supplied).

Thus, where the relevant certificate(s) issued over five years after publication, the Court must exercise its discretion in according evidentiary weight (or no evidentiary weight) to them.  "While the Court can rely on the Copyright Register's opinion on the issue of copyrightability, it should not accept it without question."  Carol Barnhart Inc. v. Econ. Cover Corp., 594 F. Supp. 364, 367 (E.D.N.Y. 1984), aff'd, 773 F.2d 411 (2d Cir. 1985).  This is because "[t]he Copyright Office's scrutiny of an article for registration is not like the intense and prolonged scrutiny required for patent and trademark registration.  Elements of copyrightability are viewed as largely legal questions and therefore equally within the expertise of the courts."  Id.

- 13 -

As the Register of Copyrights has stated to the Second Circuit, "the Copyright Office's examination of copyright applications is 'necessarily limited,' and should be 'distinguished from the Patent and Trademark Office's process for issuance of patents.'  'The Office does not make factual determinations with respect to publication or any other act done outside of the Office' and 'will register adverse claims by more than one party,' which are 'not unusual.'"  Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 166 (2d Cir. 2003) (quoting Letter of Marybeth Peters, Register of Copyrights, to Roseann MacKechnie, Clerk, U.S. Court of Appeals for the Second Circuit (Apr. 8, 2003)).[7]

In this case, no presumption of validity attaches to Adlife's certificates of registration that cover the Accused Images because the effective dates of the registration are all well more than five years—in some cases, more than *twenty* years—after the Accused Images' alleged creation and dates of publication.  The following table summarizes the claimed dates of creation and publication, effective dates of registration, and basis of ownership for the Accused Images:

| Accused Image | Registration Number | Date of Creation | Date of Publication | Effective Date of Registration | Alleged Basis of Ownership |
|---|---|---|---|---|---|
| "PorkBabyBackRib006"[8] | VA 2-020-735 | 4/21/94 | 5/5/94 | 10/23/16 | ADLIFE Marketing & Communications Co. Inc. Employer-for-Hire of Joel Albrizio |
| "SausagePasta001"[9] | VA 2-019-921 | 3/2/97 | 3/9/97 | 10/14/16 | ADLIFE Marketing & Communications Co. Inc. Employer-for-Hire of Joel Albrizio |
| "WrapTurkeyHam001"[10] | VA 2-017-741 | 11/8/05 | 11/16/05 | 9/20/16 | ADLIFE Marketing & Communications Co. Inc. Employer-for-Hire of Joel Albrizio |

---

[7] As another leading treatise comments, any presumption of validity "accorded plaintiff under the statute is . . . weak since the Copyright Office is one of record and not one of rigorous examination[.]"  Patry on Copyright § 9:11.
[8] SUMF ¶¶ 17-20.
[9] Id. ¶¶ 28-31.
[10] Id. ¶¶ 38-41.

| "MangosHR0612"[11] | VA 2-022-602 | 6/21/94 | 7/5/94 | 11/18/16 | ADLIFE Marketing & Communications Co. Inc. Employer-for-Hire of Joel Albrizio |
| "CherryBing006_ADL"[12] | VA 2-047-017 | 6/18/00 | 6/25/00 | 3/5/17 | ADLIFE Marketing & Communications Co. Inc. Employer-for-Hire of Joel Albrizio |
| "BeefBrisket001"[13] | VA 2-012-581 | 7/11/99 | 7/23/99 | 8/5/16 | Adlife Marketing & Communications Co., Inc. Employer for Hire of David Ciolfi |
| "SandwichTunaSalad001"[14] | VA 2-017-741 | 7/11/05 | 7/19/05 | 9/20/16 | ADLIFE Marketing & Communications Co. Inc. Employer-for-Hire of Joel Albrizio |

As the table illustrates, the shortest period of time between the alleged publication of an Accused Image and the effective date of the corresponding certificate of registration is just under 11 years—for "WrapTurkeyHam001." Two Accused Images—"PorkBabyBackRib006" and "MangosHR0612"—were registered more than 22 years after their alleged dates of publication. The bottom line is that ***none*** of the certificates of registration constitutes *prima facie* evidence of Adlife's claimed ownership of any of the Accused Images, and thus Adlife bears the burden of proving the validity of its copyrights. 17 U.S.C. § 410(c); <u>Tuff 'N' Rumble Mgmt.</u>, 1997 WL 158364, at *2 (stating that alleged copyright owner "has the burden of proving the validity of its copyright" where the copyright was registered more than 18 years after the date of first publication stated on the registration). The Court, in its discretion, should accord ***no*** evidentiary weight whatsoever to the certificates of registration. Adlife has provided no evidence to corroborate key information stated in the registrations. Indeed, much of the pertinent information in the registrations is either wholly unsupported or inaccurate.

---

[11] <u>Id.</u> ¶¶ 50-53.
[12] <u>Id.</u> ¶¶ 63-66.
[13] <u>Id.</u> ¶¶ 74-77.
[14] <u>Id.</u> ¶¶ 86-89.

The registration that covers "BeefBrisket001" identifies the photographer as "David Cioffi," whose surname is misspelled.  SUMF ¶ 75.  Mr. Ciolfi (the correct spelling) was employed by Adlife as a staff photographer for approximately ten years, from February 15, 1990 until January 18, 2000.  Id. ¶ 127.  However, Mr. Ciolfi does not recall taking any of the 135 images covered by Registration No. VA 2-012-581, including "BeefBrisket001."  Id. ¶ 143.  And, in fact, as to many images covered by that registration, Mr. Ciolfi is certain that he did *not* take that particular image, and he is certain he did not take all of them.  Id.  Beyond the registration itself, Adlife has provided no evidence to corroborate its assertion that Mr. Ciolfi (or any Adlife employee for that matter) actually took the "BeefBrisket001" image.  Id. ¶ 101.  As such, Adlife's evidence of ownership of the image is paper thin, at best.

There is, moreover, ample reason to discredit Adlife's attribution of authorship of "BeefBrisket001" (or any other photographic image) to Mr. Ciolfi.  Adlife has also identified Mr. Ciolfi in its Registration No. VA 2-014-708 as the photographer who took all of the images covered by that registration (which does not pertain to any of the Accused Images).  However, all images in that group registration were reportedly created and published in 2007—*seven years after Mr. Ciolfi left Adlife*.  Id. ¶¶ 139-141.  Mr. Ciolfi therefore was not, and could not have been, the photographer of any of the images allegedly covered by Registration No. VA 2-014-708 since he was not employed by Adlife in 2007, has not performed any photography services for Adlife in any capacity since leaving the company, and has not assigned or otherwise transferred to Adlife any rights he has or has ever had in photographic images he created after leaving Adlife in January 2000.  Id. ¶¶ 137-138.  For this reason, Adlife's representations to the Copyright Office regarding Mr. Ciolfi's role should not be given any weight.

The registrations covering the other six Accused Images represent that Joel Albrizio, Adlife's president, took the all of the photos in them between 1994 and 2005, as an employee of Adlife.  These assertions also are entitled to no weight.  At the time of his hire by Adlife, David Ciolfi was the only photographer employed by Adlife, but over the course of his tenure, Adlife came to employ a group of six staff photographers, whom Mr. Ciolfi oversaw and for whom Mr. Ciolfi prepared daily shooting schedules.  Id. ¶¶ 128-29, 134.  More importantly, however, during his entire ten-year tenure at Adlife, David Ciolfi never once saw Joel Albrizio pick up a camera, take a photograph, or have any involvement in the process of taking of images or any part of the technical process of either film or digital photography production, and Mr. Ciolfi never prepared a daily shooting schedule for Mr. Albrizio, as he was not one of Adlife's staff photographers.  Id. ¶¶ 133, 135.  Rather, Mr. Albrizio's role with Adlife during Mr. Ciolfi's tenure was as a partner and salesperson, and had nothing to do with photography.  Id. ¶¶ 131-32.  It strains credulity for Adlife to assert, despite its having employed a corps of staff photographers during the relevant period, that Mr. Albrizio (of all people) *took all ~1,000 photographs* covered by the other registrations.[15]  Adlife has provided no evidence in this litigation to corroborate its assertion that Mr. Albrizio (or any Adlife employee) actually took the six Accused Images attributed to him.  Id. ¶¶ 100-01, 104.

Even accepting the dubious premise that Joel Albrizio had any role in Adlife's photography operations, Adlife's attribution of authorship to Mr. Albrizio as an employee regarding "PorkBabyBackRib006" and "MangosHR0612" is particularly suspect.  These two

---

[15] Registration No. VA 2-020-735 covers 15 photographic images, including "PorkRibBabyBack006."  Registration No. VA 2-019-921 covers approximately 220 photographic images, including "SausagePasta001."  Registration No. VA 2-017-741 covers approximately 250 photographic images, including "WrapTurkeyHam001" and "SandwichTunaSalad001."  Registration No. VA 2-022-602 covers approximately 220 photographic images, including "MangosHR0612."  Registration No. VA 2-047-017 covers approximately 250 photographic images, including "CherryBing006_ADL."  SUMF ¶¶ 17-19, 28-30, 39-41, 50-52, 63-66, 86-88.

images were reportedly created on April 21, 1994 and June 21, 1994, respectively.  Mr. Albrizio purchased shares in Adlife in September 1994, and an online Radaris profile page indicates that his affiliation with Adlife began in September 1994.[16]  Id. ¶¶ 111-13.  At the time of his June 21, 2018 deposition in this action, Mr. Albrizio's LinkedIn.com profile stated that his affiliation with Adlife began in 1994 as President.  Id. ¶ 114.  However, he testified that he became a "W-2 employee" of Adlife in 1992, and that 1994 was when he purchased Adlife stock and became an officer of the company.  Id. ¶ 115.  Notably, as of August 27, 2018—two months after his deposition—Mr. Albrizio's LinkedIn.com profile page had been changed, stating that his affiliation with Adlife began in *1992*, as President.  Id. ¶ 116.

Adlife cannot explain this discrepancy or establish that Mr. Albrizio was, in fact, an employee when any of the Accused Images were allegedly taken.  Adlife cannot produce any offer or hiring letters between Adlife and Mr. Albrizio, nor does it have any documents sufficient to verify the commencement date of Mr. Albrizio's affiliation with Adlife as an employee.  Id. ¶¶ 117-18.  Adlife cannot produce a Form W-2 for Mr. Albrizio for the years 1992, 1993, 1994, or for the years 1997 (alleged creation year of "SausagePasta001"), 1999 (alleged creation year of "BeefBrisket001"), 2000 (alleged creation year of "CherryBing006_ADL"), or 2005 (alleged creation year of "SandwichTunaSalad001" and "WrapTurkeyHam001").  Id. ¶¶ 119-25.  Adlife also does not have in its possession, custody, or control any assignment agreements concerning any of the Accused Images.  Id. ¶ 126.  Simply put, Adlife cannot prove that it owns any of the Accused Images as works-for-hire of Mr. Albrizio or that Mr. Albrizio assigned or transferred any rights he may have had in the Accused Images to Adlife.  Regarding the two Accused Images allegedly created prior to September 1994, it appears that, in the course of litigation, Mr.

---

[16] Prior to purchasing shares in Adlife, Mr. Albrizio owned and operated J.M. Albrizio, Incorporated, which had a similar business purpose and business model as Adlife's.  SUMF ¶ 112.

Albrizio may have attempted to alter the public record regarding the beginning of his employment with Adlife to 1992 from 1994 in order to create the appearance that he had been an employee at the time "PorkBabyBackRib006" and "MangosHR0612 were allegedly created.

Based on the foregoing, the Court, in its discretion, should accord no weight to Adlife's registrations, which are rife with inaccuracies, lack any corroboration, and might well contain outright falsehoods.  Particularly given the lengthy passage of time between the Accused Images' alleged dates of creation/publication and the effective dates of the registrations, see H.R. Rep. 94-1476, at *156, supra, and the inaccuracies in the certificates, there is specific reason to question Adlife's unsupported and self-serving representations of ownership to the Copyright Office.  See, e.g., Brown v. Latin Am. Music Co., 498 F.3d 18, 24-25 (1st Cir. 2007) (affirming district court because the claimant "did not present any substantive support for its claim of copyright, as against the twenty-year gap" and other evidence which cast doubt on the registrations); Tuff 'N' Rumble Mgmt., 1997 WL 158364, at *2-3 (concluding that claimant had not sustained its burden of proving ownership where it failed to produce evidence of who owned the original copyright and how, when, or if that copyright had been transferred to the claimant).

Moreover, Adlife has produced no evidence—aside from the registrations (which should be accorded no weight)—to demonstrate that it owns the Accused Images.  During David Ciolfi's ten-year tenure at Adlife, the company's images were all captured using film, and the film was placed in sleeves and binders and stored in file cabinets.  SUMF ¶ 136.  Toward the end of his tenure, Adlife incorporated digital photography as it became available while still shooting film.  All film would then be scanned to Adlife's servers, along with digital images direct from digital cameras.  Id.  Adlife, however, does not have in its possession, custody, or control any notes, metadata, digital files, film, or other information to demonstrate and verify that it created

the Accused Images.  Id. ¶ 105.  In its Interrogatory responses, Adlife stated that "*Upon*

*information and belief*, Joel Albrizio – founder and CEO of Adlife – captured/took the Accused

Images."  Id. ¶ 102 (emphasis supplied).  However, Adlife represented to the Copyright Office

that Mr. Ciolfi—not Mr. Albrizio—had photographed "BeefBrisket001."  Id. ¶ 75.  Adlife then

gave a completely different answer in its supplemental interrogatory responses, stating that

information on the identity of the photographer of the Accused Images "is not currently

available," "[g]iven that the Accused Images [were] created/captured on or about 1999."  Id.

¶ 103.

Adlife's sworn discovery responses are not only internally contradictory, but are

inconsistent with its representations to the Copyright Office regarding the creation of the

Accused Images.  While a district court does not ordinarily weigh credibility at the summary

judgment stage, "in the rare circumstance where the plaintiff relies almost exclusively on his

own testimony, it will be impossible for a district court to determine whether the jury could

reasonably find for the plaintiff, and thus whether there are any 'genuine' issues of material fact,

without making some assessment of the plaintiff's account."  Jeffreys v. City of New York, 426

F.3d 549, 551, 554 (2d Cir. 2005) (affirming summary judgment on the basis of plaintiff's

testimony "which was largely unsubstantiated by any other directed evidence" and was "so

replete with inconsistencies and improbabilities that no reasonable juror would undertake the

suspension of disbelief necessary to credit the allegations made in his complaint"); accord Rojas,

660 F.3d at 103-04 (affirming summary judgment where the district court "catalogued the

inconsistencies and contradictions" in plaintiff's testimony, including where plaintiff "changed

key aspects of her prior version of events, set forth in pleadings, trial testimony, and sworn

discovery responses").  This is such a case where Adlife's assertions, even at the summary

judgment stage, cannot be credited in view of its lack of critical proof and its inconsistent and contradictory discovery responses.

Further compounding this evidentiary gap, Adlife has no information on the specific location where any of the Accused Images were taken, or on any persons (other than Joel Albrizio) who were supposedly present at the taking of any of the Accused Images or who were involved in the process of generating the Accused Images.  Id. ¶ 106.  Nor does Adlife have any agreements or other documents (beyond the registration certificates) relating to the taking or ownership of any of the Accused Images.  Id.  Nor does Adlife have any employee agreements, other work for hire agreements, and commissioning agreements concerning or relating to any of the Accused Images.  Id. ¶ 107.  Adlife has not even produced certified copies of the copyright deposits it claims to have submitted to the Copyright Office with its copyright applications.[17]  Id. ¶ 99.  Without a certified copy of the registration deposit materials from the Copyright Office, there is no way for MyWebGrocer or the Court to conclusively verify that the certificates of registration even cover the Accused Images.

Yet another reason why Adlife's claims of ownership cannot be credited is the fact that images it has registered with the Copyright Office in its name are actually owned by third parties.  During this litigation Adlife has raised other images it contends have been infringed by MyWebGrocer, including ones identified as "BeefChuckSteakBnls007" and "BeefSloppyJoe001."  Id. ¶ 144.  However, MyWebGrocer obtained these images – *which are included in the same Adlife copyright registration claiming to cover the "BeefBrisket001" image* – from trade associations representing the beef industry.  Id. ¶¶ 145-46.  These trade associations own a "vast library" of images and provide them – for no charge – for use by professionals in

---

[17] "[D]eposit material is the actual work that the copyright claimant originally sent to the Copyright Office in support of its claim for registration. . . . A failure to submit a valid deposit copy of a work will invalidate an entire copyright registration and oust a federal court of jurisdiction."  Copyright Lit. Handbook § 4.6 (2d ed.).

retail, food service, and other beef-industry-aligned fields to promote beef products.  Id. ¶ 146. Adlife's registration of images owned by third parties in one of the group registrations at issue in this action represents yet another red flag that diminishes the reliability of the certificates of registration.

Based on the foregoing, Adlife cannot carry its burden of proving ownership of the Accused Images.  The certificates of registration are entitled to no evidentiary weight, and Adlife has failed to produce any evidence to demonstrate its ownership and corroborate the information reflected in the certificates of registration.  On this additional basis, MyWebGrocer is entitled to judgment as a matter of law.

### C.   MyWebGrocer's Alleged Use of the Accused Images Was Licensed in Several Instances, or Otherwise Not a Violation.

Finally, with respect to four of the Accused Images, MyWebGrocer's alleged use fell within the scope of a valid license.  "A license is a complete defense to a claim for copyright infringement."  Latour v. Columbia Univ., 12 F. Supp. 3d 658, 661 (S.D.N.Y. 2014).  With regard to two other Accused Images, there is no evidence that MyWebGrocer ever copied or illegally used these images.

### 1.   "BeefBrisket001" and "SandwichTunaSalad001"

MyWebGrocer licensed "BeefBrisket001" (iStock file number 3167753) and "SandwichTunaSalad001" (iStock file number 3168302) from iStock on or about January 7, 2009 and June 14, 2007, respectively.[18]  SUMF ¶¶ 78, 90.  For each image, MyWebGrocer's iStock license was perpetual and permitted MyWebGrocer to "utilize the Permitted Uses an unlimited number of times," which Permitted Uses included "on-line or electronic publications, *including web pages*" (emphasis supplied).  Id. ¶¶ 79, 91.  Consistent with its licenses,

---

[18] Adlife did not accuse MyWebGrocer of infringement until *seven to nine years* after it licensed these images.

MyWebGrocer added the "BeefBrisket001" and "SandwichTunaSalad001" images to its product library, which was the *only* location where the images were housed (or "installed") by MyWebGrocer (i.e., MyWebGrocer's customers did not take possession of the images from MyWebGrocer), so that the images could be used on web pages.  Id. ¶¶ 81, 93.  Moreover, based upon the parties' course of dealing, iStock understood and accepted that MyWebGrocer's use of the images it licensed to MyWebGrocer (including "BeefBrisket001" and "SandwichTunaSalad001") was for purposes of the web services MyWebGrocer provided to its retail grocery store customers, including possible display of the images on such customers' websites.[19]  Id. ¶¶ 80, 92.

### 2. *"PorkRibBabyBack006"*

MyWebGrocer licensed the "PorkRibBabyBack006" image from Multi-Ad Services on or about March 24, 2000, with no stated expiration date, when it purchased three "Ad Builder Food Photography" CDs from Multi-Ad Services, which contained the "PorkRibBabyBack006" image and 899 other images.[20]  Id. ¶ 21.  As with the "BeefBrisket001" and "SandwichTunaSalad001" images, MyWebGrocer added the "PorkRibBabyBack006" image to its product library at some point after obtaining its license.  Id. ¶ 23.  Again, this was the only location where the image was housed by MyWebGrocer.  Id.  Just as was the case with iStock, Multi-Ad Services understood and accepted that MyWebGrocer's use of the images it licensed to MyWebGrocer (including the "PorkRibBabyBack006" image) was for purposes of the web services MyWebGrocer provided to its retail grocery store customers, including possible display of the images on such customers' websites.  Id. ¶ 22.  Neither Multi-Ad nor iStock ever accused

---

[19] This point is supported by simple common sense:  why would iStock sell licenses to MyWebGrocer that would be useless to MyWebGrocer's business, and why would MyWebGrocer buy such licenses?

[20] Adlife did not accuse MyWebGrocer of infringement until *16 years* after it licensed the image.

MyWebGrocer of improper use of licensed images, including any Accused Images at issue in this action.

### 3.   *"MangosHR0612"*

Adlife has alleged that MyWebGrocer infringed the copyright in the "MangosHR0612" image – specifically, that the image appeared in weekly circulars included on various websites operated by Piggly Wiggly, a former retail grocery store customer of MyWebGrocer, for the ad weeks ending July 25, 2017 and August 8, 2017.[21] Id. ¶ 54. ███████████████████ ████████████████████████████████████████████████████████████████████ ███████████████[22] Id. ¶ 61. The "MangosHR0612" image is included in the library of images made available by Adlife through its "PreparedFoodPhotos.com" service. Id. ¶ 62. The "MangosHR0612" image was at no time added to or included in MyWebGrocer's product library, and thus could not be accessed from that database to be displayed on any MyWebGrocer customer websites developed and/or maintained by MyWebGrocer. Id. ¶ 59.

### 4.   *"WrapTurkeyHam001"*

Adlife's only claim of infringement of the copyright for "WrapTurkeyHam001" is that the image appeared on the deli department landing page of a single website for Pennington Quality Market, one of MyWebGrocer's customers. Id. ¶ 42. However, MyWebGrocer had nothing to do with this display of the image. The customer website on which the image was displayed was a WordPress website that, although created for the customer by MyWebGrocer,

---

[21] Piggly Wiggly provided the "MangosHR0612" image to MyWebGrocer for digitization as part of a circular advertisement, which included a collection of images and text, for display only on Piggly Wiggly websites. Id. ¶ 56.
[22] ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████ Id. ¶ 60.

was populated with content and maintained solely by the customer.  Id. ¶ 44.  That customer (through its advertising agency) obtained the "WrapTurkeyHam001" image on its own and directly placed the image on its WordPress website, with no involvement from MyWebGrocer. Id. ¶ 45.  The image was never added to or included in MyWebGrocer's product library, and thus could not be accessed from that database to be displayed on any MyWebGrocer customer websites developed and/or maintained by MyWebGrocer.   Id. ¶ 48.  Moreover, the customer dealt directly with Adlife and resolved the issue regarding the appearance of the "WrapTurkeyHam001" image on its WordPress website.  Id. ¶¶ 49, 153.

### 5.     *"SausagePasta001"*

Adlife alleges infringement of the copyright for the "SausagePasta001" image because the image appeared on various (12 stores) e-commerce websites MyWebGrocer developed and/or maintained for ShopRite (Wakefern), one of MyWebGrocer's customers.  Id. ¶ 32. However, MyWebGrocer did not display the "SausagePasta001" image on ShopRite's websites. Id. ¶ 36.  The image did not come from MyWebGrocer, nor was the image ever added to or included in MyWebGrocer's product library.  Id. ¶¶ 35-36.  As such, the image could not be accessed from that database to be displayed on any MyWebGrocer customer websites developed and/or maintained by MyWebGrocer.  Id. ¶ 35.  Finally, as was the case for the "WrapTurkeyHam001" image, the customer dealt directly with Adlife and resolved the issue regarding the appearance of the "SausagePasta001" image on its websites.  Id. ¶¶ 37, 154.

### **CONCLUSION**

WHEREFORE, for the foregoing reasons, MyWebGrocer respectfully requests that this Court GRANT its Motion for Partial Summary Judgment on Liability for Copyright Infringement.

Dated at Burlington, Vermont this 1st day of March, 2019.

MYWEBGROCER, INC.

   /s/ Matthew S. Borick

Cathleen E. Stadecker
Matthew S. Borick
Evan J. O'Brien
Downs Rachlin Martin PLLC
199 Main Street
P.O. Box 190
Burlington, VT 05402-0190
Telephone: 802-863-2375
Fax: 802-862-7512
cstadecker@drm.com
mborick@drm.com
eobrien@drm.com

Attorneys For MyWebGrocer, Inc.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 1, 2019, I filed the foregoing document with the Clerk of Court via the CM/ECF system, which will provide notice of such filing to the following NEF counsel:

Gregory P. Howard, Esq., ghoward@docatty.com, jnn@docatty.com
Mathew K. Higbee, Esq., mhigbee@higbeeassociates.com
Naomi M. Sarega, Esq., nsarega@higbeeassociates.com


_____/s/ Matthew S. Borick_____
Matthew S. Borick