## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| MYWEBGROCER, INC. | ) |
| | ) |
| Plaintiff and | ) |
| Counterclaim Defendant | ) |
| | ) |
| v. | ) Civil Action No. 5:16-cv-00310-gwc |
| | ) |
| ADLIFE MARKETING &, | ) |
| COMMUNICATIONS CO., INC. | ) |
| | ) |
| Defendant and | ) |
| Counterclaim Plaintiff | ) |
| _____ | ) |

### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
### ON DAMAGES FOR COPYRIGHT INFRINGEMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, Plaintiff MyWebGrocer, Inc.

("MyWebGrocer") hereby moves for partial summary judgment on the issue of damages as it

pertains to the copyright infringement claims in this litigation – specifically, Count I

("Declaratory Judgment of No Copyright Infringement") of MyWebGrocer's Amended

Complaint (ECF 10) and the First Cause of Action ("Copyright Infringement") of Adlife

Marketing & Communications Co.'s ("Adlife") Amended Counterclaim (ECF 47).  For the

reasons set forth in the following Memorandum of Law, the Court should grant MyWebGrocer's

motion.

### MEMORANDUM OF LAW

## I.      INTRODUCTION

MyWebGrocer filed this action on November 18, 2016, and later amended its Complaint

on February 23, 2017, seeking a declaratory judgment of non-infringement of Adlife's alleged

copyrights in various prepared food images.[1]  ECF 1 & 10.  In response Adlife filed an Answer,

Affirmative Defenses, and Counterclaim on February 6, 2017, and subsequently amended the

same on March 9, 2017 and January 31, 2018, claiming that that MyWebGrocer has infringed

Adlife's alleged copyrights in various prepared food images.  ECF 5, 12 & 47.  The food images

at issue in MyWebGrocer's declaratory judgment claim are those identified by Adlife as

"BeefBrisket001," "SandwichTunaSalad001," "WrapTurkeyHam001," "SausagePasta001," and

"PorkRibBabyBack006."  The latter three images are also at issue in Adlife's infringement

claim, along with two other images ("MangosHR0612," and "CherryBing006_ADL").  For the

remainder of this motion, the "WrapTurkeyHam001," "SausagePasta001,"

"PorkRibBabyBack006," "MangosHR0612," "CherryBing006_ADL," "BeefBrisket001," and

"SandwichTunaSalad001" images are referred to collectively as the "Accused Images."[2]

MyWebGrocer now seeks summary judgment on the issue of the damages sought by

Adlife in its infringement claims.  Adlife is seeking to recover "statutory damages . . . in an

amount up to $150,000.00 for each infringement pursuant to 17 U.S.C. § 504(c) or actual

damages and profits . . . in an amount to be proven for each infringement pursuant to 17 U.S.C. §

504(b)."[3]  ECF 47, at 20.  Adlife also seeks to recover "costs of litigation and reasonable

attorney's fees . . . pursuant to 17 U.S.C. § 505."  Id.  Conversely, in its claim for declaratory

judgment, MyWebGrocer seeks a determination that any damages recoverable by Adlife

(assuming liability were found) would be limited solely to "Market Value per Accused Image

---

[1] MyWebGrocer also brought a claim for injunctive relief and damages for Adlife's violation of the Vermont
Consumer Protection Act, 9 V.S.A. §§ 2451 *et seq*., through unfair and deceptive business practices.  That claim is
not addressed in this motion.

[2] In its counterclaim, Adlife has elected ***not*** to make any claim for infringement and damages with respect to the
"BeefBrisket001" and "SandwichTunaSalad001" images.  Those images are included only in MyWebGrocer's
declaratory judgment claim.

[3] Adlife's prayer for up to $150,000 in statutory damages is premised on its allegation that the infringement in this
case was willful, which MyWebGrocer disputes.  See ECF 47, at 19.

found to be infringed," if proven.  ECF 10, at 10.

As demonstrated below, MyWebGrocer is entitled to partial summary judgment on Adlife's claims for (1) MyWebGrocer's profits, (2) actual damages, (3) statutory damages, and (4) attorneys' fees.[4]

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The record evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences drawn in his or her favor.  GEICO Gen. Ins. Co. v. Dowd, No. 2:12-cv-40, 2012 WL 6597685, at *2 (D. Vt. Dec. 18, 2012) (citing Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)).  "However, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."  Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

"By its very terms, [the summary judgment] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  U.S. v. Sullivan, No. 2:12-CV-72, 2013 WL 709222, at *5 (D. Vt. Feb. 27, 2013) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis added in Sullivan)); Rojas v. The Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (per curiam) ("mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient").  An issue of fact is material if it "might affect the outcome of the suit under the governing law.  An issue of fact is genuine if the evidence is such that a reasonable jury could

---

[4] Adlife's entitlement to any recovery, of course, is dependent upon whether it can meet its burden of proof on the issue of liability (including copyrightability, ownership, and infringement).  Concurrently with the present motion, MyWebGrocer is moving for partial summary judgment on liability.

return a verdict for the nonmoving party." Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000); Rojas, 660 F.3d at 104 ("In weighing the evidence on a motion for summary judgment, 'the judge must ask . . . not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented.'").

Also, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" and "must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002). The non-moving party may not rest on the pleadings but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

"Summary Judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Id. at 327 (internal quotations omitted). Moreover, the central purpose of summary judgment is to avoid a useless trial by isolating and disposing of factually unsupported claims or defenses, and the Rule should be interpreted in a way that allows it to accomplish this purpose. See id. at 323-24.

## III.   ARGUMENT

The compensatory damages a copyright owner may recover, assuming it has already proved infringement, are set forth in 17 U.S.C. § 504.[5]  Section 504(b) of the Copyright Act provides as follows:

---

[5] The damages recoverable in a copyright case are limited in time. Under 17 U.S.C. § 507(b), "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." In other words, the statute "allows [copyright owners] . . . to gain retrospective relief running only three years back from the date the complaint was filed." Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 672 (2014).

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that *are attributable to the infringement and are not taken into account in computing the actual damages.*  In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b) (emphasis added).  As an alternative, the copyright owner can opt not to recover its actual damages and the infringer's profits, and instead may elect to recover statutory damages under 17 U.S.C. § 504(c), as follows:

> (1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, *with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally*, in a sum of not less than $750 or more than $30,000 as the court considers just . . . .

> (2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000.  In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200 . . . .

17 U.S.C. § 504(c) (emphasis added).  Finally, the court has discretion to allow the recovery of costs, including reasonable attorneys' fees, to the prevailing party in a copyright infringement case.  17 U.S.C. § 505.

### A.    MyWebGrocer is Entitled to Summary Judgment on Adlife's Claim for MyWebGrocer's Profits.

Recovery of the second category of compensatory damages – the profits of the infringer

that are attributable to the infringement – requires the copyright owner to prove the infringer's "gross revenue reasonably related to the infringement, not unrelated revenues." On Davis v. The Gap, Inc., 246 F.3d 152, 160 (2d Cir. 2001). In other words, the copyright owner must "provide sufficient proof of a causal nexus between the infringement and the profit as to which the copyright owner is seeking disgorgement," and damages that are "only remotely or speculatively attributable to the infringement should be precluded." Complex Sys., Inc. v. ABN Ambro Bank N.V., No. 08 Civ. 7497(KBF), 2013 WL 5970065, at *2 (S.D.N.Y. Nov. 8, 2013). Moreover, in order for the statutory "attribution" element to be met, "mere connection or usage alone" is insufficient. Id. at *5.

The copyright owner's burden is especially high in cases – like this one – where the infringer's profits are "indirect" – that is, where the alleged infringer has not sold the copyrighted work itself. See Mackie v. Rieser, 296 F.3d 909, 914 (9th Cir. 2002) (indirect profits have a "more attenuated nexus to the infringement"). Indeed, "[b]ecause of the at-best highly speculative nature of all indirect profits claims such as those at issue here, *the decision to send[ ] such claims to a jury should be extremely rare*." Int'l Bus. Machs. Corp. v. BGC Partners, Inc., No. 10 Civ. 128, 2013 WL 1775437, at *3 (S.D.N.Y. Apr. 25, 2013) (quotations omitted) (emphasis added) (granting alleged infringer's motion to bar recovery of profits); see also Mager v. Brand New School, No. 03 Civ. 8552(DC), 2004 WL 2413978, at *4 (S.D.N.Y. Oct. 28, 2004) (granting alleged infringer's motion for partial summary judgment on profits "because there is simply no logical or evidentiary connection between the alleged violations and the [alleged infringer's] profits") (quotation omitted); DaimlerChrysler Servs. v. Summit Nat'l, No. 02-71871, 2006 WL 208787, at *4 (E.D. Mich. Jan. 26, 2006) (recognizing "heightened initial burden on the copyright holder where profits are indirect").

Applying the foregoing guidelines, courts in numerous copyright infringement cases have dismissed or precluded claims for indirect profits.  In Mackie, for example, defendant included plaintiff's artwork in a brochure promoting defendant's symphony subscriptions.  296 F.3d at 911.  Plaintiff sought to recover actual damages (including hypothetical royalties and lost future employment opportunities) and the profits defendant generated from subscriptions in the current season and future seasons.  Id. at 912-13.  Finding that plaintiff's evidence and expert testimony were too speculative and failed to establish the causal link required to recover indirect profits, the district court granted summary judgment to defendant.  Id. at 913.  The Ninth Circuit affirmed on appeal, warning that "to survive summary judgment on a demand for indirect profits pursuant to § 504(b), a copyright holder must proffer sufficient nonspeculative evidence to support a causal relationship between the infringement and the profits generated indirectly from such an infringement."  Id. at 915-16.  In so ruling, the court observed the following:

> Intuitively, we can surmise virtually endless permutations to account for an individual's decision to subscribe to the Pops series, reasons that have nothing to do with the artwork in question.  For example, was it because of the Symphony's reputation, or the conductor, or a specific musician, or the dates of the concerts, or the new symphony hall, or the program, or the featured composers, or community boosterism, or simply a love of music, or . . . ?  In the absence of concrete evidence, Mackie's theory is no less speculative than our effort in this paragraph to enumerate even a relatively short list of the myriad factors that could influence an individual's purchasing decisions.

Id. at 916; see also Complex Sys., Inc., 2013 WL 5970065, at *14 (precluding recovery of indirect profits and recognizing that purchasing decisions in the marketplace can be based on any number of factors completely unrelated to the copyrighted work).

Similarly, in Int'l Bus. Machs. Corp., defendant used plaintiff's copyrighted software to facilitate transactions between financial institutions.  2013 WL 1775437, at *3.  In granting

defendant's motion to bar recovery of indirect profits, which it found were "overly speculative," the court concluded that the required causal link could not be established because (1) defendant could migrate to another software with "little to no effect" or harm to its business, (2) the opinions of plaintiff's expert amounted to "speculation" that fell "well short of the requisite factual determination that at least some portion of BGC's profits 'are attributable to [BGC's alleged] infringement,'" (3) defendant did not sell the software, and (4) there was no evidence that defendant's customers cared what software was used.  Id. at **3-4.  The court further observed that even if the copyrighted work "may have played an important, significant, or meaningful role" in an alleged infringer's operations, that would not be sufficient to establish the requisite causal nexus, particularly where the work comprised only a small portion of what enabled the alleged infringer to conduct its business profitably.  Id. at *4 (quotations omitted); see also Complex Sys., Inc., 2013 WL 5970065, at *12 (indirect profits not recoverable where defendant's services were "the result of a number of other factors" besides the copyrighted work, and plaintiff could not show that the work itself was responsible for any revenue generated by defendant).

The present case presents an even greater challenge for Adlife than in many indirect profits cases, where the alleged infringer is the "end user" of the work.  The images at issue in this case appear on grocery store websites and *might* have some influence, or negative influence, or no influence whatsoever, on a grocery shopper's decision to purchase a particular food item.  So it likely is not possible that Adlife could even prove *grocery store* revenues that are "attributable" to the alleged infringement.[6]  MyWebGrocer is a step removed from that, and as

---

[6] This is particularly true for the "PorkRibBabyBack006" image, which appeared on web pages only for the product "Boneless Pork Stir Fry," *not pork baby back ribs*; the "WrapTurkeyHam001" image, which appeared only on a deli department landing page; and the "BeefBrisket001" image, which appeared only on recipe pages.  See MyWebGrocer's Statement of Undisputed Material Facts ("SUMF") ¶¶ 24, 42, 82.

explained below, its revenues and profits are not tied in any way whatsoever to the sales of grocery products or to the provision of specific images. Thus, there is no way that Adlife could meet its burden of proving recoverable profits against MyWebGrocer.

As an initial matter, it is significant that Adlife has not retained an expert to opine on the issue of recoverable profits in this case. In most if not all of the cases cited above, the copyright owners in question relied upon expert testimony to prove damages in the form of indirect profits, and even then they could not meet their burden to show the required causal nexus. But without any expert analysis whatsoever to back it up, it is axiomatic that any claim by Adlife for indirect profits would amount to "undue speculation."

Expert or no expert, however, Adlife will not be able to provide any evidence of MyWebGrocer's revenues or profits that are attributable to the appearance of the Accused Images on its customers' websites. The requisite "causal nexus" simply does not exist. MyWebGrocer provides software services to its retail grocery store customers that consist of (a) building and maintaining e-commerce websites, (b) providing digital circular services, and/or (c) building WordPress websites for customers. SUMF ¶ 1. For e-commerce services, MyWebGrocer's revenues are generated from *flat* fees per order *regardless of the number of products in an order* or *flat* monthly fees *regardless of the number of orders per month*. Id. ¶ 7. For digital circular services, MyWebGrocer's revenues are generated based upon the number of unique circular pages per cycle processed, *irrespective of the number or types of products or images on a page of a circular*. Id. ¶ 8. For WordPress websites built by MyWebGrocer for its retail grocery store customers, the customer pays a one-time *flat* fee to MyWebGrocer along with periodic maintenance/support fees. Id. ¶ 10.

As the foregoing makes clear, MyWebGrocer's revenues (and thus its profits) are not

derived from, nor affected by, the provision or display of any particular images on MyWebGrocer customer websites or the sales of any particular products through those websites, nor are they determined in any way by the number of products sold or the dollar volume of sales on its customers' websites.  Id. ¶¶ 147, 149.  Indeed, all receipts from sales of products through the websites of MyWebGrocer's customers belong solely to those customers.  Id. ¶ 148. MyWebGrocer does not take a "cut."  At bottom, MyWebGrocer has no revenues and profits "attributable to the [alleged] infringement" of the Accused Images.  Id. ¶ 151.

And even if MyWebGrocer's revenues were somehow linked to the sales of particular products through the website for a particular MyWebGrocer customer, there is no way for MyWebGrocer – or anyone for that matter – to determine, outside of pure speculation, whether the sale of a product was associated with or influenced in any way by a particular image.  Id. ¶ 150.  As following the reasoning advanced in cases like Mackie, Int'l Bus. Machs. Corp., and Complex Sys., Inc., there are "endless permutations" of factors that account for an individual's decision to purchase grocery items that have nothing to do with photographs of the food.  Nor is it possible to say with any level of certainty that the individual even *looked* at the photograph of a food item before purchasing it.  One can only speculate as to the nexus between the photograph and the sale, which is impermissible in and of itself (see, e.g., Mackie, 296 F.3d at 914; Complex Sys., Inc., 2013 WL 5970065, at *2), but even if the sale of a particular grocery item could be attributed to a photograph and thereby generated revenue for the grocery store, the required causal link to MyWebGrocer's revenue still could not be made.

Other considerations highlighted in the case law apply with equal force here.  For one, although MyWebGrocer's product library includes food images that are available for use by its retail grocery store customers for their websites (typically in ecommerce or recipe settings),

MyWebGrocer does not charge separate fees for the use of any images, nor does it reduce its software services fees if a customer does not use MyWebGrocer's product library.  SUMF ¶¶ 2-6; see Int'l Bus. Machs. Corp., 2013 WL 1775437, at *4 (fact that alleged infringer did not sell the copyrighted work was indicative of no causal link between infringement and revenues). Moreover, the food images on MyWebGrocer's customer websites have no material significance. Removal of a particular food image from MyWebGrocer's product library or from one of its customers' websites has no effect whatsoever on MyWebGrocer's business (including its revenues and profits), as alternate images are readily available and serve the same purpose if desired.  SUMF ¶ 152; see Int'l Bus. Machs. Corp., 2013 WL 1775437, at *3 (fact that alleged infringer could switch from the infringing work to another product with no harm to its business was indicative of no causal link between infringement and revenues).  Accordingly, MyWebGrocer had no trouble promptly taking down or removing images where infringement was accused.  SUMF ¶¶ 26, 34, 47, 58, 71, 84, 96.

On a similar note, Adlife has argued throughout this litigation that the very fact that its images may have been used on websites for a MyWebGrocer customer demonstrates that the image must have some "worth" to MyWebGrocer.  But as courts have observed, mere use of a work is insufficient to establish the causal nexus required for the "attribution" element to be met. Complex Sys., Inc., 2013 WL 5970065, at *5.

In summary, for the foregoing reasons Adlife will not be able to meet its evidentiary burden to establish a claim for "profits of the infringer that are attributable to the infringement." MyWebGrocer is therefore entitled to summary judgment on this aspect of Adlife's prayer for relief.

**B.**     **MyWebGrocer is Entitled to Summary Judgment on Adlife's Claim for Actual Damages.  In the Alternative, Adlife's Recovery of Actual Damages Should Be Limited to the Fair Market License Value of the Images at Issue, Provided that Adlife Can Prove Such Value.**

The primary measure of actual damages, where proven, is "the extent to which the market value of the copyrighted work at the time of the infringement has been injured or destroyed by the infringement," including lost sales or other profits the copyright owner would have received from the work but for the infringement.  Baker v. Urban Outfitters, Inc., 254 F.Supp.2d 346, 356 (S.D.N.Y. 2003) (quoting Fitzgerald Publ'g Co. v. Baylor Publ'g Co., 807 F.2d 1110, 1118 (2d Cir. 1986)).  Actual damages are awarded to compensate the copyright owner for its own losses from the infringement and, importantly, cannot be based upon "undue speculation."  Id. (citing and quoting Abeshouse v. Ultragraphics, Inc., 754 F.2d 467, 470 (2d Cir. 1985) and On Davis, 246 F.3d at 166.

Where a copyright owner cannot demonstrate lost sales/profits or other diminution in value, a common measure used by courts to award actual damages is the fair market value of a reasonable license fee – that is, "the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer."  On Davis, 246 F.3d at 166-67.  "The question is not what the owner would have charged [for a license], but rather what is the fair market value," which value the copyright owner must show.  Id. at 166; see also Mackie, 296 F.3d at 917 ("the market value approach is an objective, not a subjective, analysis"); DaimlerChrysler Servs., 2006 WL 208787, at *2 (copyright owner "may not rely on its own subjective estimate as to the price it would have charged [an alleged infringer] . . . . [the copyright owner] must introduce evidence of the fair market value of [the copyrighted work] at the time of infringement").  Such a measure serves to minimize the risk of abuse by the copyright owner.  On Davis, 246 F.3d at 166; see also Baker, 254 F.Supp.2d at 358 ("reasonable license

fee damages are not intended to be a windfall for a [copyright owner]").

In the present case, Adlife has not provided any evidence – nor even claimed for that matter – that it directly suffered lost sales or profits due to the alleged infringement of any images by MyWebGrocer, or that the value of its purported copyrights has been somehow diminished. As such (and assuming infringement were proven), any actual damages recoverable by Adlife would be limited to the fair market value of a reasonable license fee for the uses of Adlife's images by MyWebGrocer. But even then, Adlife will be unable to meet its burden of proof, as it has offered no evidence or expert testimony on the fair market value for the specific uses in question, which uses were as follows:

- The "PorkRibBabyBack006" Image. MyWebGrocer purchased a perpetual license covering this image from Multi-Ad Services in 2000, at a cost of approximately $5.80 per image licensed – 35 percent of which (i.e., $2.03) presumably was paid by Multi-Ad to Adlife per the terms of the "Adlife Digital Food Photographer Distributor Agreement" between those parties.[7] SUMF ¶¶ 21, 155, 157-59. Multi-Ad licensed the image to MyWebGrocer for the understood purpose of use in connection with the web services MyWebGrocer provided to its retail grocery store customers, including possible display on such customers' websites. Id. ¶ 22. MyWebGrocer added the image to its product library, which was the only location where the image was housed by MyWebGrocer (i.e., MyWebGrocer's customers did not take possession of the image from MyWebGrocer). Id. ¶ 23. Adlife claims infringement because, as of November 2016, the image appeared on various (29 stores) e-commerce websites MyWebGrocer developed and/or maintained for ShopRite, one of MyWebGrocer's retail grocery store customers, with the image being associated in each instance with the product "Boneless Pork Stir Fry." Id. ¶ 24. Adlife informed MyWebGrocer of its claim on November 1, 2016, at which time MyWebGrocer promptly and in good faith removed the image from its product library and, correspondingly, from the ShopRite websites where it had appeared, despite having licensed the image from Multi-Ad.[8] Id. ¶¶ 25-26.

- The "SausagePasta001" Image. Adlife claims infringement because, as of October and November 2016, this image appeared on various (12 stores) e-commerce websites

---

[7] MyWebGrocer purchased three "Ad Builder Food Photography" CDs, which contained a total of 900 images (including the "PorkRibBabyBack006" image), for a total perpetual license price of $5,220.00. Id. ¶ 157. Notably, for any sales by Multi-Ad of CDs containing Adlife's images under the "Adlife Digital Food Photographer Distributor Agreement," Adlife required that Multi-Ad first obtain Adlife's agreement to the selling price and to the identity of the customer. Id. ¶ 156.

[8] Adlife has already settled with ShopRite (Wakefern) regarding its alleged infringement claim for the "PorkRibBabyBack006" image. Id. ¶ 154.

MyWebGrocer developed and/or maintained for ShopRite.  Id. ¶ 32.  MyWebGrocer did not display the image on ShopRite's websites, the image did not come from MyWebGrocer, and at no time was the image added to or included in MyWebGrocer's product library (and thus could not be accessed from that database to be displayed on any MyWebGrocer customer websites).  Id. ¶¶ 35-36.  Adlife informed MyWebGrocer of its claim of infringement on November 1, 2016, at which time MyWebGrocer promptly and in good faith removed or caused to be removed the image from the ShopRite websites where it had appeared.[9]  Id. ¶¶ 33-34.

- The "WrapTurkeyHam001" Image.  Adlife claims infringement because, as of September 2016, this image appeared on the deli department landing page of a single website for Pennington Quality Market, one of MyWebGrocer's retail grocery store customers.  Id. ¶¶ 42-43.  This website was a WordPress site that, although created for Pennington by MyWebGrocer, was populated with content and maintained solely by Pennington.  Id. ¶ 44.  Pennington obtained the image on its own (through its ad agency) and directly placed the image on its website, with no involvement from MyWebGrocer.  Id. ¶ 45.  The image was at no time added to or included in MyWebGrocer's product library, and thus could not be accessed from that database to be displayed on any MyWebGrocer customer websites developed and/or maintained by MyWebGrocer.  Id. ¶ 48.  Adlife informed MyWebGrocer of its claim of infringement on November 1, 2016, at which time MyWebGrocer promptly and in good faith removed or caused to be removed the image from the Pennington website where it had appeared.[10]  Id. ¶¶ 46-47.

- The "MangosHR0612" Image.  Adlife claims infringement because this image appeared in weekly circulars included on various websites operated by Piggly Wiggly, a former retail grocery store customer of MyWebGrocer (for digital circular services only), for the ad weeks ending July 25, 2017 and August 8, 2017.  Id. ¶¶ 54-55.  ██████████████████ ███████████████████████████ Piggly Wiggly provided the image to MyWebGrocer for digitization as part of a circular advertisement, which included a collection of images and text, to be displayed solely on Piggly Wiggly websites.  Id. ¶¶ 56, 60.  The image was at no time added to or included in MyWebGrocer's product library, and thus could not be accessed from that database to be displayed on any MyWebGrocer customer websites developed and/or maintained by MyWebGrocer.  Id. ¶ 59.  Adlife informed MyWebGrocer of its claim of infringement on August 1, 2017, at which time MyWebGrocer promptly and in good faith removed or caused to be removed the circular containing the image from the Piggly Wiggly websites where it was displayed.  Id. ¶¶ 57-58.

- The "CherryBing006_ADL" Image.  Adlife claims infringement because this image appeared in weekly circulars included on various websites operated by Key Food, a retail grocery store customer of MyWebGrocer (for digital circular services only), for the ad

---

[9] Adlife has already settled with ShopRite (Wakefern) regarding its alleged infringement claim for the "SausagePasta001" image.  Id. ¶ 154.

[10] Adlife has already dealt directly with Pennington to resolve its alleged infringement claim for the "WrapTurkeyHam001" image.  Id. ¶ 153.

weeks ending July 27, 2017 and August 3, 2017.  Id. ¶¶ 67-68.  ██████████
████████████████████████████Key Food provided the image to MyWebGrocer for
digitization as part of a circular advertisement, which included a collection of images and
text, to be displayed solely on Key Food websites.  Id. ¶¶ 69, 73.  The image was at no
time added to or included in MyWebGrocer's product library, and thus could not be
accessed from that database to be displayed on any MyWebGrocer customer websites
developed and/or maintained by MyWebGrocer.  Id. ¶ 72.  Adlife informed
MyWebGrocer of its claim of infringement on August 1, 2017, at which time
MyWebGrocer promptly and in good faith removed or caused to be removed the circular
containing the image from the Key Food websites where it was displayed.  Id. ¶¶ 70-71.

- The "BeefBrisket001" Image.  MyWebGrocer purchased a perpetual license covering this
  image (in an "extra small" format) from iStock in 2009 for a price of one iStock "credit,"
  which at that time amounted to $1.00 – some portion of which presumably was paid by
  iStock to Adlife per those parties' express agreement.  Id. ¶¶ 78-79, 163.  iStock licensed
  the image to MyWebGrocer for the understood purpose of use in connection with the web
  services MyWebGrocer provided to its retail grocery store customers, including possible
  display on such customers' websites.  Id. ¶ 80.  The iStock license expressly permitted
  MyWebGrocer to "utilize the Permitted Uses an unlimited number of times," which
  Permitted Uses included "on-line or electronic publications, including web pages."  Id. ¶
  79.  MyWebGrocer added the image to its product library, which was the only location
  where the image was housed (or "installed") by MyWebGrocer (i.e., MyWebGrocer's
  customers did not take possession of the image from MyWebGrocer).  Id. ¶ 81.  Adlife
  claims infringement because, as of July 2016, the image appeared on recipe pages on
  non-e-commerce websites MyWebGrocer developed and/or maintained for Albertsons (4
  banners/stores) and Key Food (1 store), two of MyWebGrocer's retail grocery store
  customers.  Id. ¶ 82.  MyWebGrocer was notified of Adlife's claim of infringement in
  late July 2016 (for three Albertsons banners) and on September 9, 2016 (for one
  Albertsons banner and for Key Food), at which time MyWebGrocer promptly and in
  good faith removed the image from its product library and, correspondingly, from the
  Albertsons and Key Food websites where it had appeared back in July 2016, despite
  having licensed the image from iStock.  Id. ¶¶ 83-84.

- The "SandwichTunaSalad001" Image.  MyWebGrocer purchased a perpetual license
  covering this image (in an "extra small" format) from iStock in 2007 for a price of one
  iStock "credit," which at that time amounted to $1.00 – some portion of which
  presumably was paid by iStock to Adlife per those parties' express agreement.  Id. ¶¶ 90-
  91, 163.  iStock licensed the image to MyWebGrocer for the understood purpose of use
  in connection with the web services MyWebGrocer provided to its retail grocery store
  customers, including possible display on such customers' websites.  Id. ¶ 92.  The iStock
  license expressly permitted MyWebGrocer to "utilize the Permitted Uses an unlimited
  number of times," which Permitted Uses included "on-line or electronic publications,
  including web pages."  Id. ¶ 91.  MyWebGrocer added the image to its product library,
  which was the only location where the image was housed (or "installed") by
  MyWebGrocer (i.e., MyWebGrocer's customers did not take possession of the image

from MyWebGrocer).  Id. ¶ 93.  Adlife claims infringement because, as of September 2016, the image appeared on a single e-commerce website MyWebGrocer developed and/or maintained for ShopRite.  Id. ¶ 94.  MyWebGrocer was notified of Adlife's claim of infringement on October 3, 2016, at which time MyWebGrocer promptly and in good faith removed the image from its product library and, correspondingly, from the ShopRite website where it had appeared, despite having licensed the image from iStock.[11]  Id. ¶¶ 95-96.

As the above points demonstrate, MyWebGrocer made no use of two of the foregoing images ("WrapTurkeyHam001" and "SausagePasta001"), and therefore there is no fair market value for Adlife to even recover.  MyWebGrocer purchased licenses for three of the remaining images ("PorkRibBabyBack006," "BeefBrisket001," and "SandwichTunaSalad001"), and thus has already paid market value.  But even if it could show that MyWebGrocer's actions with respect to those images exceeded the scope of those licenses (which MyWebGrocer disputes), Adlife has not offered anything to demonstrate the fair market value of the unauthorized portions of the use.  Nor has Adlife offered evidence that would establish the market value for MyWebGrocer's limited actions with respect to the "MangosHR0612" and "CherryBing006_ADL" images.

The only evidence of license value Adlife has offered in this case is the fact that, ██████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████  Id. ¶ 166. "PreparedFoodPhotos.com" is Adlife's current subscription service for licensing its images, specifically offering "unlimited downloads" from a library of approximately 25,000 images, as well as "full access to stock photography on the website for the specific purposes of advertising," including in "[o]n-line or electronic publications, including web pages," for the subscriber's use and "for the benefit of one of its clients," for a monthly cost of $999.00 – or *four cents per*

---

[11] Adlife has already settled with ShopRite (Wakefern) regarding its alleged infringement claim for the "SandwichTunaSalad001" image.  Id. ¶ 154.

*image*.  Id. ¶¶ 164-65.  In any event, however, offering evidence regarding its

"PreparedFoodPhotos.com" service does not satisfy Adlife's burden in proving actual damages,

given that a copyright owner may not rely upon its own subjective estimate of what it would

charge an alleged infringer – the objective measure of fair market value at the time of

infringement is required.[12]  On Davis, 246 F.3d at 166; Mackie, 296 F.3d at 917;

DaimlerChrysler Servs., 2006 WL 208787, at *2.

In view of the foregoing, MyWebGrocer is entitled to summary judgment on Adlife's

claim for actual damages.  Further, to the extent the Court finds Adlife could prove such

damages, they should be limited to fair market license value (to the extent not already paid by

MyWebGrocer).

> **C.**    **MyWebGrocer is Entitled to Summary Judgment on Adlife's Claim for Statutory Damages Concerning the "WrapTurkeyHam001," "BeefBrisket001," and "SandwichTunaSalad001" Images.  For the Remaining Images, MyWebGrocer is Entitled to Summary Judgment on the Issues of Innocent Infringement and Willfulness.**

As explained above, as an alternative to seeking actual damages and the infringer's

profits, a copyright owner may elect to seek statutory damages under 17 U.S.C. § 504(c)(1).  A

single award of statutory damages is available for each work infringed, regardless of the number

of infringements of the work.  Id.; Bryant v. Media Right Prods., Inc., 603 F.3d 135, 140 (2d Cir.

2010) ("The Copyright Act allows only one award of statutory damages for any 'work'

infringed.").  The availability of statutory damages is further limited by 17 U.S.C. § 412, which

---

[12] MyWebGrocer submits that the fair market value of the food images at issue in this litigation, whatever it may be, is exceedingly low.  MyWebGrocer licensed the "BeefBrisket001" and "SandwichTunaSalad001" images from iStock for $1.00 apiece, and licensed the "PorkRibBabyBack006" image from Multi-Ad for $5.80.  SUMF ¶¶ 157, 163.  Currently, images can be licensed from iStock for either one or three "credits" (iStock's "own currency") per image, with credits costing between $8.00 and $12.00 depending on how many credits are purchased.  Id. ¶¶ 160-62.  This amounts to a range of between $8.00 and $36.00 per image.  Id. ¶ 162.  Images are also available at no charge from certain outlets, such as food industry associations.  Id. ¶ 146.  Finally, it is worth noting that the average monthly cost for Adlife's own "PreparedFoodPhotos.com" subscription service amounts to approximately four cents (4¢) per image (i.e., $999 ÷ 25,000 images).  Id. ¶ 164.

provides that "no award of statutory damages or of attorney's fees, as provided by sections 504

and 505, shall be made for . . . (2) any infringement of copyright commenced after first

publication of the work and before the effective date of its registration, unless such registration is

made within three months after the first publication of the work."

The bar imposed by § 412 of the Copyright Act clearly applies to the

"WrapTurkeyHam001," "BeefBrisket001," and "SandwichTunaSalad001" images:

- Adlife claims that the "WrapTurkeyHam001" image was created on November 8, 2005 and first published on November 16, 2005. SUMF ¶¶ 40-41. The effective date of the image's copyright registration was September 20, 2016. Id. ¶ 38. Adlife has reported that infringement of the image occurred as early as September 9, 2016 – i.e., before the effective date of registration, which registration was well beyond three months after first publication. Id. ¶ 43.

- Adlife claims that the "BeefBrisket001" image was created on July 11, 1999 and first published on July 23, 1999. Id. ¶¶ 76-77. The effective date of the image's copyright registration was August 5, 2016. Id. ¶ 74. Adlife has reported that infringement of the image occurred as early as July 2016 – i.e., before the effective date of registration, which registration was well beyond three months after first publication. Id. ¶ 82.

- Adlife claims that the "SandwichTunaSalad001" image was created on July 11, 2005 and first published on July 19, 2005. Id. ¶¶ 88-89. The effective date of the image's copyright registration was September 20, 2016. Id. ¶ 86. Adlife has reported that infringement of the image occurred on or before September 19, 2016 – i.e., before the effective date of registration, which registration was well beyond three months after first publication. Id. ¶ 94.

Statutory damages, therefore, are precluded as a matter of law for the "WrapTurkeyHam001,"

"BeefBrisket001," and "SandwichTunaSalad001" images.

For works that are not divested of a statutory damage award under § 412, the Copyright

Act permits a court to award statutory damages of between $750 and $30,000 per work, at the

court's discretion. 17 U.S.C. § 504(c)(1). However, if the copyright owner can prove that the

infringement was "willful," a court may award statutory damages as high as $150,000. 17

U.S.C. § 504(c)(2). "A copyright holder seeking to prove that a copier's infringement was

willful must show that the infringer had knowledge that its conduct represented infringement or .

. . recklessly disregarded the possibility." Bryant, 603 F.3d at 143. On the other hand, if the

alleged infringer can prove that the infringement was "innocent" – specifically, that "the

infringer was not aware and had no reason to believe that his or her acts constituted an

infringement of copyright" – a court may award of statutory damages as low as $200. 17 U.S.C.

§ 504(c)(2).

As explained below, MyWebGrocer is entitled to summary judgment on the issues of

innocent infringement and willfulness. Although the Second Circuit has noted that "caution

must be exercised in granting summary judgment when state of mind is in issue," it has further

explained that "the summary judgment rule would be rendered sterile . . . if the mere incantation

of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Res.

Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc., 926 F.2d 134, 141 (2d Cir. 1991)

(quotation omitted).

### 1.    *Innocent Infringement*

Any infringement of the "MangosHR0612" and "CherryBing006_ADL" images by

MyWebGrocer was innocent. The decision in the Bryant case is particularly instructive on the

issue of innocent infringement. In Bryant, plaintiffs contracted with one of the defendants

(Media Right) to market plaintiffs' two copyrighted albums. Bryant v. Europadisk, Ltd., No. 07

Civ 3050(WGY), 2009 WL 1059777, at *2 (S.D.N.Y. Apr. 15, 2009). Media Right, in turn,

contracted with another defendant (The Orchard) to distribute various audio recordings, which

included plaintiffs' albums. Id. at *3. In that contract, Media Right expressly warranted to The

Orchard that use of the recordings (including plaintiffs' albums) would not infringe upon any

rights of any third parties. Id. Although the district court concluded that The Orchard had

infringed plaintiffs' copyrights, it found the infringement to be innocent based upon The Orchard's reliance on the express warranty by Media Right that no rights would be infringed, and also upon the fact that The Orchard ceased the infringing conduct as soon as it learned of plaintiffs' copyright claim.  Id. at *7.  As against The Orchard, the court awarded plaintiffs statutory damages of $200 for each of its two albums.  Id. at *9.  The Second Circuit affirmed the district court's conclusion and award.  Bryant, 603 F.3d at 143.

In the present case, the undisputed facts clearly demonstrate that MyWebGrocer's alleged infringement of the "MangosHR0612" and "CherryBing006_ADL" images was innocent, following the same reasoning as in Bryant.  Both images were provided to MyWebGrocer by customers as part of a circular to be digitized, ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ SUMF ¶¶ 56, 60, 69, 73. And in each case, MyWebGrocer promptly took down the images upon notice of Adlife's claims of infringement.  Id. ¶¶ 58, 71.

The Court can also determine based on the undisputed facts that MyWebGrocer's alleged infringement of the "SausagePasta001" and "PorkRibBabyBack006" images was innocent. Regarding the "SausagePasta001" image, MyWebGrocer did not display that image on its customer's (ShopRite) website, id. ¶ 36, and thus would not even have known it was there let

alone potentially infringing.[13]  Regarding the "PorkRibBabyBack006" image, MyWebGrocer licensed that image from Multi-Ad specifically for uses contemplated by itself and Multi-Ad.[14] Id. at ¶¶ 21-22.  Thus, for both of these images, MyWebGrocer "was not aware and had no reason to believe that [its] acts constituted an infringement of copyright."  Moreover, as with the "MangosHR0612" and "CherryBing006_ADL" images, MyWebGrocer took down the "SausagePasta001" and "PorkRibBabyBack006" images upon notice of Adlife's claims of infringement.  Id. ¶¶ 26, 34.

## 2. *Willfulness*

By definition, the fact that MyWebGrocer's alleged infringement in this case was innocent means that there cannot be a finding of willfulness.  But even if the alleged infringement here was not innocent, a finding of willfulness – which requires that MyWebGrocer knew it was infringing or recklessly disregarded the possibility that it was infringing – would not be justified in this case.  The undisputed facts show that MyWebGrocer obtains the images used for its customers' websites only from legitimate channels – specifically, through licenses provided by authorized distributors, from consumer packaged goods companies and manufacturers authorized to furnish images, from industry associations that own images for use in promoting their industries, and from retail grocery store customers that expressly represent and warrant that use of the images will not infringe third parties' intellectual property rights – and that such was the case for all of the images at issue in this case.  Id. ¶¶ 3, 12-13, 21, 56, 60, 69, 73, 78, 90, 146.  The undisputed facts show that MyWebGrocer does not illegally download unlicensed or unauthorized images from the Internet or any other source.  Id. ¶ 15.  In other

---

[13] The same reasoning applies with respect to the "WrapTurkeyHam001" image.  But as explained above, Adlife is not entitled to *any* statutory damages for that image.

[14] The same reasoning applies with respect to the "BeefBrisket001" and "SandwichTunaSalad001" images.  But as explained above, Adlife is not entitled to *any* statutory damages for those images.

words, MyWebGrocer undeniably acts with reasonable care to avoid infringing the intellectual property rights of others.  Moreover, in this case MyWebGrocer promptly took down or caused to be taken down each of the images for which Adlife claimed infringement, despite the fact that MyWebGrocer at all times reasonably believed that the use of the images was duly authorized and lawful.  Id. ¶¶ 26, 34, 47, 58, 71, 84, 96.

In view of all of the foregoing, MyWebGrocer submits that there is no way a reasonable jury could find that any infringement by MyWebGrocer – if it even occurred at all – was committed willfully.

> **D.  MyWebGrocer is Entitled to Summary Judgment on Adlife's Claim for Attorneys' Fees Allocable to the "WrapTurkeyHam001," "BeefBrisket001," and "SandwichTunaSalad001" Images.**

Under 17 U.S.C. § 505, the court has discretion to award costs, including attorneys' fees, to the prevailing party in a copyright infringement action.  However, a copyright owner prevailing in litigation may not recover attorneys' fees where the alleged infringement began after the work was first published and before the copyright was registered, unless the registration was made within three months after the work was first published.  17 U.S.C. § 412.  Thus, for the same reasons Adlife cannot recover statutory damages for the "WrapTurkeyHam001," "BeefBrisket001," and "SandwichTunaSalad001" images, it also cannot recover attorneys' fees.

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, MyWebGrocer respectfully requests that this Court GRANT its Motion for Partial Summary Judgment on Damages for Copyright Infringement.

Dated at Burlington, Vermont this 1st day of March, 2019.

MYWEBGROCER, INC.

   /s/ Matthew S. Borick

Cathleen E. Stadecker
Matthew S. Borick
Evan J. O'Brien
Downs Rachlin Martin PLLC
199 Main Street
P.O. Box 190
Burlington, VT 05402-0190
Telephone: 802-863-2375
Fax: 802-862-7512
cstadecker@drm.com
mborick@drm.com
eobrien@drm.com

Attorneys For MyWebGrocer, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 1, 2019, I filed the foregoing document with the Clerk of Court via the CM/ECF system, which will provide notice of such filing to the following NEF counsel:

Gregory P. Howard, Esq., ghoward@docatty.com, jnn@docatty.com
Mathew K. Higbee, Esq., mhigbee@higbeeassociates.com
Naomi M. Sarega, Esq., nsarega@higbeeassociates.com

_____ /s/ Matthew S. Borick_____
Matthew S. Borick