**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

| | | |
|---|---|---|
| MYWEBGROCER, INC. | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:16-cv-00310-gwc |
| | ) | |
| ADLIFE MARKETING &, | ) | |
| COMMUNICATIONS CO., INC. | ) | |
| | ) | |
| Defendant and | ) | |
| Counterclaim Plaintiff | ) | |
| _____ | ) | |

**PLAINTIFF MYWEBGROCER'S STATEMENT
OF UNDISPUTED MATERIAL FACTS**

Pursuant to Fed. R. Civ. P. 56(c) and Local Rule 56(a), MyWebGrocer, Inc.

("MyWebGrocer") submits this Statement of Undisputed Material Facts in support of the

following:

- Motion for Partial Summary Judgment on the issue of *liability* with respect to (a) Count I ("Declaratory Judgment of No Copyright Infringement") of MyWebGrocer's Amended Complaint (ECF 10), and (b) the First Cause of Action ("Copyright Infringement") in Defendant/Counterclaimant Adlife Marketing & Communications Co.'s ("Adlife") First Amended Counterclaim (ECF 47); and

- Motion for Partial Summary Judgment on the issue of *damages* with respect to (a) Count I of MyWebGrocer's Amended Complaint, and (b) the First Cause of Action in Adlife's First Amended Counterclaim.

**UNDISPUTED FACTS**

**A.    General**

1.      MyWebGrocer provides software services to its retail grocery store customers that

consist of (a) building and maintaining e-commerce websites, (b) providing digital circular

services, and/or (c) building WordPress websites for customers.  Affidavit of Jerry Tarrant ("Tarrant Aff."), at ¶ 4.

2.      MyWebGrocer has its own product library/database that contains information (e.g., descriptions, ingredients, nutrition facts) on more than one million products, some of which have images associated with them.  Tarrant Aff., at ¶ 5; Declaration of Matthew S. Borick, Esq. ("Borick Decl."), at Exhibit 1, pp. 42-43.

3.      MyWebGrocer has obtained the images that are included in its product library from consumer packaged goods companies/manufacturers pursuant to written authorizations, from third-party image providers (e.g., iStock, Multi-Ad/Kwikee, ItemMaster) pursuant to license agreements, and from industry groups (e.g., National Cattlemen's Beef Association) that provide images they own.  Tarrant Aff., at ¶ 6.

4.      MyWebGrocer's retail grocery store customers use MyWebGrocer's product library primarily in connection with e-commerce websites and recipe pages on websites.  Tarrant Aff., at ¶ 7; Borick Decl., at Exhibit 1, pp. 45-46, 118-19.

5.      MyWebGrocer does not charge separate fees to its retail grocery store customers to use MyWebGrocer's product library.  Tarrant Aff., at ¶ 8.

6.      MyWebGrocer does not reduce its fees for software services if a retail grocery store customer chooses to use a different product library than MyWebGrocer's.  Tarrant Aff., at ¶ 9.

7.      MyWebGrocer's e-commerce services are typically priced in two different ways, either (a) a flat fee per order regardless of the number of products in an order or (b) a flat monthly fee regardless of the number of orders per month.  Tarrant Aff., at ¶ 10.

8.      MyWebGrocer's digital circular services are priced based upon the number of unique circular pages per cycle processed, irrespective of the number or types of products or images on a page.  Tarrant Aff., at ¶ 11.

9.      MyWebGrocer does not provide images for circular content on customer websites; such images are provided solely by the customer.  Tarrant Aff., at ¶ 12; Borick Decl., at Exhibit 1, pp. 45, 69.

10.     For WordPress websites built by MyWebGrocer for its retail grocery store customers, the customer pays a one-time flat fee to MyWebGrocer along with periodic maintenance/support fees.  Tarrant Aff., at ¶ 13.

11.     For WordPress websites built by MyWebGrocer for its retail grocery store customers, the website is controlled solely by the customer.  Tarrant Aff., at ¶ 14.

12.     MyWebGrocer occasionally receives images from its retail grocery store customers for display on those customers' specific websites.  Tarrant Aff., at ¶ 15.

13.     With respect to images MyWebGrocer receives from its retail grocery store customers for display on those customers' websites, the customer represents and warrants to MyWebGrocer, through its master services agreement, that it has obtained all necessary rights for the display of the image and that such display will not infringe upon the intellectual property rights of any third parties.  Tarrant Aff., at ¶ 16.

14.     MyWebGrocer does not add images provided by its retail grocery store customers to its product library, nor does MyWebGrocer display such images for any other customers. Tarrant Aff., at ¶ 17.

15.     MyWebGrocer does not illegally download unlicensed or unauthorized images from the Internet or any other source.  Tarrant Aff., at ¶ 18; Borick Decl., at Exhibit 1, p. 141.

16.     Based upon (a) its own sourcing of images for its product library, (b) the representations and warranties of its customers concerning images they provide, and (c) the fact that it does not illegally download unlicensed or unauthorized images, MyWebGrocer at all times believes that all images it displays or provides for display on customer websites do not infringe the intellectual property rights of third parties.  Tarrant Aff., at ¶ 19; Borick Decl., at Exhibit 1, p. 141.

**B.     The "PorkRibBabyBack006" Image**

17.     Adlife is the claimed owner of U.S. Copyright Registration No. VA 2-020-735, with an effective date of October 23, 2016.  Borick Decl., at Exhibit 2, p. 1.

18.     Registration No. VA 2-020-735 is a group registration of approximately 15 photographic images, whose author is claimed in the registration to be "ADLIFE Marketing & Communications Co. Inc. Employer-for-Hire of Joel Albrizio."  Borick Decl., at Exhibit 2, p. 1.

19.     Among the images purportedly covered by Registration No. VA 2-020-735 is one identified by Adlife as "PorkRibBabyBack006," with a claimed publication date of May 5, 1994. Borick Decl., at Exhibit 2, p. 1.

20.     Adlife reported the creation date of the "PorkRibBabyBack006" image as April 21, 1994.  Borick Decl., at Exhibit 3.

21.     MyWebGrocer licensed the "PorkRibBabyBack006" image from Multi-Ad Services on or about March 24, 2000, with no stated expiration date, when it purchased three "Ad Builder Food Photography" CDs from Multi-Ad Services, which contained the "PorkRibBabyBack006" image and 899 other images.  Borick Decl., at Exhibit 4; Tarrant Aff., at ¶¶ 26-27; Affidavit of Marc Radosevic ("Radosevic Aff.), at ¶¶ 5-6.

22.     At all times, Multi-Ad Services understood and accepted that MyWebGrocer's use of the images it licensed to MyWebGrocer (including the "PorkRibBabyBack006" image) was for purposes of the web services MyWebGrocer provided to its retail grocery store customers, including possible display of the images on such customers' websites.  Tarrant Aff., at ¶ 28; Radosevic Aff., at ¶ 7.

23.     At some point after obtaining its license for the "PorkRibBabyBack006" image, MyWebGrocer added that image to its product library, which was the only location where the image was housed by MyWebGrocer (i.e., MyWebGrocer's customers did not take possession of the image from MyWebGrocer).  Tarrant Aff., at ¶ 33; Borick Decl., at Exhibit 1, pp. 138, 141.

24.     Adlife has alleged that MyWebGrocer infringed the copyright in the "PorkRibBabyBack006" image – specifically, that the image appeared on various (29 stores) e-commerce websites MyWebGrocer developed and/or maintained for ShopRite (Wakefern), one of MyWebGrocer's retail grocery store customers, in November 2016, with the image being associated in each instance with the product "Boneless Pork Stir Fry."  ECF 47 & 47-4.

25.     MyWebGrocer was notified of the alleged infringement of the copyright in the "PorkRibBabyBack006" image on November 1, 2016.  Tarrant Aff., at ¶ 34.

26.     Despite having rights to use the "PorkRibBabyBack006" image, MyWebGrocer promptly and in good faith removed that image from its product library after receiving notice of the alleged infringement, after which time the image was not and could not be displayed on any MyWebGrocer customer websites, including but not limited to ShopRite websites.  Tarrant Aff., at ¶ 37; Borick Decl., at Exhibit 1, p. 138.

27.     ShopRite (Wakefern) dealt directly with Adlife and resolved the issue regarding the appearance of the "PorkRibBabyBack006" image on its websites.  Affidavit of Allison M. Berger, Esq. ("Berger Aff."), at ¶¶ 4-5.

**C.     The "SausagePasta001" Image**

28.     Adlife is the claimed owner of U.S. Copyright Registration No. VA 2-019-921, with an effective date of October 14, 2016.  Borick Decl., at Exhibit 5, pp. 1, 6.

29.     Registration No. VA 2-019-921 is a group registration of approximately 220 photographic images, whose author is claimed in the registration to be "Adlife Marketing & Communications Co. Inc., Employer-for-Hire of Joel Albrizio."  Borick Decl., at Exhibit 5, pp. 1-6.

30.     Among the images purportedly covered by Registration No. VA 2-019-921 is one identified by Adlife as "SausagePasta001," with a claimed publication date of March 9, 1997. Borick Decl., at Exhibit 5, p. 1.

31.     Adlife reported the creation date of the "SausagePasta001" image as March 2, 1997.  Borick Decl., at Exhibit 6.

32.     Adlife has alleged that MyWebGrocer infringed the copyright in the "SausagePasta001" image – specifically, that the image appeared on various (12 stores) e-commerce websites MyWebGrocer developed and/or maintained for ShopRite (Wakefern), one of MyWebGrocer's retail grocery store customers, in October/November 2016.  ECF 47 & 47-5.

33.     MyWebGrocer was notified of the alleged infringement of the copyright in the "SausagePasta001" image on November 1, 2016.  Tarrant Aff., at ¶ 38.

34.     After receiving notice of the alleged infringement, MyWebGrocer promptly and in good faith removed or caused to be removed the "SausagePasta001" image from the ShopRite websites where it was displayed.  Tarrant Aff., at ¶ 39.

35.     The "SausagePasta001" image was at no time added to or included in MyWebGrocer's product library, and thus could not be accessed from that database to be displayed on any MyWebGrocer customer websites developed and/or maintained by MyWebGrocer.  Tarrant Aff., at ¶ 40; Borick Decl., at Exhibit 1, pp. 143-44.

36.     MyWebGrocer did not display the "SausagePasta001" image on ShopRite's websites.  The image did not come from MyWebGrocer, and MyWebGrocer is unaware of where the image came from.  Tarrant Aff., at ¶ 41; Borick Decl., at Exhibit 1, p. 144.

37.     ShopRite (Wakefern) dealt directly with Adlife and resolved the issue regarding the appearance of the "SausagePasta001" image on its websites.  Berger Aff., at ¶¶ 4-5.

**D.     The "WrapTurkeyHam001" Image**

38.     Adlife is the claimed owner of U.S. Copyright Registration No. VA 2-017-741, with an effective date of September 20, 2016.  Borick Decl., at Exhibit 7, pp. 1, 6.

39.     Registration No. VA 2-017-741 is a group registration of approximately 250 photographic images, whose author is claimed in the registration to be "Adlife Marketing & Communications Co., Inc., Employer-for-Hire of Joel Albrizio."  Borick Decl., at Exhibit 7, p. 1-6.

40.     Among the images purportedly covered by Registration No. VA 2-017-741 is one identified by Adlife as "WrapTurkeyHam001," with a claimed publication date of November 16, 2005.  Borick Decl., at Exhibit 7, p. 4.

41.    Adlife reported the creation date of the "WrapTurkeyHam001" image as November 8, 2005.  Borick Decl., at Exhibit 8, p. 2.

42.    Adlife has alleged that MyWebGrocer infringed the copyright in the "WrapTurkeyHam001" image – specifically, that the image appeared on the deli department landing page of a single website for Pennington Quality Market, one of MyWebGrocer's retail grocery store customers.  ECF 47 & 47-6.

43.    Adlife has reported that MyWebGrocer's alleged infringement of the copyright in the "WrapTurkeyHam001" image occurred as early as September 9, 2016.  Borick Decl., at Exhibit 9.

44.    The Pennington Quality Market website on which the "WrapTurkeyHam001" image was displayed was a WordPress website that, although created for Pennington by MyWebGrocer, was populated with content and maintained solely by Pennington.  Tarrant Aff., at ¶ 42; Borick Decl., at Exhibit 1, p. 126.

45.    Pennington Quality Market (through its ad agency) obtained the "WrapTurkeyHam001" image on its own and directly placed the image on its WordPress website, with no involvement from MyWebGrocer.  Tarrant Aff., at ¶ 43; Borick Decl., at Exhibit 10; Borick Decl., at Exhibit 1, pp. 126, 131; Affidavit of Robert Tegge ("Tegge Aff."), at ¶ 5; Affidavit of Michael Rothwell ("Rothwell Aff."), at ¶ 4.

46.    MyWebGrocer was notified of the alleged infringement of the copyright in the "WrapTurkeyHam001" image on November 1, 2016.  Tarrant Aff., at ¶ 44.

47.    After receiving notice of the alleged infringement, MyWebGrocer promptly and in good faith removed or caused to be removed the "WrapTurkeyHam001" image from the

Pennington Quality Market website where it was displayed.  Tarrant Aff., at ¶ 45; Borick Decl.,

at Exhibit 1, pp. 128-29; Borick Decl., at Exhibit 10.

48.     The "WrapTurkeyHam001" image was at no time added to or included in

MyWebGrocer's product library, and thus could not be accessed from that database to be

displayed on any MyWebGrocer customer websites developed and/or maintained by

MyWebGrocer.  Tarrant Aff., at ¶ 46.

49.     Pennington Quality Market dealt directly with Adlife and resolved the issue

regarding the appearance of the "WrapTurkeyHam001" image on its WordPress website.

Rothwell Aff., at ¶¶ 5-6; Borick Decl., at Exhibit 10.

**E.     The "MangosHR0612" Image**

50.     Adlife is the claimed owner of U.S. Copyright Registration No. VA 2-022-602,

with an effective date of November 18, 2016.  Borick Decl., at Exhibit 11, pp. 1, 6.

51.     Registration No. VA 2-022-602 is a group registration of approximately 220

photographic images, whose author is claimed in the registration to be "Adlife Marketing &

Communications Co., Inc., Employer-for-Hire of Joel Albrizio."  Borick Decl., at Exhibit 11, pp.

1-6.

52.     Among the images purportedly covered by Registration No. VA 2-022-602 is one

identified by Adlife as "MangosHR0612," with a claimed publication date of July 5, 1994.

Borick Decl., at Exhibit 11, p. 2.

53.     Adlife reported the creation date of the "MangosHR0612" image as June 21,

1994.  Borick Decl., at Exhibit 12.

54.     Adlife has alleged that MyWebGrocer infringed the copyright in the

"MangosHR0612" image – specifically, that the image appeared in weekly circulars included on

various websites operated by Piggly Wiggly, a former retail grocery store customer of MyWebGrocer, for the ad weeks ending July 25, 2017 and August 8, 2017.  ECF 47 & 47-7.

55.     MyWebGrocer formerly provided digital circular services, but not e-commerce services, to Piggly Wiggly.   Tarrant Aff., at ¶ 47.

56.     For each of the two applicable ad weeks, Piggly Wiggly provided the "MangosHR0612" image to MyWebGrocer for digitization as part of a circular advertisement, which included a collection of images and text, to be displayed solely on Piggly Wiggly websites.  Tarrant Aff., at ¶ 48; Borick Decl., at Exhibit 1, p. 146.

57.     MyWebGrocer was notified of the alleged infringement of the copyright in the "MangosHR0612" image on August 1, 2017.  Tarrant Aff., at ¶ 49.

58.     After receiving notice of the alleged infringement, MyWebGrocer promptly and in good faith removed or caused to be removed the circular containing the "MangosHR0612" image from the Piggly Wiggly websites where it was displayed.  Tarrant Aff., at ¶ 50.

59.     The "MangosHR0612" image was at no time added to or included in MyWebGrocer's product library, and thus could not be accessed from that database to be displayed on any MyWebGrocer customer websites developed and/or maintained by MyWebGrocer.  Tarrant Aff., at ¶ 51.

60.     ███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████

 Borick

Decl., at Exhibit 13.

61.                                                                                   Borick Decl., at

Exhibit 14.

62.     The "MangosHR0612" image is included in the library of images made available

by Adlife through its "PreparedFoodPhotos.com" service.  Borick Decl., at Exhibit 15.

**F.     The "CherryBing006_ADL" Image**

63.     Adlife is the claimed owner of U.S. Copyright Registration No. VA 2-047-017,

with an effective date of March 5, 2017.  Borick Decl., at Exhibit 16, pp. 1, 6.

64.     Registration No. VA 2-047-017 is a group registration of approximately 250

photographic images, whose author is claimed in the registration to be "ADLIFE Marketing &

Communications Co. Inc., Employer-for-Hire of Joel Albrizio."  Borick Decl., at Exhibit 16, pp.

1-6.

65.     Among the images purportedly covered by Registration No. VA 2-047-017 is one

identified by Adlife as "CherryBing006_ADL," with a claimed publication date of June 25,

2000.  Borick Decl., at Exhibit 16, p. 4.

66.     Adlife reported the creation date of the "CherryBing006_ADL" image as June 18,

2000.  Borick Decl., at Exhibit 17.

67.     Adlife has alleged that MyWebGrocer infringed the copyright in the

"CherryBing006_ADL" image – specifically, that the image appeared in weekly circulars

included on various websites operated by Key Food, a retail grocery store customer of

MyWebGrocer, for the ad weeks ending July 27, 2017 and August 3, 2017.  ECF 47 & 47-8.

68.    MyWebGrocer provided digital circular services, but not e-commerce services, to Key Food.   Tarrant Aff., at ¶ 52.

69.    For each of the two applicable ad weeks, Key Food provided the "CherryBing006_ADL" image to MyWebGrocer for digitization as part of a circular advertisement, which included a collection of images and text, to be displayed solely on Key Food websites.  Tarrant Aff., at ¶ 53; Borick Decl., at Exhibit 1, p. 146.

70.    MyWebGrocer was notified of the alleged infringement of the copyright in the "CherryBing006_ADL" image on August 1, 2017.  Tarrant Aff., at ¶ 54.

71.    After receiving notice of the alleged infringement, MyWebGrocer promptly and in good faith removed or caused to be removed the circular containing the "CherryBing006_ADL" image from the Key Food websites where it was displayed.  Tarrant Aff., at ¶ 55.

72.    The "CherryBing006_ADL" image was at no time added to or included in MyWebGrocer's product library, and thus could not be accessed from that database to be displayed on any MyWebGrocer customer websites developed and/or maintained by MyWebGrocer.  Tarrant Aff., at ¶ 56.

73.    ███████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

█████████████████████████████████████████  Borick Decl., at Exhibit

18.

## G.    The "BeefBrisket001" Image

74.    Adlife is the claimed owner of U.S. Copyright Registration No. VA 2-012-581,

with an effective date of August 5, 2016.  Borick Decl., at Exhibit 19, pp. 1, 10.

75.    Registration No. VA 2-012-581 is a group registration of approximately 135

photographic images, whose author is claimed in the registration to be "Adlife Marketing &

Communications Co., Inc. Employer for Hire of David Cioffi [sic]."  Borick Decl., at Exhibit 19,

pp. 1-10.

76.    Among the images purportedly covered by Registration No. VA 2-012-581 is one

identified by Adlife as "BeefBrisket001," with a claimed publication date of July 23, 1999.

Borick Decl., at Exhibit 19, p. 7.

77.    Adlife reported the creation date of the "BeefBrisket001" image as July 11, 1999.

Borick Decl., at Exhibit 20.

78.    MyWebGrocer licensed the "BeefBrisket001" image (iStock file number

3167753), in an "extra small" format, from iStock on or about January 7, 2009.  Borick Decl., at

Exhibits 21-22; Tarrant Aff., at ¶ 29.

79.    MyWebGrocer's iStock license for the "BeefBrisket001" image was perpetual

and permitted MyWebGrocer to "utilize the Permitted Uses an unlimited number of times,"

which Permitted Uses included "on-line or electronic publications, including web pages."

Borick Decl., at Exhibit 23, pp. MWG-00329-00330.

80.    At all times, iStock understood and accepted that MyWebGrocer's use of the

images it licensed to MyWebGrocer (including the "BeefBrisket001" image) was for purposes of

the web services MyWebGrocer provided to its retail grocery store customers, including possible display of the images on such customers' websites.  Tarrant Aff., at ¶ 32; Borick Decl., at Exhibit 1, pp. 96-97, 104.

81.     At some point after obtaining its license for the "BeefBrisket001" image, MyWebGrocer added that image to its product library, which was the only location where the image was housed by MyWebGrocer (i.e., MyWebGrocer's customers did not take possession of the image from MyWebGrocer).  Tarrant Aff., at ¶ 33; Borick Decl., at Exhibit 1, p. 97.

82.     Adlife has previously alleged that MyWebGrocer infringed the copyright in the "BeefBrisket001" image – specifically, that the image appeared on recipe pages on non-e-commerce websites MyWebGrocer developed and/or maintained for Albertsons (4 banners/stores) and Key Food (1 store), two of MyWebGrocer's retail grocery store customers, in July 2016.  ECF 10 & 10-1; Tarrant Aff., at ¶ 35.

83.     MyWebGrocer was notified of the alleged infringement of the copyright in the "BeefBrisket001" image in late July 2016 (for three Albertsons banners) and on September 9, 2016 (for one Albertsons banner and for Key Food).  Tarrant Aff., at ¶ 35.

84.     Despite having rights to use the "BeefBrisket001" image, MyWebGrocer promptly and in good faith removed that image from its product library after receiving notice of the alleged infringement, after which time the image was not and could not be displayed on any MyWebGrocer customer websites, including but not limited to Albertsons and Key Food websites.  Tarrant Aff., at ¶ 37; Borick Decl., at Exhibit 1, pp. 103, 114.

85.     In its Amended Counterclaim in this action, Adlife did not include the "BeefBrisket001" image among those for which it presently seeks relief.  ECF 47.

**H.     The "SandwichTunaSalad001" Image**

86.     Adlife is the claimed owner of U.S. Copyright Registration No. VA 2-017-741, with an effective date of September 20, 2016.  Borick Decl., at Exhibit 7, pp. 1, 6.

87.     Registration No. VA 2-017-741 is a group registration of approximately 250 photographic images, whose author is claimed in the registration to be "Adlife Marketing & Communications Co., Inc., Employer-for-Hire of Joel Albrizio."  Borick Decl., at Exhibit 7, pp. 1-6.

88.     Among the images purportedly covered by Registration No. VA 2-017-741 is one identified by Adlife as "SandwichTunaSalad001," with a claimed publication date of July 19, 2005.  Borick Decl., at Exhibit 7, p. 4.

89.     Adlife reported the creation date of the "SandwichTunaSalad001" image as July 11, 2005.  Borick Decl., at Exhibit 8 p. 1.

90.     MyWebGrocer licensed the "SandwichTunaSalad001" image (iStock file number 3168302), in an "extra small" format, from iStock on or about June 14, 2007.  Borick Decl., at Exhibits 21 & 24; Tarrant Aff., at ¶ 30.

91.     MyWebGrocer's iStock license for the "SandwichTunaSalad001" image was perpetual and permitted MyWebGrocer to "utilize the Permitted Uses an unlimited number of times," which Permitted Uses included "on-line or electronic publications, including web pages." Borick Decl., at Exhibit 25, pp. MWG-00290-00291.

92.     At all times, iStock understood and accepted that MyWebGrocer's use of the images it licensed to MyWebGrocer (including the "SandwichTunaSalad001" image) was for purposes of the web services MyWebGrocer provided to its retail grocery store customers, including possible display of the images on such customers' websites.  Tarrant Aff., at ¶ 32; Borick Decl., at Exhibit 1, p. 104.

93.     At some point after obtaining its license for the "SandwichTunaSalad001" image, MyWebGrocer added that image to its product library, which was the only location where the image was housed by MyWebGrocer (i.e., MyWebGrocer's customers did not take possession of the image from MyWebGrocer).  Tarrant Aff., at ¶ 33; Borick Decl., at Exhibit 1, p. 117.

94.     Adlife has previously alleged that MyWebGrocer infringed the copyright in the "SandwichTunaSalad001" image – specifically, that the image appeared on a single e-commerce website MyWebGrocer developed and/or maintained for ShopRite (Wakefern), one of MyWebGrocer's retail grocery store customers, on or before September 19, 2016.  ECF 10 & 10-3.

95.     MyWebGrocer was notified of the alleged infringement of the copyright in the "SandwichTunaSalad001" image on October 3, 2016.  Tarrant Aff., at ¶ 36.

96.     Despite having rights to use the "SandwichTunaSalad001" image, MyWebGrocer promptly and in good faith removed that image from its product library after receiving notice of the alleged infringement, after which time the image was not and could not be displayed on any MyWebGrocer customer websites, including but not limited to ShopRite websites.  Tarrant Aff., at ¶ 37; Borick Decl., at Exhibit 1, p. 117.

97.     In its Amended Counterclaim in this action, Adlife did not include the "SandwichTunaSalad001" image among those for which it presently seeks relief.  ECF 47.

98.     ShopRite (Wakefern) dealt directly with Adlife and resolved the issue regarding the appearance of the "SandwichTunaSalad001" image on its websites.  Berger Aff., at ¶¶ 4-5.

**I.      Additional Facts Relevant to Adlife's Claimed Ownership of Copyrights in the Accused Images**

99.     Adlife has not produced in this litigation the certified deposits of the material it submitted to the Copyright Office in the course of registering its copyrights covering the

"PorkRibBabyBack006," "SausagePasta001," "WrapTurkeyHam001," "MangosHR0612,"
"CherryBing006_ADL," "BeefBrisket001," and "SandwichTunaSalad001" images (collectively,
hereafter, the "Accused Images").  Tarrant Aff., at ¶ 64.

100.    Although the copyright registrations claiming to cover the
"PorkRibBabyBack006," "SausagePasta001," "WrapTurkeyHam001," "MangosHR0612,"
"CherryBing006_ADL," and "SandwichTunaSalad001" images identify the author of such
images as "Adlife Marketing & Communications Co., Inc., Employer-for-Hire of Joel Albrizio,"
Adlife has provided no evidence in this litigation to corroborate its assertion that Mr. Albrizio
actually took the images.  Tarrant Aff., at ¶ 57.

101.    Although the copyright registration claiming to cover the "BeefBrisket001" image
identifies the author of the image as "Adlife Marketing & Communications Co., Inc. Employer
for Hire of David Cioffi [sic]," Adlife has provided no evidence in this litigation to corroborate
its assertion that David Ciolfi actually took the image.  Tarrant Aff., at ¶ 59.

102.    In its written discovery responses, Adlife has stated that "Upon information and
belief, Joel Albrizio – founder and CEO of Adlife – captured/took the Accused Images."  Borick
Decl., at Exhibit 26 (Adlife Interrogatory Response #10).

103.    Adlife has also stated in its written discovery responses that information on the
identity of the photographer of the Accused Images "is not currently available," "[g]iven that the
Accused Images [were] created/captured on or about 1999." Borick Decl., at Exhibit 27 (Adlife
Supplemental Interrogatory Response #1).

104.    Adlife has provided no evidence in this litigation to corroborate its assertion that
an Adlife employee actually took the Accused Images.  Tarrant Aff., at ¶¶ 58, 60.

105.     Adlife does not have in its possession, custody, or control any notes, metadata, digital files, film, or other information to demonstrate and verify that it created the Accused Images.  Borick Decl., at Exhibit 28 (Adlife Document Request Response #45).

106.     Adlife does not have in its possession, custody, or control information on the specific location where any of the Accused Images were taken, or on any persons (other than Joel Albrizio) who were present at the taking of any of the Accused Images or who were involved in any creative process for the Accused Images, nor does it have any agreements or other documents (beyond the registration certificates) relating to the taking or ownership of any of the Accused Images.  Borick Decl., at Exhibit 26 (Adlife Interrogatory Response #10, Adlife Document Request Responses #28-29).

107.     Adlife does not have in its possession, custody, or control any employee agreements, other work for hire agreements, and commissioning agreements concerning or relating to any of the Accused Images.  Borick Decl., at Exhibit 26 (Adlife Document Request Response #27).

108.     Adlife does not have in its possession, custody, or control any documents concerning or relating to the photographing of, or any other creative processes and decision-making for, any of the Accused Images.  Borick Decl., at Exhibit 26 (Adlife Document Request Response #28).

109.     According to Joel Albrizio, who claims to have photographed the Accused Images (or all but one of them), "[t]he creativity takes place with the food" – specifically, preparing food that "the customer, the consumer could identify with and believe they could cook at the house." Borick Decl., at Exhibit 29, pp. 42-44.

110.    According to Joel Albrizio, who claims to have photographed the Accused Images (or all but one of them), "lighting isn't very difficult.  The cameras all pretty much self-adjust on their own."  Borick Decl., at Exhibit 29, p. 43.

111.    Joel Albrizio purchased shares in Adlife in September 1994.  Borick Decl., at Exhibit 30, at ¶ 5; Borick Decl., at Exhibit 31, at *1.

112.    Prior to purchasing shares in Adlife, Joel Albrizio owned and operated J.M. Albrizio, Incorporated, which had a similar business purpose and business model as Adlife's.  Borick Decl., at Exhibit 30, at ¶ 6.

113.    An online Radaris profile page on Joel Albrizio indicates that his affiliation with Adlife began in September 1994.  Borick Decl., at Exhibit 32.

114.    As of the time of his deposition in this matter on June 21, 2018, Joel Albrizio's profile page on LinkedIn.com stated that his affiliation with Adlife began in 1994, as President.  Borick Decl., at Exhibit 33.

115.    In his deposition, Joel Albrizio testified that he became a "W-2 employee" of Adlife in 1992, and that 1994 was "when [he] bought the stock of Adlife and became an officer of the company."  Borick Decl., at Exhibit 29, pp. 18, 311.

116.    As of August 27, 2018, Joel Albrizio's profile page on LinkedIn.com had been changed, and stated that his affiliation with Adlife began in 1992, as President.  Borick Decl., at Exhibit 34.

117.    Adlife does not have in its possession, custody, or control any offer or hiring letters between Adlife and Joel Albrizio.  Borick Decl., at Exhibit 28 (Adlife Document Request Response #57).

118.    Adlife does not have in its possession, custody, or control any documents sufficient to verify the commencement date of Joel Albrizio's affiliation with Adlife as an employee.  Borick Decl., at Exhibit 28 (Adlife Document Request Response #58).

119.    Adlife does not have in its possession, custody, or control a Form W-2 for Joel Albrizio for 1992.  Borick Decl., at Exhibit 28 (Adlife Document Request Response #59).

120.    Adlife does not have in its possession, custody, or control a Form W-2 for Joel Albrizio for 1993.  Borick Decl., at Exhibit 28 (Adlife Document Request Response #60).

121.    Adlife does not have in its possession, custody, or control its Form W-2 for Joel Albrizio for 1994.  Borick Decl., at Exhibit 28 (Adlife Document Request Response #61).

122.    Adlife does not have in its possession, custody, or control a Form W-2 for Joel Albrizio for 1997.  Borick Decl., at Exhibit 28 (Adlife Document Request Response #62).

123.    Adlife does not have in its possession, custody, or control a Form W-2 for Joel Albrizio for 1999.  Borick Decl., at Exhibit 28 (Adlife Document Request Response #63).

124.    Adlife does not have in its possession, custody, or control a Form W-2 for Joel Albrizio for 2000.  Borick Decl., at Exhibit 28 (Adlife Document Request Response #64).

125.    Adlife does not have in its possession, custody, or control a Form W-2 for Joel Albrizio for 2005.  Borick Decl., at Exhibit 28 (Adlife Document Request Response #65).

126.    Adlife does not have in its possession, custody, or control any assignment agreements concerning any of the Accused Images.  Borick Decl., at Exhibit 28 (Adlife Document Request Response #66).

127.    David Ciolfi was employed by Adlife as a staff photographer for approximately ten years, from February 15, 1990 until January 18, 2000.  Affidavit of David Ciolfi ("Ciolfi Aff."), at ¶ 4.

128.    When David Ciolfi was hired by Adlife in 1990, he was the only photographer employed by the company.  Ciolfi Aff., at ¶ 5.

129.    Over time during David Ciolfi's tenure with Adlife, the company came to employ a group of six staff photographers.  Ciolfi Aff., at ¶ 6.

130.    For part of his ten-year tenure at Adlife, David Ciolfi was the director of photography for the company, and oversaw the work of the company's photography staff.  Ciolfi Aff., at ¶ 7.

131.    David Ciolfi was employed by Adlife at the time Joel Albrizio began working for the company.  Ciolfi Aff., at ¶ 8.

132.    When Joel Albrizio began working at Adlife, his role with the company was as a partner and salesperson, and had nothing to do with photography.  Ciolfi Aff., at ¶ 9.

133.    During his entire ten-year tenure at Adlife, David Ciolfi never once saw Joel Albrizio pick up a camera, take a photograph, or have any involvement in the process of taking of images or any part of the technical process of either film or digital photography production.  Ciolfi Aff., at ¶ 10.

134.    While employed as the director of photography at Adlife, David Ciolfi prepared daily shooting schedules for each of the company's photographers.  Ciolfi Aff., at ¶ 11.

135.    David Ciolfi never prepared a daily shooting schedule for Joel Albrizio, as Mr. Albrizio was not one of the company's photographers.  Ciolfi Aff., at ¶ 12.

136.    In the beginning of Mr. Ciolfi's ten-year tenure at Adlife, the company's images were all captured using film, and the film was placed in sleeves and binders and stored in file cabinets. Later, Adlife incorporated digital photography as it became available while still

shooting film. All film would then be scanned to Adlife's servers, along with digital images direct from digital cameras.  Ciolfi Aff., at ¶ 13.

137.    David Ciolfi has not performed any photography services for Adlife in any capacity since leaving the company in January 18, 2000.  Ciolfi Aff., at ¶ 14.

138.    David Ciolfi has not assigned or otherwise transferred to Adlife any rights he has or ever had in photographic images he created any time after January 18, 2000.  Ciolfi Aff., at ¶ 15.

139.    David Ciolfi is identified in Adlife's U.S. Copyright Registration No. VA 2-014-708 as the photographer who took all of the images covered by that registration.  Borick Decl., at Exhibit 35, p. 1.

140.    Adlife reported that all of the images covered by Registration No. VA 2-014-708 were created and published in 2007.  Borick Decl., at Exhibit 35, p. 1; Borick Decl., at Exhibit 36.

141.    David Ciolfi was not the photographer of any of the images covered by Registration No. VA 2-014-708, as they were all created and published seven years after Mr. Ciolfi left the company.  Ciolfi Aff., at ¶¶ 16-17.

142.    David Ciolfi is identified in Adlife's U.S. Copyright Registration No. VA 2-012-581 as the photographer who took all of the images covered by that registration.  Borick Decl., at Exhibit 19, p. 10.

143.    David Ciolfi does not recall taking any of the particular images covered by Registration No. VA 2-012-581, including the image identified as "BeefBrisket001," but in the case of many of the images covered by that registration, Mr. Ciolfi is certain that he did not take that particular image, and he is certain he did not take all of the images allegedly covered by that

registration.  Ciolfi Aff., at ¶¶ 18-19.

144.    During this litigation Adlife has reported on other images it contends have been infringed by MyWebGrocer, including images identified by Adlife as "BeefChuckSteakBnls007" and "BeefSloppyJoe001."  Tarrant Aff., at ¶ 61.

145.    The images identified by Adlife as "BeefChuckSteakBnls007" and "BeefSloppyJoe001" are included in the same Adlife copyright registration claiming to cover the "BeefBrisket001" image.  Tarrant Aff., at ¶ 62; Borick Decl., at Exhibit 19, pp. 5-6.

146.    MyWebGrocer obtained the images identified by Adlife as "BeefChuckSteakBnls007" and "BeefSloppyJoe001" from trade associations representing the beef industry.  These trade associations own a "vast library" of images and provide them – for no charge – for use by professionals in retail, food service, and other beef-industry-aligned fields to promote beef products.  Tarrant Aff., at ¶ 63; Borick Decl., at Exhibit 37.

## J.    Additional Facts Relevant to Adlife's Claim for Damages

147.    MyWebGrocer's revenues and profits are not derived from, nor affected by, the provision or display of any particular images on MyWebGrocer customer websites or the sales of any particular products through those websites.  Tarrant Aff., at ¶ 20.

148.    All receipts from sales of products through the websites of MyWebGrocer's customers belong solely to those customers.  Tarrant Aff., at ¶ 21.

149.    MyWebGrocer's revenues and profits are not determined in any way by the number of products sold or the dollar volume of sales on its customers' websites.  Tarrant Aff., at ¶ 22.

150.    There is no way for MyWebGrocer to determine, outside of pure speculation, whether the sale of a product through the website for a particular MyWebGrocer customer was

associated with or influenced in any way by a particular image.  Tarrant Aff., at ¶ 23.

151.    MyWebGrocer has not any received any revenues or profits that can be attributed to the use of any of the Accused Images or any other Adlife images on the websites for MyWebGrocer's retail grocery store customers.  Tarrant Aff., at ¶ 24.

152.    Removal of a particular food image from MyWebGrocer's product library or from one of its customers' websites has no effect whatsoever on MyWebGrocer's business (including its revenues and profits), as alternate images are readily available and serve the same purpose if desired.  Tarrant Aff., at ¶ 25.

153.    Adlife has already dealt directly with Pennington Quality Market to resolve its alleged infringement claims for the "WrapTurkeyHam001" image.  Rothwell Aff., at ¶¶ 5-6; Borick Decl., at Exhibit 10.

154.    Adlife has already settled with ShopRite (Wakefern) regarding its alleged infringement claims for the "PorkRibBabyBack006," "SausagePasta001," and "SandwichTunaSalad001" images.  Berger Aff., at ¶¶ 4-5.

155.    Pursuant to the "Adlife Digital Food Photographer Distributor Agreement" (entered June 8, 1994, amended Sept. 13, 2011) between Multi-Ad Services and Adlife, Multi-Ad Services paid Adlife thirty-five percent (35%) of its net sales of its CDs containing Adlife's food images.  Borick Decl., at Exhibit 38, pp. 3-4; Borick Decl., at Exhibit 29, p. 142.

156.    For any sales by Multi-Ad of CDs containing Adlife's images under the "Adlife Digital Food Photographer Distributor Agreement," Adlife required that Multi-Ad first obtain Adlife's agreement to the selling price and to the identity of the customer.  Borick Decl., at Exhibit 29, pp. 143, 154.

157.    In March 2000, MyWebGrocer purchased from Multi-Ad Services three "Ad

Builder Food Photography" CDs, which contained a total of 900 images (including Adlife's "PorkRibBabyBack006" image), for a total perpetual license price of $5,220.00, or $5.80 per image. Borick Decl., at Exhibit 4; Tarrant Aff., at ¶¶ 26-27; Borick Decl., at Exhibit 39; Radosevic Aff., at ¶¶ 5-6.

158.    Under the terms of the "Adlife Digital Food Photographer Distributor Agreement," Adlife was entitled to receive $1,827.00 (i.e. 35% of $5,220.00), or approximately $2.03 per image, of the license price MyWebGrocer paid to Multi-Ad. Borick Decl., at Exhibit 38, pp. 3-4.

159.    The relationship between Adlife and Multi-Ad under the "Adlife Digital Food Photographer Distributor Agreement" was terminated in November 2016, with the termination becoming effective as of March 1, 2017. ECF 47-2, p. 2 of 2; Borick Decl., at Exhibit 29, pp. 154, 161.

160.    Images can be purchased/licensed from iStock using "credits," which are iStock's "own currency" that "can be used to download any file on iStock – including photos." Borick Decl., at Exhibit 40, p. 2 ("All about credits").

161.    The present cost of one iStock "credit" ranges from $8.00 to $12.00, depending upon how many credits are purchased. Borick Decl., at Exhibit 41.

162.    At present, single images can be purchased/licensed on iStock for one "credit" (for "Essentials" images) or for three "credits" (for "Signature" images), which (applying the per-credit prices noted in the preceding paragraph) amounts to a range of between $8.00 and $36.00 per image. Borick Decl., at Exhibit 40, p. 1 ("Purchasing one image").

163.    MyWebGrocer licensed the "BeefBrisket001" image (iStock file number 3167753) and the "SandwichTunaSalad001" image (iStock file number 3168302) from iStock

back in 2009 and 2007, respectively, in an "extra small" format and for a price of one iStock "credit" each, which at that time amounted to $1.00 for each image.  Borick Decl., at Exhibits 21-22, 24; Tarrant Aff., at ¶¶ 29-31.

164.    Adlife's current subscription service for licensing its images, "PreparedFoodPhotos.com," offers "unlimited downloads" from a library of approximately 25,000 images for a monthly cost of $999.00, or approximately four cents (4¢) per image per month.  Borick Decl., at Exhibit 42 (the figure of 25,000 images is derived by adding the numbers of images pertaining to each category of prepared foods identified on the webpage, e.g. appetizers, bakery, beverages, etc.).

165.    The Terms of Use and End-User Subscription Agreement for Adlife's "PreparedFoodPhotos.com" service provide that Adlife's program allows a subscriber – specifically, up to five "End-users" (who can be the subscriber's employees or affiliates) – "full access to stock photography on the website for the specific purposes of advertising," including in "[o]n-line or electronic publications, including web pages," for the subscriber's use and "for the benefit of one of its clients."  Borick Decl., at Exhibit 43, pp. 2-4.

166.    ████████████████████████████████████
████████████████████████████████████████
███████████████████████ Borick Decl., at Exhibit 14.


Dated at Burlington, Vermont this 1st day of March, 2019.

MYWEBGROCER, INC.

__/s/ Matthew S. Borick_____
Cathleen E. Stadecker
Matthew S. Borick
Evan J. O'Brien
Downs Rachlin Martin PLLC
199 Main Street
P.O. Box 190
Burlington, VT 05402-0190
Telephone: 802-863-2375
Fax: 802-862-7512
cstadecker@drm.com
mborick@drm.com
eobrien@drm.com

Attorneys For MyWebGrocer, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 1, 2019, I filed the foregoing Statement of Undisputed Facts, together with the supporting exhibits, declaration, and affidavits cited therein, with the Clerk of Court via the CM/ECF system, which will provide notice of such filing to the following NEF counsel:

Gregory P. Howard, Esq., ghoward@docatty.com, jnn@docatty.com
Mathew K. Higbee, Esq., mhigbee@higbeeassociates.com
Naomi M. Sarega, Esq., nsarega@higbeeassociates.com


_____/s/ Matthew S. Borick_____
Matthew S. Borick