# Exhibit 29 to the Declaration of Matthew S. Borick

```
 1              UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF VERMONT
 3           CIVIL ACTION NO.:  5:16-cv-00310-gwc
 4
 5     ******************************************
 6   MYWEBGROCER, INC.,                          *
 7              PLAINTIFF                        *
 8              COUNTERCLAIM DEFENDANT           *
 9   v.                                          *
10                                               *
11   ADLIFE MARKETING &                          *
12   COMMUNICATIONS CO., INC.,                   *
13              DEFENDANT                        *
14              COUNTERCLAIM PLAINTIFF           *
15     ******************************************
16            DEPOSITION OF:  JOEL ALBRIZIO
17            ADLER, POLLOCK & SHEEHAN, P.C.
18            One Citizens Plaza, 8th Floor
19            Providence, Rhode Island
20            June 21, 2018    9:18 a.m.
21
22
23
24               Pauline L. Bailey
25               Professional Reporter
```

```
 1        A.    Yes.
 2        Q.    Okay.  So, when you started with
 3   Adlife, you think it was '92-ish?
 4        A.    Yeah, we worked together for at least
 5   a couple of years before I purchased the stock.
 6        Q.    All right.  So, were you actually an
 7   employee of Adlife starting in '92?
 8        A.    Yes, W-2 employee.
 9        Q.    All right.  How did you come to work
10   for Adlife?
11        A.    They liked my photography.
12        Q.    And you mean -- who is they?
13        A.    Their customers.
14        Q.    How did you know that their -- their
15   customers liked your photography?
16        A.    We were competitors at one time, they
17   didn't enjoy competing because we put together a
18   heck of a product.  And so we three Italian guys
19   got together in a Chinese restaurant and we agreed
20   to work together.
21        Q.    So, at the time JM Albrizio, Inc. was
22   a -- was competing with Adlife?
23        A.    No, I wouldn't say competing, but we
24   were in the same business.
25        Q.    Okay.  And so eventually you sat down
```

```
 1         A.    No.
 2         Q.    All right.  What do you think of, you
 3   know, I guess in, you know, in your artistic
 4   vision, you know, are the most important
 5   considerations you look for in getting a picture
 6   taken?
 7         A.    I want it to look like something you
 8   could cook at home, that's the key.  It can't look
 9   like something hotsy-totsy, you know, it has to be
10   something that -- we're selling something that we
11   believe the customer, the consumer could identify
12   with and believe they could cook at the house.
13         Q.    And so, what kind of things do you
14   factor in when you're doing that?
15         A.    I want it to look like -- I would
16   want it to look if -- if -- let's say I were really
17   able to cook it or wanted to cook it.
18         Q.    So, to make a good looking photo like
19   that, what does it -- what does it take
20   technologically to get it to look like that?
21         A.    That's too broad a question.
22         Q.    Well, I mean, to, you know, to take a
23   photo that looks -- that looks nice, that -- that
24   someone is going to want to see, what kind of
25   things do you have to do to make it look good, you
```

```
 1   know, technologically, starting with types of
 2   camera, lighting?
 3        A.    Well, it's not the type of camera,
 4   it's the -- it's the -- it's the image, it's what
 5   you're photographing.  It's like if you want this
 6   to look like a real meeting, it looks like this
 7   table.  You wouldn't want this to -- if you -- if
 8   we were actually photographing something to look
 9   like a meeting and we were all here sitting here as
10   we are, there's nothing on the table and there's no
11   place mats and there's nothing, then it doesn't
12   look real.  So, I just go by what I feel looks
13   real.
14        Q.    So, that's the actual artistic setup
15   is what looks real to you?
16        A.    Right.
17        Q.    How about from a -- from a technical
18   standpoint, you know, what do you do about lighting
19   and those kind of things?
20        A.    Well, lighting isn't very difficult.
21   The cameras all pretty much self-adjust on their
22   own.
23        Q.    So, it's just a camera and a -- and a
24   plate of food?
25        A.    The creativity takes place with the
```

1   food.
2       Q.   And who at Adlife works on that part,
3   the creativity of the food itself?
4       A.   Well, no one now.  We don't -- we
5   don't -- we just -- I just got done telling you, we
6   only photograph videos now.
7       Q.   Okay.  But I guess prior to going
8   into videos though, when you were taking still
9   shots, who, you know, who were the people who were
10  involved in this process?
11      A.   At times I used in-house people, at
12  times I used people that were restaurants.  For the
13  last number of years I've used restaurants.
14      Q.   So, in-house people, what -- who were
15  some of the people you used?
16      A.   I -- I couldn't tell you the names of
17  all the people over the years.  The -- I prepared
18  what I liked.  There would be different things --
19  there would be different things available to me, I
20  would put those together and create the picture
21  that I wanted for the store.
22      Q.   Right, but I said -- you're saying I,
23  I, I, but before it was we, we, we.
24      A.   Well, I -- I just explained to you
25  when we -- when we began everything, when you talk

```
 1        A.    Uh-huh.
 2        Q.    And --
 3              THE COURT REPORTER:  Is that yes?
 4        Q.    (By Mr. Borick) -- it says here --
 5   yeah, yes?
 6        A.    Oh, yes.
 7        Q.    Distributor agrees to pay developer a
 8   royalty fee of 35 percent of net sales of all
 9   distributor's food photography CD-ROMS contained
10   developed for -- digital photos on a quarterly
11   basis, correct?
12        A.    The agreement says, okay.
13        Q.    Yes.  So, basically Multi-Ad was
14   obligated on a quarterly basis to pay Adlife 35
15   percent of the -- of any net sales of the CD-ROMS
16   with images, correct?
17        A.    Yes.
18        Q.    All right.
19        A.    Per the agreement, yes.
20        Q.    And so, Multi-Ad was actually selling
21   these CDs to people?
22        A.    No, they were licensing them.
23        Q.    Okay.  But the word -- the word here
24   uses sales, correct?
25        A.    No, the -- it's licensing.  If you
```

```
 1   read through it's specific to -- somewhere in the
 2   agreement it's specific to that Adlife retains all
 3   copyrights and when the -- when the images -- when
 4   the subscription ends, the images had to be
 5   returned.
 6        Q.   Does -- did Adlife have anything --
 7   have any control over the license agreement that
 8   Multi-Ad was using with its own customers?
 9        A.   Initially, yes.
10        Q.   Okay.  What was that involvement?
11        A.   We had to agree on the price and we
12   had to agree that the customer could be a customer.
13        Q.   Okay.  Those are the two pieces,
14   right?
15        A.   Right.
16        Q.   Who it could be sold to and who it
17   could be -- and what the price would be?
18        A.   And for what price, yes.
19        Q.   All right. Now page four, Section 2.3
20   --
21        A.   Uh-huh.
22        Q.   -- says -- it's called definition of
23   net sales.  In the middle of that paragraph it says
24   distributor may set the price for its CD-ROMS
25   containing developer's digital photos, including
```

```
 1        A.    If that's how you read it.  Our
 2   relationship always was that we had to agree on a
 3   price and we had to agree on the individual or
 4   company that used it, period.
 5        Q.    Okay.  I thought you said up to a
 6   certain point that was how it worked and that it
 7   changed?
 8        A.    Right.  Some -- I don't know where in
 9   here the date changed where they stopped giving us
10   that information.  And when I was made aware that
11   that information was no longer always available to
12   us, we discontinued the relationship.
13        Q.    So, what was the -- let me see, can I
14   ask you.  So, if I asked you today, you know, how -
15   - how much Multi-Ad was selling for, you know, over
16   the period of this agreement, can you give me some
17   ranges of what things were selling for at the time?
18        A.    I really couldn't in 2011.
19        Q.    Yeah.  So, that -- but like back
20   though -- back when we're talking about CD-ROMS
21   even, back in '94, do you have any idea what the
22   prices were being charged for at the time?
23        A.    No.
24        Q.    All right.  When the termination
25   occurred, that was November 2016, I believe?
```

```
 1          Q.   Okay.  So, just recapping, the
 2   primary issues you remember was they weren't
 3   telling you who they were licensing to, nor what
 4   they were charging?
 5          A.   Right.
 6          Q.   Okay.  And so, can you give me an
 7   approximate year when this was discovered?
 8          A.   I -- it'd be too -- I don't want to
 9   estimate.
10          Q.   All right.  So, the termination
11   became effective, it looks like from Exhibit 14 it
12   became effective on, is it March 1, 2017?
13          A.   That was the first date that a user
14   could no longer use the subscription.
15          Q.   Okay.  So, then -- so, it's your
16   position that, you know, any Adlife images that a
17   party would've received from Multi-Ad was no longer
18   authorizing after that time period?
19          A.   I think that was their position.
20          Q.   That was their position.
21          A.   Well, I mean you're reading their
22   position --
23          Q.   Right.
24          A.   -- you're not reading my position.
25          Q.   Okay.  And so, what is your position?
```

```
 1          Q.    They said, another -- another
 2   defense, on information and belief Adlife
 3   represented to the copyright office for the purpose
 4   of securing the registrations that Adlife is the
 5   author of the image by virtue of its "employer for
 6   hire" relationship with Joel Albrizio, despite
 7   having knowledge that Joel Albrizio did not take
 8   the images and was not employed by Adlife at the
 9   time some -- some or all of the images were taken.
10                Do you see that or is that true?
11          A.    I've read that before, but I -- I go
12   back to the only thing that I can believe is that
13   someone looks at the LinkedIn page and says, wait a
14   second, he says the date is here, the date is here.
15   I -- I put down when I bought the stock of Adlife
16   and became an officer of the company.  I didn't put
17   down when I worked for Adlife doing, you know,
18   doing photography work or whatever else.  No
19   different than if I went to work for this law firm
20   as a consultant and they paid me by the hour for
21   the work that I did.  And W-2 obviously.
22          Q.    Right.
23          A.    And -- and but then, you know, two
24   years later they decided to make me a partner here.
25   Then I would put it on -- I would change my
```