**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| MYWEBGROCER, INC. )<br>)<br>    Plaintiff and )<br>    Counterclaim Defendant )<br>)<br>  v. )<br>)<br>ADLIFE MARKETING &,  )<br>COMMUNICATIONS CO., INC. )<br>)<br>    Defendant and )<br>    Counterclaim Plaintiff )<br>_____ ) | Civil Action No. 5:16-cv-00310-gwc |

**PLAINTIFF'S STATEMENT OF *DISPUTED* MATERIAL FACTS IN**
**RESPONSE TO DEFENDANT'S SEPARATE STATEMENT OF UNDISPUTED FACTS**
**IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56(c) and Local Rule 56(b), Plaintiff MyWebGrocer, Inc.

("MyWebGrocer") submits this Statement of Disputed Material Facts in response to Defendant

Adlife Marketing & Communications Co.'s ("Adlife") Separate Statement of Undisputed Facts

in Support of Defendant's Motion for Summary Judgment (ECF 95-1).

1.       Since 1978, Defendant and Counterclaim Plaintiff Adlife Marketing &

Communications Co. Inc. ("Adlife") has created, artistically arranged and professionally

produced a library of still images of food and other grocery items.

**RESPONSE:**

**Disputed on the grounds that the stated "fact" is more appropriately characterized**

**as opinion ("artistically arranged," "professionally produced").  Further disputed that**

***Adlife* has been engaged in the stated activities since 1978.  That year marks when Joel**

**Albrizio, Adlife's current president, claims to have begun freelancing in college and**

**subsequently through a business known as JM Albrizio, Inc., which operated from between**

1978 and 1994.  **Second Declaration of Matthew S. Borick, Esq. ("Second Borick Decl."), at**
**Exhibit 44, pp. 11:16-25 - 12:1-21.**

2.      The photographs in Adlife's library are high-resolution, artistically rendered with
pleasing angles and selective lighting, color- corrected and color-separated, which makes them
particularly valuable as, when used together, they provide color consistency.

**RESPONSE:**

        **Disputed on the grounds that the stated "fact" is more appropriately characterized**
**as opinion ("artistically rendered." "pleasing angles," "selective lighting," "particularly**
**valuable").  Further disputed for the reasons set forth in Section III.A of MyWebGrocer's**
**Motion for Partial Summary Judgment on Liability for Copyright Infringement (ECF 91)**
**and the supporting materials submitted therewith (ECF 93 & exhibits).**

3.      Adlife's one of a kind library now consists of tens of thousands of photos.

**RESPONSE:**

        **Disputed on the grounds that the stated "fact" is more appropriately characterized**
**as opinion ("one of a kind").  Further disputed that no other similar food photography**
**libraries exist.  Examples of other libraries include iStock by Getty Images, Shutterstock,**
**The Picture Pantry, StockFood, Foodiesfeed, and Pixabay.  Second Borick Decl., at Exhibit**
**45; id., at Exhibit 46; id., at Exhibit 47; id., at Exhibit 48; id., at Exhibit 49; id., at Exhibit**
**50.**

4.      The process for creating an image to be included in Adlife's food photography
library would typically include an Adlife employee creating a preliminary sketch of the image,
sending the sketch to a kitchen to have the food prepared, and then having the photographer style
the food on the plate before taking the photograph.  The photograph would then be color

corrected and color separated for consistency with the rest of Adlife's food photography library.

**RESPONSE:**

> **Not disputed that this stated fact reflects what Joel Albrizio and Sharon Albrizio testified to in their depositions. As stated, however, the fact is not material because it does not specifically address the actual taking of the particular images that are at issue in this litigation.**

5.      Every image in Adlife's food photography library was created by a W-2 employee.

**RESPONSE:**

> **Disputed for the reasons set forth in Section III.B of MyWebGrocer's Motion for Partial Summary Judgment on Liability for Copyright Infringement (ECF 91) and the supporting materials submitted therewith (ECF 93 & exhibits).**

6.      Adlife's food photography library contains the following food photographs: BeefBrisket001, SandwichTunaSalad001, PorkRibBabyBack006, SausagePasta001, WrapTurkeyHam001, MangosHR0612, and CherryBing006_ADL (the "Copyrighted Food Photographs").

**RESPONSE:**

> **Not disputed that the images identified by the listed names appear on the preparedfoodphotos.com website. Notably, the copyright owner for each of the images is identified as "Joel Albrizio - Prepared Food Photos," not Adlife. See, e.g., Second Borick Decl., at Exhibit 51. MyWebGrocer objects to the admissibility of the exhibits cited by Adlife on the grounds that they do not include certified copies of the deposit materials submitted to the U.S. Copyright Office.**

7.      Adlife registered the Copyrighted Food Photographs as works for hire with the United States Copyright Office.

**RESPONSE:**

**Not disputed that Adlife obtained registrations, but disputed that such registrations are valid for the reasons set forth in Section III of MyWebGrocer's Motion for Partial Summary Judgment on Liability for Copyright Infringement (ECF 91) and the supporting materials submitted therewith (ECF 93 & exhibits).  MyWebGrocer objects to the admissibility of the exhibits cited by Adlife on the grounds that they do not include certified copies of the deposit materials submitted to the U.S. Copyright Office.**

8.      Adlife did not register any image in its food photography library with the United States Copyright Office for which Adlife was not able to accurately verify the creation information.

**RESPONSE:**

**Disputed for the reasons set forth in Section III.B of MyWebGrocer's Motion for Partial Summary Judgment on Liability for Copyright Infringement (ECF 91) and the supporting materials submitted therewith (ECF 93 & exhibits).**

9.      Currently, the only place to license images from Adlife's food photography library is through a monthly subscription to www.preparedfoodphotos.com, a website owned and operated by Adlife.

**RESPONSE:**

**Not disputed.**

10.      In the past, limited portions of Adlife's food photography library were available through a monthly subscription with Multi-Ad, Inc. ("Multi-Ad").

**RESPONSE:**

      **Not disputed that Adlife's claimed images were available through Multi-Ad.**
**Disputed as whether the number was "limited."  In the cited deposition testimony, Mr.**
**Albrizio stated that he did not know how many of Adlife's images were available through**
**Multi-Ad.  See ECF 95-6, at p. 12 of 34 (Albrizio Depo., at p. 102:8-11).**

      11.    Adlife terminated its relationship with Multi-Ad, Inc. in November of 2016 and,
effective March 1, 2017, Multi-Ad subscribers were no longer authorized to use Adlife images.

**RESPONSE:**

      **Not disputed.**

      12.    Adlife decided to terminate its relationship with Multi-Ad because Multi-Ad was
not providing information to Adlife as to who was licensed and what price Multi-Ad was
charging its customers to license Adlife images.

**RESPONSE:**

      **Not disputed that Mr. Albrizio identified the stated reason as one of the reasons**
**behind the termination.  Mr. Albrizio also testified that "[t]here could've been a million**
**other reasons."  See ECF 95-6, at p. 20 of 34 (Albrizio Depo., at p. 158:18-22); see also First**
**Amended Complaint,  *Adlife Marketing & Communications Company, Inc. v. Multi-Ad***
***Solutions, LLC et al.*, U.S. District Court for the Central District of Illinois, Docket No.**
**1:17-CV-01418-MMM-JEH, ECF 42, at ¶¶ 34-45.**

      13.    Beginning in 2007, stock photo provider iStock licensed a limited number of
images from Adlife's food photography library on a per image basis.

**RESPONSE:**

      **Not disputed that Adlife's claimed images were available through iStock.  Disputed**

- 5 -

to the extent that "a couple thousand" images cannot be fairly construed as "a limited number."  See ECF 95-6, at p. 12 of 34 (Albrizio Depo., at p. 102:2-7).

14.     Adlife terminated its relationship with iStock in October of 2016.

**RESPONSE:**

      **Not disputed.**

15.     Currently, none of Adlife's food photography library is available for license on iStock.

**RESPONSE:**

      **Not disputed.**

16.     After Adlife terminated its relationship with iStock, iStock took away Adlife's ability to directly look up and confirm licenses issued from iStock.

**RESPONSE:**

      **Not disputed.  Further responding, Adlife continued to have other options for checking with iStock regarding licenses.  See, e.g., ECF 95-1, at ¶ 17.**

17.     Because Adlife does not have direct access to those records, in order to confirm any iStock license, Adlife is required to contact iStock directly so that an iStock employee can search iStock's records to see if a license was purchased.

**RESPONSE:**

      **Not disputed.**

18.     Plaintiff and Counterclaim Defendant MyWebGrocer, Inc. is a Delaware Corporation formed on June 18, 2009.

**RESPONSE:**

      **Not disputed.**

19.     MyWebGrocer Inc. is the Plaintiff and Counterclaim Defendant in this action.

**RESPONSE:**

   **Not disputed.**

20.     Prior to the organization of MyWebGrocer, Inc. in 2009 an entity known as MyWebGrocer, LLC was organized as a Vermont limited liability company on July 28, 1999.

**RESPONSE:**

   **Not disputed.**

21.     According to the Vermont Secretary of State, MyWebGrocer, LLC is currently inactive and ceased to do business on July 30, 2009.

**RESPONSE:**

   **Not disputed.  Further responding, on July 30, 2009, MyWebGrocer, LLC was merged with and into MyWebGrocer, Inc.  Second Borick Decl., at Exhibit 52; Second Affidavit of Jerry Tarrant ("Second Tarrant Aff."), at ¶ 7.  The purpose behind the merger of MyWebGrocer, LLC into MyWebGrocer, Inc. was so that the company could accept investment capital from outside sources.  Second Tarrant Aff., at ¶ 7.  MyWebGrocer, Inc. was created and incorporated in Delaware for this specific purpose.  Id.  The merger of MyWebGrocer with and into MyWebGrocer, Inc. had no effect on how the company performed its services for customers, including how the company used its various licenses and licensed images.  Id., at ¶ 8.**

22.     MyWebGrocer creates digital platforms for grocery stores, including developing, hosting, maintaining and optimizing e-commerce websites for the retail grocery industry and the consumer packaged goods industry.

**RESPONSE:**

**Not disputed.**

23.    The websites MyWebGrocer creates for its retail customers, which are owned by MyWebGrocer and reside exclusively on MyWebGrocer's servers, frequently use photographs of prepared food.

**RESPONSE:**

**MyWebGrocer objects pursuant to Fed. R. Civ. P. 56(c)(2) on the grounds that the stated fact is not supported by admissible evidence.  Adlife's cited support for this fact is MyWebGrocer's ENE statement, which is inadmissible under Fed. R. Evid. 408.  Adlife's assertion that MyWebGrocer has "waived" this evidentiary privilege, by virtue of referencing its ENE statement in its response to Adlife's Interrogatory No. 7, is unfounded. MyWebGrocer's response to Interrogatory No. 7 incorporated by reference the language in MyWebGrocer's ENE Statement that described "(a) the circumstances under which MyWebGrocer (and its counsel) became aware that Defendant was claiming copyright ownership in the Accused Images, as well as the basis for such claim; and (b) the steps MyWebGrocer (and its counsel) took as a result."  This language is separate and distinct from the language upon which Adlife relies in stating the present fact; accordingly, there is no "waiver."  Further responding, the stated fact is disputed in any event because it is incorrect.  MyWebGrocer builds websites for its customers and owns the intellectual property (i.e., software) through which the websites operate.  Second Tarrant Aff., at ¶ 5. The customers themselves own the actual websites.  Id.  In addition, the websites MyWebGrocer builds for its customers do not reside exclusively on MyWebGrocer's servers.  Id., at ¶ 6.  Although some of the websites MyWebGrocer builds for its customers reside exclusively on MyWebGrocer's servers, others reside either wholly or partially on**

**the customer's servers.  Id.** ███████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████ **Id.**

24.     Wakefern, Albertsons/Safeway, Pennington Quality Markets, and Key Food are all customers of MyWebGrocer.

**RESPONSE:**

> **Not disputed.**

25.     A number of independent Piggly Wiggly branded franchises located in Wisconsin and Illinois are also customers of MyWebGrocer.

**RESPONSE:**

> **Not disputed that Piggly Wiggly was formerly a customer of MyWebGrocer. Disputed that Piggly Wiggly is currently a customer.  See ECF 93, at ¶ 55.**

26.     The food images in MyWebGrocer's image database are sourced from ItemMaster, iStock, Multi-Ad Inc. d/b/a Kwikee Systems, Consumer Packaged Goods companies (referred to as "CPGs"), the National Cattleman's Association, the National Pork Board, and the National Chicken Council.

**RESPONSE:**

> **Not disputed.**

27.     Approximately 10 to 12 employees from MyWebGrocer's retail operations department have access to the images in MyWebGrocer's food image database at any given time.

**RESPONSE:**

> **Disputed on the grounds that the stated fact mischaracterizes the cited deposition testimony.  Mr. Tarrant testified – in his personal capacity, as the topic addressed in this**

stated fact was beyond the scope of Adlife's Rule 30(b)(6) notice – that he did not know how many MyWebGrocer employees had access to the images in MyWebGrocer's database, but that it could be between 10 and 12 people (i.e., the number of people in MyWebGrocer's operations department). **See ECF 95-22, at p. 8 of 34 (Tarrant Depo., at p. 44:10-20).**

28.    The MyWebGrocer employees who have access to MyWebGrocer's food image database are located at MyWebGrocer headquarters in Vermont and at MyWebGrocer's Dublin, Ireland office.

**RESPONSE:**

**Disputed on the grounds that the stated fact mischaracterizes the cited deposition testimony.  Mr. Tarrant testified – in his personal capacity, as the topic addressed in this stated fact was beyond the scope of Adlife's Rule 30(b)(6) notice – that some MyWebGrocer employees who had access to the images in MyWebGrocer's database "might" be in the company's Dublin, Ireland office.  See ECF 95-22, at p. 8 of 34 (Tarrant Depo., at p. 44:22-23).**

29.    Once an image is placed in MyWebGrocer's food image database, there is no way for MyWebGrocer to tell which source it came from or on what date it was acquired.

**RESPONSE:**

**Disputed on the grounds that the stated fact mischaracterizes the cited deposition testimony.  Although Adlife cites to a block of testimony, the stated fact reflects only a portion of that block of testimony, and does not address other sources of information available to MyWebGrocer beyond what it actually shown in its database.  See ECF 95-22, at p. 11 of 34 (Tarrant Depo., at p. 50:1-21).**

30.     MyWebGrocer does not store licensing information with each image it acquires when that image is uploaded to MyWebGrocer's food image database.

**RESPONSE:**

**Not disputed that licensing information is not stored "with each image."**

31.     Food images used on the websites designed by MyWebGrocer for its customers are typically used in one of four ways: in connection with MyWebGrocer's e-commerce services, on recipe pages, on a WordPress component, and in digitized circulars.

**RESPONSE:**

**Not disputed.**

32.     Food images used in connection with MyWebGrocer's e-commerce platform are sometimes sourced from MyWebGrocer's database of food images and sometimes provided to MyWebGrocer by its retail customers.

**RESPONSE:**

**Not disputed.**

33.     Food images used on the Wordpress component were provided by MyWebGrocer's retail customers.

**RESPONSE:**

**Not disputed.**

34.     Food images used in connection with recipe pages are sometimes sourced from MyWebGrocer's database of food images and sometimes provided to MyWebGrocer by its retail customers.

**RESPONSE:**

**Not disputed.**

35.     Food images appearing in connection with digitized circulars are sourced from single file PDF copies of weekly circulars provided by MyWebGrocer's customers or their advertising agencies to MyWebGrocer.

**RESPONSE:**

**Not disputed.**

36.     MyWebGrocer customers provide a single PDF file of their weekly circular to MyWebGrocer for digitization, which is dissected by MyWebGrocer in a process that involves pulling the individual pieces of the circular out, duplicating the individual food images contained in the circular, and displaying individual JPEG files of each extracted food image on the customer's website.

**RESPONSE:**

**Not disputed that the stated fact is consistent with Mr. Tarrant's deposition testimony given in his personal capacity.  MyWebGrocer objected to Topic 4 of Adlife's Rule 30(b)(6) notice ("Any and all WEBSITES owned and/or operated by you.") on the grounds that it was vague, overbroad, and in violation of the "reasonable particularity" standard under Fed. R. Civ. P. 30(b)(6), and MyWebGrocer sought relief from the Court on these bases.  See ECF 62 & 62-1.  During a telephonic hearing held on August 7, 2018, the Court directed Adlife to provide further clarification on Topic 4, but Adlife did not do so.**

37.     In July of 2016 Adlife identified an unlicensed use of its BeefBrisket001 image, and sent correspondence to a Safeway store in California, and two Albertsons stores in Indiana and Massachusetts respectively stating that the retailers were not authorized to use the BeefBrisket001 image, offering to settle the matter with each of the retailers for $8,000 ("July

Infringement Notices").

**RESPONSE:**

>  **Disputed as to the characterization that the use was "unlicensed," for the reasons set forth in Section III.C of MyWebGrocer's Motion for Partial Summary Judgment on Liability for Copyright Infringement (ECF 91) and the supporting materials submitted therewith (ECF 93 & exhibits).  Further disputed, based upon the express wording of the July Infringement Notices cited by Adlife in support of this stated fact, that Adlife offered to settle with the retailers for $8,000.  The July Infringement Notices demanded $8,000 from each retailer – and invoiced them for that amount – as "the cost of this infringement." See ECF 95-3, at pp. 14-22 of 34.  The July Infringement Notices did not state that payment of the invoiced $8,000 would settle the matter.  See id.**

38.     The July Infringement Notices contained an exhibit showing the BeefBrisket001 image being used on a recipes page for each retailer's website.

**RESPONSE:**

>  **Not disputed.**

39.     On August 8, 2016 Adlife received a letter from Albertsons' in-house counsel, Gigi Remington, stating that Albertsons had received the July Infringement Notice, investigated the matter, and "concluded that MyWebGrocer (MWG) is the provider of the allegedly infringing copyrighted image depicted in your letters," and stating that Albertsons and Safeway had tendered the claim to MyWebGrocer for handling.

**RESPONSE:**

>  **Not disputed.**

40.     On August 19, 2016, MyWebGrocer General Counsel Christina Wahlig sent a

letter Joel Albrizio, president of Adlife stating that "MyWebGrocer acquired the right to use this [BeefBrisket001] image when it purchased the assets of NeXpansion Inc. in 2003."

**RESPONSE:**

    **Not disputed.**

41.    In the August 19, letter, MyWebGrocer further refused to stop using the image and stated that even if Adlife could provide evidence proving the use was unauthorized, MyWebGrocer would refuse to pay any monetary compensation:

> "MyWebGrocer intends to continue to use the image unless and until Adlife provides evidence that MyWebGrocer is mistaken in its understanding that it acquired the rights to use this image in 2003. Upon provision of such evidence MyWebGrocer will take down the Image but we will not pay any monetary damages as MyWebGrocer believes it has the right to use the image in question."

**RESPONSE:**

    **Disputed on the grounds that the stated fact mischaracterizes some of the quoted portion of the cited letter.  See ECF 95-17, at p. 2 of 2.  Further disputed on the grounds that, later that same day (August 19), Attorney Wahlig informed Adlife that would take down the image that same day.  Second Borick Decl., at Exhibit 53.**

42.    On September 9, 2016, Adlife provided MyWebGrocer with the copyright registration number covering the BeefBrisket001 image.

**RESPONSE:**

    **Not disputed that Adlife identified a copyright registration number that purportedly covered the BeefBrisket001 image.**

43.    That same day, Wahlig responded to Albrizio in an email accusing Albrizio of "falsely represen[ing] to MyWebGrocer customer [Albertsons-Safeway] that MyWebGrocer has

been uncooperative" and stating that "Adlife's repeated emails to MyWebGrocer and its customer [Albertsons-Safeway], while refusing to provide the requested evidence, constitute[s] harassment."

**RESPONSE:**

       **Disputed that the referenced communication from Atty. Wahlig was in response to the communication in ¶ 42 above, which was from Sharon Ferretti at 3:46 p.m.  Second Borick Decl., at Exhibit 54.  The referenced communication from Atty. Wahlig was earlier in the day (11:42 a.m.).  ECF 95-18, at p. 3 of 4.  Otherwise, not disputed.**

       44.     On September 14, 2016, Wahlig sent a second formal letter to Albrizio requesting information regarding licenses issued by Adlife because MyWebGrocer was "having some difficulty retrieving certain records" related to its acquisition of NeXpansion, Inc. including "obtaining more specific identification of [the] assets and licenses" acquired the NeXpansion, Inc. purchase.

**RESPONSE:**

       **Disputed on the grounds that the stated fact mischaracterizes the cited letter.  The request in Atty. Wahlig's letter for information on licenses issued *by Adlife* was unrelated to the text quoted by Adlife.  Atty. Wahlig's point regarding "having some difficulty retrieving certain records" was in reference to the passage of time (13 years) since MyWebGrocer had purchased the assets and licenses of a *third party* (NeXpansion).  See ECF 95-19, at p. 2 of 4.**

       45.     Attached to the September 14, 2016 letter was a document titled "ASSET PURCHASE AGREEMENT" dated November 13th, 2003 between NeXpansion, Inc., and MyWebGrocer, LLC, not MyWebGrocer, Inc.

**RESPONSE:**

**Not disputed.**

46.     Subsequently, Adlife identified an unlicensed use of its SandwichTunaSalad001 image, and on September 19, 2016, Adlife sent correspondence to a ShopRite store in Connecticut stating that ShopRite was not authorized to use the SandwichTunaSalad001 image and offering to settle the matter for $8,000 ("September Infringement Notice").

**RESPONSE:**

**Disputed as to the characterization that the use was "unlicensed," for the reasons set forth in Section III.C of MyWebGrocer's Motion for Partial Summary Judgment on Liability for Copyright Infringement (ECF 91) and the supporting materials submitted therewith (ECF 93 & exhibits).  Further disputed, based upon the express wording of the September Infringement Notice cited by Adlife in support of this stated fact, that Adlife offered to settle with ShopRite for $8,000.  The September Infringement Notice demanded $8,000 from ShopRite – and invoiced it for that amount – as "the cost of this infringement."  See ECF 95-3, at p. 28 of 34.  The September Infringement Notice did not state that payment of the invoiced $8,000 would settle the matter.  See id.**

47.     The September Infringement Notice contained an exhibit showing the SandwichTunaSalad001 image being used on a digital shopping cart on the ShopRite website.

**RESPONSE:**

**Disputed that the exhibit showed the image being used on a "digital shopping cart." See ECF 95-3, at p. 29 of 34.**

48.     On November 1, 2016 in accordance with MyWebGrocer's prior request, Adlife sent counsel for MyWebGrocer three additional images owned by Adlife which Adlife

contended were used without permission or license, specifically: PorkRibBabyBack006, SausagePasta001, and WrapTurkeyHam001.

**RESPONSE:**

**Not disputed that on November 1, 2016 Adlife identified three additional images it allegedly owned and that were allegedly used without permission or license. See ECF 95-3, at p. 5 of 34, at ¶ 20.**

49.     After subsequent discussions broke down, on November 18, 2016, MyWebGrocer filed "a declaratory judgment action on behalf of MyWebGrocer and its customers" regarding the BeefBrisket001, SandwichTunaSalad001, PorkRibBabyBack006, SausagePasta001, and WrapTurkeyHam001 images, and asking that the Court "issue a declaratory judgment stating that Adlife is without right or authority to threaten or to maintain suit against MyWebGrocer or its customers for alleged copyright infringement, that no valid and enforceable copyright is infringed by MyWebGrocer or its customers."

**RESPONSE:**

**Not disputed that MyWebGrocer's *original* Complaint, filed on November 18, 2016, contained the quoted language. Adlife's citation to MyWebGrocer's First Amended Complaint is partially inaccurate. See ECF 95-3, at p. 2 of 34, at ¶ 1.**

50.     Five days later, on November 23, 2016, Wahlig sent an email to Shannon Shirt at iStock seeking to verify potential iStock licenses for the images in MyWebGrocer's complaint, as licenses had not yet been verified.

**RESPONSE:**

**Not disputed.**

51.     On November 28, 2018, Shirt emailed Wahlig and stated that she was not able to

find any license to NeXpansion Inc., but that she had found a license for the BeefBrisket001 image and for the SandwichTunaSalad001 image under an account for MyWebGrocer.

**RESPONSE:**

**Not disputed.**

52.     The results of the search indicated that "an account for My Web Grocer" had purchased a "standard license" for the BeefBrisket001 Image from iStock on January 7, 2009, and a "standard license" for the SandwichTunaSalad001 image from iStock on January 14, 2007.

**RESPONSE:**

**Not disputed.**

53.     Because the iStock licenses for the BeefBrisket001 and SandwichTunaSalad001 images were purchased before the formation MyWebGrocer, Inc. on June 18, 2009, they would have been purchased from iStock by MyWebGrocer, LLC.

**RESPONSE:**

**Disputed on the grounds that the stated "fact" is more appropriately characterized as argument or speculation ("would have been").  But not disputed that MyWebGrocer, LLC purchased the license, which vested in MyWebGrocer, Inc. by operation of law as a result of a merger.**

54.     On February 23, 2017, MyWebGrocer filed an Amended Complaint which added a cause of action against Adlife under Vermont Consumer Protection Act ("VCPA"), 9 V.S.A. §2451, *et seq*.

**RESPONSE:**

**Not disputed.**

55.     Adlife filed an Answer and a Counterclaim alleging copyright infringement as to

the PorkRibBabyBack006, SausagePasta001, WrapTurkeyHam001, MangosHR0612, and CherryBing006_ADL images, and attached infringement data sheets showing evidence of the various infringements alleged and the dates the infringement occurred.

**RESPONSE:**

**Not disputed that Adlife's Counterclaim alleged copyright infringement as to the images it identified as PorkRibBabyBack006, SausagePasta001, WrapTurkeyHam001, MangosHR0612, and CherryBing006_ADL, and that the Counterclaim included attachments that purport to be "evidence."  MyWebGrocer objects on the grounds that the referenced attachments have not been authenticated.**

56.     On June 28, 2017, Wahlig sent an email to Shirt requesting a copy of the iStock standard license agreement from 2007, which Shirt provided.

**RESPONSE:**

**Disputed on the grounds that the stated fact mischaracterizes the cited email.  Atty. Wahlig did not request the "standard" license agreement from iStock, but rather requested "the License Agreement that would have been in place for 2007."  See ECF 95-26, at p. 3 of 17.  Otherwise, not disputed.**

57.     On June 29, 2017, Wahlig sent an email to Shirt requesting a copy of the iStock standard license agreement from 2009, which Shirt also provided.

**RESPONSE:**

**Disputed on the grounds that the stated fact mischaracterizes the cited email.  Atty. Wahlig did not request the "standard" license agreement from iStock, but rather requested "the 2009 license agreement."  See ECF 95-27, at p. 3 of 30.  Otherwise, not disputed.**

58.     On July 6, 2017, Naomi Sarega, counsel for Adlife, sent an email to Veronica

Langridge a claims specialist at iStock to confirm licenses for various Adlife images. Langridge responded by stating that she was unable to locate licenses for the SausagePasta001 and WrapTurkeyHam001 images, and that the PorkRibBabyBack006 image was never offered for license through iStock.

**RESPONSE:**

**MyWebGrocer objects to the admissibility of the exhibit cited by Adlife on the grounds that it is inadmissible hearsay.  Disputed on the grounds that the documentation cited in support of the stated fact does not actually support the stated fact.**

59.     On July 24, 2017, Jerry Tarrant, COO of MyWebGrocer, sent a email to Michael Rothwell, VP and General Manager of Pennington Quality Market, and Robert Tegge, the president of Media Minds, Inc., Pennington's advertising agency, inquiring about the WrapTurkeyHam001 image, which had been found on Pennington Quality Market website and contained an iStock number.

**RESPONSE:**

**Not disputed.**

60.     On August 4, 2017, Tegge responded stating that the WrapTurkeyHam001 image had not been licensed but instead downloaded directly from a Google search and that it was not acquired via iStock.

**RESPONSE:**

**Not disputed.**

61.     On August 4, 2017, Wahlig reached out to a representative of Multi-Ad to see if MyWebGrocer could obtain information about a possible past license to MyWebGrocer.

**RESPONSE:**

**Disputed on the grounds that the referenced communication did not occur on August 4, 2017.  See ECF 95-24, at p. 9 of 10.  Otherwise, not disputed.**

62.     Multi-Ad confirmed that on March 24, 2000 MyWebGrocer paid a one time fee and entered into a services agreement with Multi- Ad and acquired CDs containing food images for the years 1997, 1998, and 1999 totaling approximately 900 images.

**RESPONSE:**

**Disputed on the grounds that the stated fact mischaracterizes the purchase as a "services agreement."  See, generally, ECF 95-25, at pp. 3-4 of 4.  Otherwise, not disputed.**

63.     Multi-Ad did not sell the CDs outright but rather licensed them on a subscription basis.

**RESPONSE:**

**Disputed.  See ECF 93, at ¶ 21; ECF 95-24, at p. 5 of 10.**

64.     Multi-Ad sent a copy of its contract with MyWebGrocer and included a set of the standard terms and conditions which would have accompanied a typical contract at that time.

**RESPONSE:**

**Not disputed.**

65.     Because the date of the contract with Multi-Ad predated the formation of MyWebGrocer, Inc. the contract with Multi-Ad would have been executed with MyWebGrocer, LLC.

**RESPONSE:**

**Disputed on the grounds that the stated "fact" is more appropriately characterized as argument or speculation ("would have been").  But not disputed that MyWebGrocer, LLC purchased the license, which vested in MyWebGrocer, Inc. by operation of law as a**

**result of a merger.**

66.     MyWebGrocer later determined that the PorkRibBabyBack006 image was

obtained from Multi-Ad.

**RESPONSE:**

    **Disputed on the grounds that the term "later" is vague and indefinite without any**

**surrounding context.  Otherwise, not disputed that the PorkRibBabyBack006 image was**

**obtained from Multi-Ad.**

67.     On August 23, 2017, an attorney for Adlife's emailed Veronica Langridge, an

iStock claims specialist, to verify licenses for a number of images, including the

CherryBing006_ADL and MangosHR0612 images.

**RESPONSE:**

    **MyWebGrocer objects to the admissibility of the exhibit cited by Adlife on the**

**grounds that it is inadmissible hearsay.  Not disputed that the referenced email was sent.**

68.     On August 29, 2017, Langridge responded stating that she had been unable to

locate iStock licenses issued to MyWebGrocer for the CherryBing006_ADL and

MangosHR0612 images.

**RESPONSE:**

    **MyWebGrocer objects to the admissibility of the exhibit cited by Adlife on the**

**grounds that it is inadmissible hearsay.  Not disputed that the referenced email was sent.**

**Further responding, Ms. Langridge also stated in her August 29 response that "This does**

**not mean that the uses were not licensed, as they may be have been licensed by another**

**account that we are unaware of for MWG."  ECF 95-31, at p. 2 of 14.**

69.     The BeefBrisket001 image was stored in MyWebGrocer's database of food

images.

**RESPONSE:**

     **Not disputed.**

70.     The BeefBrisket001 image was displayed on a recipes page on MyWebGrocer's website for its retail customer Albertsons.

**RESPONSE:**

     **Not disputed.**

71.     The SandwichTunaSalad001 image was displayed in connection with a digital shopping cart on MyWebGrocer's website for its customer ShopRite.

**RESPONSE:**

     **Not disputed that the image was displayed on an e-commerce website, which included an on-line shopping cart.  See ECF 95-3, at p. 29 of 34.**

72.     The MyWebGrocer website for ShopRite displayed the PorkRibBabyBack006 image as part of a digital shopping cart.

**RESPONSE:**

     **Not disputed that the image was displayed on e-commerce websites, which included an on-line shopping cart.  See ECF 95-4 at pp. 37-65 of 427; ECF 95-22, at p. 24 of 34.**

73.     MyWebGrocer customer Wakefern provided the SausagePasta001 image to MyWebGrocer.

**RESPONSE:**

     **Not disputed that Wakefern had obtained the SausagePasta001 image.  Further responding, the image did not come from MyWebGrocer, nor is MyWebGrocer aware of where the image had been obtained.  See ECF 93, at ¶ 36.**

74.     iStock was unable to locate a license for the SausagePasta001 image for either MyWebGrocer or Wakefern.

**RESPONSE:**

    **Not disputed.**

75.     The SausagePasta001 image was displayed in connection with a digital shopping cart on the MyWebGrocer website for its customer Wakefern.

**RESPONSE:**

    **Not disputed that the image was displayed on e-commerce websites, which included an on-line shopping cart.  See ECF 95-4 at pp. 67-78 of 427.**

76.     The WrapTurkeyHam001 Image was downloaded from Google Images without a license and displayed onto a recipes page for the MyWebGrocer website Pennington Quality Markets.

**RESPONSE:**

    **Disputed that the image was displayed on a recipes page.  See ECF 93, at ¶ 42.  The image was displayed only on a deli department landing page for a WordPress website populated solely by Pennington Quality Market.  Id. at ¶¶ 42, 44-45.**

77.     The CherryBing006_ADL image was uploaded by MyWebGrocer to the KeyFoods website by MyWebGrocer as part of a PDF circular provided by Key Foods.

**RESPONSE:**

    **Not disputed.**

78.     MyWebGrocer was not able to confirm whether MyWebGrocer or its client Key Foods had a license for the image CherryBing006_ADL.

**RESPONSE:**

**Not disputed.**

79.     The MangosHR0612 image was uploaded to a Piggly Wiggly branded store website by MyWebGrocer as part of a PDF circular provided by a Piggly Wiggly branded stores in Wisconsin and Illinois.

**RESPONSE:**

**Not disputed.**

80.     MyWebGrocer was not able to confirm whether Piggly Wiggly had a license for the image MangosHR0612.

**RESPONSE:**

**Disputed on the grounds that** ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████ **See ECF 93, at ¶ 61.**

81.     Each Piggly Wiggly store is an independently owned and operated franchise.

**RESPONSE:**

**MyWebGrocer objects pursuant to Fed. R. Civ. P. 56(c)(2) on the grounds that the stated fact is not supported by admissible evidence.  Adlife's cited support for this fact is limited to the Declaration of Joel Albrizio, with no foundation to establish Mr. Albrizio's personal knowledge of the stated fact.**

82.     Currently, a company called Piggly Wiggly Alabama Distributing Company, Inc. is a subscriber to www.preparedfoodphotos.com.

**RESPONSE:**

**Disputed on the grounds that** ████████████████████████████████

███████████████████████████ **See ECF 93-16, at p. 2 of 2.  Adlife has refused to produce its actual subscription agreements with its purported subscribers, which agreements presumably would identify the subscribing entities.**

83.    Piggly Wiggly Alabama Distributing Company, Inc's subscription to www.preparedfoodphotos.com does not cover any stores located in Illinois or Wisconsin including the stores that are part of Adlife's Counterclaim, which appear to be operated by a separate company, Piggly Wiggly Midwest, LLC.

**RESPONSE:**

**Disputed on the grounds that** ████████████████████████████

███████████████████████████ **See ECF 93-16, at p. 2 of 2.  Adlife has refused to produce its actual subscription agreements with its purported subscribers, which agreements presumably would identify the subscribing entities and the scope of coverage.**

84.    Piggly Wiggly Midwest, LLC does not have a subscription to www.preparedfoodphotos.com.

**RESPONSE:**

**Disputed on the grounds that** █████████████████████████████

██████████████████ **See ECF 93-16, at p. 2 of 2.  Adlife has refused to produce its actual subscription agreements with its purported subscribers, which agreements presumably would identify the subscribing entities.**

85.    Adlife has no record of any MyWebGrocer customers subscribing to www.preparedfoodphotos.com.

**RESPONSE:**

**Disputed on the grounds that the declaration cited in support of the stated fact does**

- 26 -

**not actually support the stated fact.  Further disputed on the grounds that** ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  **See ECF**

**93, at ¶ 61; ECF 93-16, at p. 2 of 2.**

86.     MyWebGrocer had no evidence suggesting that Adlife was not the owner of the

Copyrighted Food Photos.

**RESPONSE:**

        **Disputed for the reasons set forth in Section III.B of MyWebGrocer's Motion for**

**Partial Summary Judgment on Liability for Copyright Infringement (ECF 91) and the**

**supporting materials submitted therewith (ECF 93 & exhibits).  Further disputed on the**

**grounds that the stated fact is not established by the cited deposition testimony.  Mr.**

**Tarrant testified – in his personal capacity, as the topic addressed in this stated fact was**

**beyond the scope of Adlife's Rule 30(b)(6) notice – that (at that time) he did not have any**

**evidence demonstrating that Adlife did or did not own the images.  See ECF 95-22, at pp.**

**27 & 32 of 34 (Tarrant Depo., at p. 145:10-24 and Errata Sheet).  In any event, this has no**

**bearing on MyWebGrocer's subsequent investigation and factual determinations.**

Dated at Burlington, Vermont this 1st day of April, 2019.

MYWEBGROCER, INC.

_/s/ Matthew S. Borick_____

Cathleen E. Stadecker
Matthew S. Borick
Evan J. O'Brien
Downs Rachlin Martin PLLC
199 Main Street
P.O. Box 190
Burlington, VT 05402-0190
Telephone: 802-863-2375
Fax: 802-862-7512
cstadecker@drm.com
mborick@drm.com
eobrien@drm.com

Attorneys For MyWebGrocer, Inc.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 1, 2019, I filed the foregoing document with the Clerk of Court via the CM/ECF system, which will provide notice of such filing to the following NEF counsel:

Gregory P. Howard, Esq., ghoward@docatty.com, jnn@docatty.com
Mathew K. Higbee, Esq., mhigbee@higbeeassociates.com
Naomi M. Sarega, Esq., nsarega@higbeeassociates.com

/s/ Matthew S. Borick
Matthew S. Borick

19131592.2